## 23-1502

# United States Court of Appeals
### for the
# Fourth Circuit

TANJANEKA JONES,

*Plaintiff/Appellee,*

– v. –

ELI LILLY AND COMPANY,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## JOINT APPENDIX

JANICE WILLIAMS-JONES
LAW OFFICE OF JANICE WILLIAMS-JONES
3201 Rogers Avenue, Suite 301
Ellicott City, Maryland 21043
(410) 203-1246

*Counsel for Appellant*

MATTHEW A. FITZGERALD
MCGUIREWOODS, LLP
800 East Canal Street
Richmond, Virginia 23219
(804) 775-4716

*Counsel for Appellee*

 **COUNSEL PRESS** • VA – (804) 648-3664

# TABLE OF CONTENTS

**VOLUME ONE**

District Court Docket Sheet .................................................................JA1

Third Amended Complaint
filed October 13, 2021 ................................................................JA8

Exhibits to Defendant's Motion for Summary Judgment
filed October 12, 2022:

    A.    Transcript of Deposition of Tanjaneka La-Shawn Jones
        taken May 5, 2022...................................................JA19

    B.    Letter Regarding Performance Improvement Plan
        dated June 28, 2019..........................................JA173

    C.    Letter Regarding Performance Improvement Plan
        dated October 16, 2019 .....................................JA176

    D.    Transcript of Deposition of Grace Faulkner
        taken June 29, 2022..........................................JA181

    E.    Letter Regarding Performance Improvement Plan
        dated March 13, 2020 .......................................JA192

Exhibits to Plaintiff's Opposition to Defendant's Motion for Summary Judgment
filed November 23, 2022:

    2.    Affidavit of Tanjaneka Jones
        sworn November 21, 2022................................JA195

    3.    Transcript of Deposition of Timothy Schott
        taken June 10, 2022..........................................JA201

    7.    Faulkner Report
        dated November 23, 2020................................JA226

i

9.      Affidavit of William White
            sworn October 19, 2022 .......................................................JA230

12.     Fell 2019 Wrap-Up .................................................................JA234

13.     Affidavit of Jazmine Perry
            sworn October 2022 ...........................................................JA239

Exhibits to Defendant's Reply in Support of its Motion for Summary Judgment
    filed December 21, 2022:

    A.      Transcript of Deposition of Timothy Schott
                taken June 10, 2022............................................................JA243

    B.      Transcript of Deposition of Grace Faulkner
                taken June 29, 2022...........................................................JA252

Memorandum Opinion Granting Defendant's Motion for Summary Judgment
    filed April 7, 2023...................................................................JA257

Order Granting Defendant's Motion for Summary Judgment
    filed April 7, 2023...................................................................JA277

Plaintiff's Notice of Appeal
    filed May 2, 2023...................................................................JA278

APPEAL,CLOSED,MJSELECT

**U.S. District Court**
**District of Maryland (Greenbelt)**
**CIVIL DOCKET FOR CASE #: 8:20-cv-03564-ADC**

Jones v. Eli Lilly and Company                    Date Filed: 12/09/2020
Assigned to: Magistrate Judge A. David Copperthite    Date Terminated: 04/07/2023
Demand: $100,000                                  Jury Demand: Plaintiff
Case in other court:  USCA, 23-01502              Nature of Suit: 442 Civil Rights: Jobs
                      Circuit Court for Prince George's County, Mar,    Jurisdiction: Federal Question
                      CAL20-08247
Cause: 28:1441 Petition for Removal - Employment Discrim

**Plaintiff**

**Tanjaneka Jones**                    represented by    **Janice Lee Williams-Jones**
                                                         Law Office of Janice Williams-Jones
                                                         3201 Rogers Avenue
                                                         Ste 301
                                                         Ellicott City, MD 21043
                                                         410-203-1246
                                                         Email: lawofficeofjwjones@gmail.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eli Lilly and Company**              represented by    **Daniel Zev Herbst**
                                                         Reed Smith LLP
                                                         1301 K St NW Ste 1100 East Tower
                                                         Washington, DC 20005
                                                         12024149200
                                                         Fax: 12024149299
                                                         Email: dherbst@reedsmith.com
                                                         *TERMINATED: 12/02/2021*
                                                         *LEAD ATTORNEY*

                                                         **Elena D Marcuss**
                                                         McGuireWoods LLP
                                                         500 E Pratt St Ste 1000
                                                         Baltimore, MD 21202
                                                         14106594454
                                                         Fax: 14106594547
                                                         Email: emarcuss@mcguirewoods.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Mark Joseph Passero**
                                                         Reed Smith LLP
                                                         901 E Byrd Street, Suite 1900

JA1

Richmond, VA 23219
8043443400
Fax: 8043443410
Email: mpassero@passerolaw.com
*TERMINATED: 09/30/2021*
*LEAD ATTORNEY*

**Peter A Milianti**
McGuire Woods LLP
77 W Wacker Dr Ste 4100
Chicago, IL 60601
3127502765
Email: pmilianti@mcguirewoods.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah K Wake**
McGuire Woods LLP
77 West Wacker Drive 41st Fl
41st Floor
Chicago, IL 60601
312-849-8100
Fax: 312-698-4538
Email: swake@mcguirewoods.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyree Preston Jones , Jr.**
Reed Smith LLP
1301 K St NW Ste 1100 East Tower
Washington, DC 20005
2024149296
Fax: 2024149299
Email: tpjones@reedsmith.com
*TERMINATED: 12/02/2021*
*PRO HAC VICE*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/09/2020 | 1 | NOTICE OF REMOVAL from Circuit Court for Prince George's County, Maryland, case number CAL 20-08247. ( Filing fee $ 402 receipt number 0416-9003869), filed by Eli Lilly and Company. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A - Summons and Amended Complaint (State Court))(Passero, Mark) (Entered: 12/09/2020) |
| 12/09/2020 | 2 | QC NOTICE: 1 Notice of Removal, filed by Eli Lilly and Company was filed incorrectly. ***State court documents must be separated and labeled. Each state court document (i.e., complaint, summons, etc.) must be properly labeled and filed as separate attachments. Please refile each attachment using the "Other Documents" category, select the "Supplemental" event, and link filing to 1 Notice of Removal. The first labeled attachment can be the main document and the other labeled documents as separate attachments. File any pending motions as separate docket entries* (ybs, Deputy Clerk) (Entered: 12/09/2020) |
| 12/09/2020 | 3 | State Court AMENDED COMPLAINT against Eli Lilly and Company, filed by Tanjaneka Jones. (Attachments: # 1 Redline Version)(ybs, Deputy Clerk) (Entered: 12/09/2020) |

JA2

| 12/09/2020 | | THE ABOVE DOCUMENTS (3) ARE COPIES OF ORIGINAL PAPERS FILED IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. (ybs, Deputy Clerk) (Entered: 12/09/2020) |
|---|---|---|
| 12/09/2020 | 4 | Standing Order Concerning Removal. Signed by Judge George Jarrod Hazel on 12/9/2020. (c/m 12/9/2020 ybs, Deputy Clerk) (Entered: 12/09/2020) |
| 12/09/2020 | 5 | Removal Notification Letter to Pro Se Party (c/m 12/9/2020 ybs, Deputy Clerk) (Entered: 12/09/2020) |
| 12/09/2020 | 6 | Supplemental to 1 Notice of Removal, filed by Eli Lilly and Company (Attachments: # 1 Complaint (State Court), # 2 Service of Process (State Court), # 3 Civil Information Sheet (State Court), # 4 Summons (State Court))(Passero, Mark) (Entered: 12/09/2020) |
| 12/15/2020 | 7 | Local Rule 103.3 Disclosure Statement by Eli Lilly and Company (Passero, Mark) (Entered: 12/15/2020) |
| 12/15/2020 | 8 | Consent MOTION for Extension of Time *to Respond to Amended Complaint* by Eli Lilly and Company (Attachments: # 1 Text of Proposed Order)(Passero, Mark) (Entered: 12/15/2020) |
| 12/16/2020 | 9 | PAPERLESS ORDER granting 8 Motion for Extension of Time. Signed by Judge George Jarrod Hazel on 12/16/2020. (jw2s, Chambers)(c/m 12/16/2020) Modified on 12/16/2020 (dg3s, Deputy Clerk). (Entered: 12/16/2020) |
| 12/22/2020 | 10 | RESPONSE re 4 Standing Order Concerning Removal filed by Eli Lilly and Company. (Passero, Mark) (Entered: 12/22/2020) |
| 01/20/2021 | 11 | NOTICE of Appearance by Janice Lee Williams-Jones on behalf of Tanjaneka Jones (Williams-Jones, Janice) (Entered: 01/20/2021) |
| 01/29/2021 | 12 | MOTION to Dismiss for Failure to State a Claim by Eli Lilly and Company (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Text of Proposed Order)(Passero, Mark) (Entered: 01/29/2021) |
| 02/10/2021 | 13 | Consent MOTION for Extension of Time to File Response/Reply as to 12 MOTION to Dismiss for Failure to State a Claim by Tanjaneka Jones. (Attachments: # 1 Text of Proposed Order Order)(Williams-Jones, Janice) (Entered: 02/10/2021) |
| 02/16/2021 | 14 | MOTION to Appear Pro Hac Vice for Tyree P. Jones, Jr. (Filing fee $100, receipt number 0416-9112239.) by Eli Lilly and Company(Passero, Mark) (Entered: 02/16/2021) |
| 02/19/2021 | 15 | PAPERLESS ORDER granting 14 Motion to Appear Pro Hac Vice on behalf of Tyree Preston Jones, Jr. Directing attorney Tyree Preston Jones, Jr to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 2/19/2021. (srd, Deputy Clerk) (Entered: 02/19/2021) |
| 02/23/2021 | 16 | Correspondence re: Status of Decision on Plaintiff's Consent Motion for an Extension of Time for Her Response (Williams-Jones, Janice) (Entered: 02/23/2021) |
| 03/11/2021 | 17 | RESPONSE in Opposition re 12 MOTION to Dismiss for Failure to State a Claim filed by Tanjaneka Jones.(Williams-Jones, Janice) (Entered: 03/11/2021) |
| 03/11/2021 | 18 | MOTION to Amend/Correct *Amended Complaint* by Tanjaneka Jones (Attachments: # 1 Supplement Second Amended Complaint, # 2 Text of Proposed Order)(Williams-Jones, Janice) (Entered: 03/11/2021) |
| 03/25/2021 | 19 | REPLY to Response to Motion re 12 MOTION to Dismiss for Failure to State a Claim filed by Eli Lilly and Company.(Passero, Mark) (Entered: 03/25/2021) |

| 03/25/2021 | 20 | RESPONSE in Opposition re 18 MOTION to Amend/Correct *Amended Complaint* filed by Eli Lilly and Company.(Passero, Mark) (Entered: 03/25/2021) |
| 06/28/2021 | 21 | NOTICE of Appearance by Daniel Zev Herbst on behalf of Eli Lilly and Company (Herbst, Daniel) (Entered: 06/28/2021) |
| 06/28/2021 | 22 | MOTION to Withdraw as Attorney *(Mark J. Passero)* by Eli Lilly and Company(Passero, Mark) (Entered: 06/28/2021) |
| 09/30/2021 | 23 | MEMORANDUM OPINION. Signed by Judge George Jarrod Hazel on 9/30/2021. (dg3s, Deputy Clerk) (Entered: 10/01/2021) |
| 09/30/2021 | 24 | ORDER granting in part and denying in part 12 MOTION to Dismiss for Failure to State a Claim ; granting 13 CONSENT Motion for Extension of Time to File Response/Reply ; granting in part and denying in part 18 MOTION to Amend/Correct Amended Complaint; Plaintiff's Second Amended Complaint shall now be the operative pleading as to Counts I, II, IV and V; granting 22 MOTION to Withdraw as Attorney (Mark J. Passero). Attorney Mark Josepoh Passero terminated; directing the Defendants to file an Answer within 14 days. Signed by Judge George Jarrod Hazel on 9/30/2021. (dg3s, Deputy Clerk) (Entered: 10/01/2021) |
| 09/30/2021 | 25 | SECOND AMENDED COMPLAINT against Eli Lilly and Company, filed by Tanjaneka Jones.(dg3s, Deputy Clerk) (Entered: 10/01/2021) |
| 10/13/2021 | 26 | THIRD AMENDED COMPLAINT against All Defendants, filed by Tanjaneka Jones. (Attachments: # 1 Attachment Redline for 3rd Amended Complaint)(Williams-Jones, Janice) Modified on 10/15/2021 (mg3s, Deputy Clerk). (Entered: 10/13/2021) |
| 10/14/2021 | 27 | ANSWER to 25 Amended Complaint *Answer and Affirmative Defenses to Second Amended Complaint* by Eli Lilly and Company.(Herbst, Daniel) (Entered: 10/14/2021) |
| 10/29/2021 | 28 | PAPERLESS Correspondence re: Scheduling a Rule 16 Conference Call for Monday December 13, 2021 at 10:00am. Please dial in on (877) 810-9415 and use access code 5860700 (jw2s, Chambers) (Entered: 10/29/2021) |
| 11/01/2021 | 29 | NOTICE to Substitute Attorney (Herbst, Daniel) (Entered: 11/01/2021) |
| 11/02/2021 | 30 | QC NOTICE: 29 Notice to Substitute Attorney filed by Eli Lilly and Company was filed incorrectly.<br>***Each attorney must file their Notice of Appearance using their CM/ECF login in order to be added as counsel to a case. Counsel will not be terminated until the appearance of new counsel is entered.* (dg3s, Deputy Clerk) (Entered: 11/02/2021) |
| 12/01/2021 | 31 | NOTICE of Appearance by Elena D Marcuss on behalf of Eli Lilly and Company (Marcuss, Elena) (Entered: 12/01/2021) |
| 12/01/2021 | 32 | MOTION to Appear Pro Hac Vice for Peter A. Milianti (Filing fee $100, receipt number 0416-9632846.) by Eli Lilly and Company(Marcuss, Elena) (Entered: 12/01/2021) |
| 12/01/2021 | 33 | PAPERLESS ORDER granting 32 Motion to Appear Pro Hac Vice on behalf of Peter A Milianti. Directing attorney Peter A Milianti to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 12/1/2021. (dm4, Deputy Clerk) (Entered: 12/01/2021) |
| 12/07/2021 | 34 | REPORT of Rule 26(f) Planning Meeting(Marcuss, Elena) (Entered: 12/07/2021) |
| 01/03/2022 | 35 | Paperless Correspondence re: Scheduling a Rule 16 conference call for Monday January 3, 2022 at 1:00PM. Please dial in on (877) 810-9415 access code 5860700 (jw2s, Chambers) (Entered: 01/03/2022) |

JA4

| 02/25/2022 | 36 | SCHEDULING ORDER: Status Report due by 7/8/2022. Signed by Judge George Jarrod Hazel on 1/5/2022. (Attachments: # 1 Letter to Counsel regarding Discovery Disputes) (dg3s, Deputy Clerk) (Entered: 02/25/2022) |
| 03/17/2022 | 37 | Joint MOTION for Other Relief *[JOINT MOTION FOR ENTRY OF A STIPULATED ORDER REGARDING CONFIDENTIALITY OF DISCOVERY MATERIAL]* by Eli Lilly and Company (Attachments: # 1 Text of Proposed Order Exhibit A - Proposed Stipulated Order)(Milianti, Peter) (Entered: 03/17/2022) |
| 03/17/2022 | 38 | PAPERLESS ORDER granting 37 Joint Motion for Stipulated Order. Signed by Judge George Jarrod Hazel on 3/17/2022. (jw2s, Chambers) (Entered: 03/17/2022) |
| 04/28/2022 | 39 | MOTION to Appear Pro Hac Vice for Sarah K. Wake (Filing fee $100, receipt number AMDDC-9900817.) by Eli Lilly and Company(Marcuss, Elena) (Entered: 04/28/2022) |
| 05/04/2022 | 40 | PAPERLESS ORDER granting 39 Motion to Appear Pro Hac Vice on behalf of Sarah K Wake. Directing attorney Sarah K Wake to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. Signed by Clerk on 5/4/2022. (dm4s, Deputy Clerk) (Entered: 05/04/2022) |
| 07/07/2022 | 41 | STATUS REPORT *[JOINT]* by Eli Lilly and Company(Milianti, Peter) (Entered: 07/07/2022) |
| 07/29/2022 | 42 | Joint MOTION for Extension of Time *on Dispositive Motions Deadline* by Eli Lilly and Company(Milianti, Peter) (Entered: 07/29/2022) |
| 08/11/2022 | 43 | PAPERLESS ORDER granting 42 Motion for Extension of Time. Signed by Judge George Jarrod Hazel on 8/11/2022. (jw2s, Chambers) (Entered: 08/11/2022) |
| 09/02/2022 | 44 | Joint MOTION for Extension of Time to File *Dispositive Motions* by Eli Lilly and Company(Milianti, Peter) (Entered: 09/02/2022) |
| 09/06/2022 | 45 | QC NOTICE: 44 Motion for Extension of Time to File filed by Eli Lilly and Company was filed incompletely. <br> ***The following attachments or exhibits are missing - Text of Proposed Order. Pursuant to Local Rule 105.1, all Motions must be accompanied with a memorandum in support and proposed order. To correct this problem, file the Proposed Order using the event Notice (Other) and link the Proposed Order to 44 .* (dg3s, Deputy Clerk) (Entered: 09/06/2022) |
| 09/06/2022 | 46 | NOTICE by Eli Lilly and Company re 44 Joint MOTION for Extension of Time to File *Dispositive Motions Proposed Order 2nd Joint Motion for MSJ Deadline Extension* (Milianti, Peter) (Entered: 09/06/2022) |
| 09/20/2022 | 47 | PAPERLESS ORDER granting 44 Motion for Extension of Time to File Document. Signed by Judge George Jarrod Hazel on 9/20/2022. (jw2s, Chambers) (Entered: 09/20/2022) |
| 10/12/2022 | 48 | MOTION for Summary Judgment by Eli Lilly and Company (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Text of Proposed Order)(Marcuss, Elena) (Entered: 10/12/2022) |
| 10/24/2022 | 49 | Consent MOTION for Extension of Time to File Response/Reply as to 48 MOTION for Summary Judgment by Tanjaneka Jones. (Attachments: # 1 Text of Proposed Order) (Williams-Jones, Janice) (Entered: 10/24/2022) |
| 10/26/2022 | 50 | PAPERLESS ORDER granting 49 Motion for Extension of Time to File Response/Reply re 49 Consent MOTION for Extension of Time to File Response/Reply as to 48 MOTION for Summary Judgment . Signed by Judge George Jarrod Hazel on 10/26/2022. (jw2s, Chambers) (Entered: 10/26/2022) |

JA5

| | | |
|---|---|---|
| 11/23/2022 | 51 | RESPONSE in Opposition re 48 MOTION for Summary Judgment filed by Tanjaneka Jones. (Attachments: # 1 Supplement Exhibit 1 Placeholder, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit List, # 16 Text of Proposed Order)(Williams-Jones, Janice) (Entered: 11/23/2022) |
| 11/23/2022 | 52 | SUPPLEMENTAL in regards to RESPONSE in Opposition re 48 MOTION for Summary Judgment *Exhibit 1* filed by Tanjaneka Jones. (Attachments: # 1 Exhibit 1 Pt. 2)(Williams-Jones, Janice) Modified on 11/28/2022 (dg3s, Deputy Clerk). (Entered: 11/23/2022) |
| 11/30/2022 | 53 | MOTION for Extension of Time *on Dispositive Motion Reply Deadline* by Eli Lilly and Company (Attachments: # 1 Text of Proposed Order Proposed Order)(Milianti, Peter) (Entered: 11/30/2022) |
| 12/07/2022 | 54 | ORDER granting 53 MOTION for Extension of Time on Dispositive Motion Reply Deadline. Signed by Judge George Jarrod Hazel on 12/7/2022. (dg3s, Deputy Clerk) (Entered: 12/07/2022) |
| 12/21/2022 | 55 | REPLY to Response to Motion re 48 MOTION for Summary Judgment *[DEFENDANT ELI LILLY AND COMPANYS REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT]* filed by Eli Lilly and Company. (Attachments: # 1 Exhibit A - Deposition Transcript of Timothy Schott, # 2 Exhibit B - Deposition Transcript of Grace Faulkner) (Wake, Sarah) (Entered: 12/21/2022) |
| 02/23/2023 | 56 | NOTICE of Assignment to Magistrate Judge (dg3s, Deputy Clerk) (Entered: 02/23/2023) |
| 02/24/2023 | 57 | Consent/Decline to Proceed Before a US Magistrate Judge. (Entered: 02/24/2023) |
| 03/01/2023 | 58 | Consent/Decline to Proceed Before a US Magistrate Judge. (Entered: 03/01/2023) |
| 03/02/2023 | 59 | PAPERLESS ORDER: In accordance with 28 USC 636(c), all parties have voluntarily consented to have Magistrate Judge A. David Copperthite conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. Signed by Magistrate Judge A. David Copperthite on 3/2/2023. (dg3s, Deputy Clerk) (Entered: 03/02/2023) |
| 04/07/2023 | 60 | MEMORANDUM OPINION. Signed by Magistrate Judge A. David Copperthite on 4/7/2023. (kk5s, Deputy Clerk) (Entered: 04/07/2023) |
| 04/07/2023 | 61 | ORDER granting 48 Defendant's Motion for Summary Judgment; closing this case. Signed by Magistrate Judge A. David Copperthite on 4/7/2023. (kk5s, Deputy Clerk) (Entered: 04/07/2023) |
| 04/20/2023 | 62 | BILL OF COSTS by Eli Lilly and Company (Attachments: # 1 Exhibit A - Receipts for Deposition Charges)(Wake, Sarah) (Entered: 04/20/2023) |
| 05/02/2023 | 63 | NOTICE OF APPEAL by Tanjaneka Jones. Filing fee $ 505, receipt number AMDDC-10574825.(Williams-Jones, Janice) (Entered: 05/02/2023) |
| 05/02/2023 | 64 | RESPONSE in Opposition re 62 Bill of Costs filed by Tanjaneka Jones. (Attachments: # 1 Text of Proposed Order)(Williams-Jones, Janice) (Entered: 05/02/2023) |
| 05/04/2023 | 65 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 63 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(jb5s, Deputy Clerk) (Entered: 05/04/2023) |

| 05/09/2023 | 66 | USCA Case Number 23-1502 for 63 Notice of Appeal filed by Tanjaneka Jones. Case Manager - Naeemah R. Sims (bw5s, Deputy Clerk). (Entered: 05/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/12/2023 13:02:13 | | |
| **PACER Login:** | jwjones5521 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 8:20-cv-03564-ADC |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TANJANEKA JONES,** | : | |
| | : | **Civil Case No. 20-cv-03564 (GJH)** |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **ELI LILLY AND COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

………………………………………………………………………………………………

## THIRD AMENDED COMPLAINT

Plaintiff Tanjaneka Jones ("Plaintiff"), by and through her undersigned attorney, submits this Third Amended Complaint against Defendant Eli Lilly and Co. ("Defendant") and states as follows:

### NATURE OF THE CASE

1.      Plaintiff asserts claims against Defendant for sex discrimination and retaliation, under Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e *et seq*. and the Maryland Human Rights Act, Md. Code Ann, State Gov't §20-606 and race discrimination and retaliation, pursuant to the Civil Rights Act of 1991, 42 U.S.C. §1981.

### THE PARTIES

2.      Plaintiff is a resident of Prince George's County, Maryland. Plaintiff worked for Defendant from her home office, located in Prince George's County, Maryland, at all relevant times.

3.      Defendant is a multinational corporation with a principal place of business in Indianapolis, Indiana. Defendant has transacted business in Prince George's County, Maryland, and maintained a resident agent in Maryland at all relevant times.

Jones Vs. Lilly
**Jones-024**

JA8

**VENUE AND JURISDICTION**

4.      Venue is proper in the Court due to Defendant having removed this matter from the Circuit Court of Prince George's County to this Court based on 28 U.S.C. §1331, federal question jurisdiction.

5.      This Court also has jurisdiction because Plaintiff filed her complaint within 90 days of receiving a right to sue letter from the U.S. Equal Employment Opportunity Commission.

**FACTUAL BACKGROUND**

6.      Plaintiff, a Black, female began working as a Senior Sales Representative ("SSR") for Defendant in or around 2014. As an SSR, Plaintiff's primary duty was to sell pharmaceutical products because business sales controlled the SSR's income, benefits, and opportunities.

7.      For instance, yearly pay increases and quarterly bonus payouts were based on sales, as was the SSRs ranking within their teams and nationally. As a result, Plaintiff's sales results were tracked weekly, monthly, and quarterly to determine quarterly sales bonuses and payouts. Based on sales, annual Achievement trips were awarded to teams and individual SSRs for reaching 100% quota attained on primary products sales. Additionally, yearly awards were based on individual sales achievements recognized at the annual Regional Meeting for Representative of the Year, Rookie of the Year, Outstanding Sales Performance for Jardiance, etc. This recognition opened up opportunities for SSRs to obtain pay increases and job advancement.

8.      In or around May 2019, David Sun ("Mr. Sun"), an Asian male, began supervising Plaintiff's team. At that time, the team was one of Defendant's top five teams in the

2

country, and Plaintiff was individually ranked number two on her team. Plaintiff was also

exceeding Defendant's sales goal by nine percent and was one of the best SSRs on the team.

9.     Despite Plaintiff's success, Mr. Sun placed her on a Performance Improvement

Plan ("PIP") after supervising her for less than one month. To support his disciplinary decision,

Mr. Sun overly scrutinized and criticized Plaintiff's work performance and then relied on false

and subjective reasons to discipline her.

10.     However, Mr. Sun did not overly scrutinize or criticize the performance of

Douglas Barna ("Barna") and Brandon Fell ("Fell"), two Caucasian male SSRs who had far lower

sales rankings than Plaintiff. And, on information and belief, Fell, who was not meeting

Defendant's sales quota, was not placed on a PIP like Plaintiff.

11.     Around this time, Plaintiff also learned that Mr. Sun scrutinized and criticized

Krystle Allen, a Black female SSR, meeting Defendant's sales quotas like Plaintiff. After

learning this information, Plaintiff contacted Defendant's Human Resources ("HR")

representatives several times between June 2019 and November 2019, requesting assistance.

12.     During the conversations with HR in or around October 2019, Plaintiff accused

Mr. Sun of race and gender discrimination because he overly scrutinized and criticized her work

performance compared to her Caucasian male colleagues and placed her on a PIP. She also told

HR that Krystle Allen, another Black female SSR who also exceeded sales goals, was similarly

overly scrutinized and criticized by Mr. Sun.

13.     Despite Plaintiff's complaints, HR did nothing to help her. Instead, after HR

discussed Plaintiff's Complaint with Mr. Sun on or about October 15, 2019, he placed Plaintiff

on probation on or about October 16, 2019, and took away her bonus opportunity. He then

increased the critiques and scrutinization of her performance even though Plaintiff's sales

numbers continued to soar. While on probation, Plaintiff was ineligible for bonuses and could not apply for vacancies or promotions with Defendant.

14.     As a result, Plaintiff returned to Defendant's HR several times for guidance and filed a charge of discrimination with the U.S. EEOC in October 2019. A few days later, her concerns with Mr. Sun worsened, and his harassment began occurring almost every week. Ultimately, Plaintiff's workplace began to feel more and more hostile because she was being disciplined for false reasons rather than congratulated for exceeding Defendant's sales goals.

15.     Due to Mr. Sun's false and discriminatory write-ups, Plaintiff's bonuses were revoked for consecutive months beginning in October 2019, even though she was the second-highest ranked salesperson on her team.

16.      These disciplinary actions and the accompanying unsatisfactory rating on her performance evaluation disqualified Plaintiff from applying for other jobs or promotions with Defendant.

17.     While this was happening to Plaintiff, Mr. Sun also discriminated against William White and Brian Calloway, two Black male SSRs on his team who were meeting sales goals. As with Plaintiff, he overly scrutinized and criticized their performance and subsequently discharged or constructively discharged them for discriminatory reasons.

18.     However, Mr. Sun treated Barna and Fell, two Caucasian SSRs, with lower sales performance, more favorably than the two Black SSRs. Indeed, Fell was below Defendant's sales quotas, but he was not discharged or constructively discharged like the Black male SSRs.

19.     Ultimately, Mr. Sun's unlawful actions caused Plaintiff to resign in December 2019. Before and after her resignation, Plaintiff lost bonuses and the opportunity to apply for

4

JA11

other positions or promotions and suffered from anxiety and severe emotional distress due to Mr.

Sun's unlawful conduct.

## COUNT I - SEX DISCRIMINATION
## IN VIOLATION OF TITLE VII AND MD. CODE ANN, STATE GOV'T §20-606

20.    Plaintiff adopts and incorporates by reference all of the allegations set forth in the

previous paragraphs.

21.    In violation of Title VII, and §20-606, Defendant interfered with Plaintiff's

benefits, privileges, terms, and conditions of employment due to her sex.

22.    Specifically, Mr. Sun overly criticized and scrutinized the job performance of

Plaintiff and Allen, two female SSRs. He also issued unwarranted performance based

disciplinary actions to Plaintiff while she was the second highest ranking SSR on her team.

However, Fell and Barna, two male SSRs with lower sales rankings than Plaintiff, received

better treatment from Mr. Sun because they were not issued unwarranted discipline, overly

critiqued and scrutinized or placed on PIPs, like Plaintiff.

23.    As a result of the unequal treatment by Mr. Sun due to Plaintiff's sex, Plaintiff

resigned and lost bonuses, stock options, and the opportunity to apply for other positions with

Defendant. She also suffered anguish, depression, anxiety, fear, humiliation, embarrassment, loss

of self-esteem, loss of income, and other damages.

24.    Defendant's conduct was malicious, willful, and intentional and caused tangible

harm to Plaintiff that affected the terms, conditions, and privileges of her employment compared

to similarly situated co-workers outside her protected classes.

WHEREFORE, Plaintiff seeks pecuniary, and nonpecuniary damages against Defendant

in excess of $100,000 plus costs, interest, expenses, attorney fees, and such additional relief as

the Court deems just.

JA12

**COUNT II-RETALIATION (SEX)**
**IN VIOLATION OF TITLE VII**
**AND MD. CODE ANN, STATE GOV'T §20-606**

25.     Plaintiff adopts and incorporates by reference all of the allegations set forth in the previous paragraphs.

26.     In violation of Title VII and §20-606, Defendant interfered with Plaintiff's terms, conditions, benefits, and privileges of employment in retaliation for her protected activity based on sex.

27.     Between June 2019 and November 2019, Plaintiff engaged in protected activity when she informed HR that Mr. Sun discriminated against her due to her gender and filed a charge of discrimination with the EEOC in or around October 2019.

28.     After Mr. Sun became aware of Plaintiff's protected activity, he retaliated against Plaintiff by issuing false and unwarranted disciplinary actions to her for alleged performance issues when she was exceeding Defendant's performance standards. However, Mr. Sun did not issue false discipline to similarly situated SSRs with poor sales performance.

29.     Because of Defendant's unequal treatment, Plaintiff lost bonuses, stock options, and the opportunity to apply for vacancies and promotions. She also suffered anguish, depression, anxiety, humiliation, embarrassment, loss of self-esteem, loss of income, and other damages. Later, she felt forced to resign from her job.

30.     Defendant's conduct was malicious, willful, and intentional and caused tangible harm to Plaintiff that affected the terms, conditions, and privileges of her employment as compared to employees outside her protected classes.

JA13

WHEREFORE, Plaintiff seeks pecuniary, and nonpecuniary damages against Defendant in excess of $100,000 plus costs, interest, expenses, attorney fees, and such additional relief as the Court deems just.

### COUNT III-RACE DISCRIMINATION
### IN VIOLATION OF 42 U.S.C. §1981

31.     Plaintiff adopts and incorporates by reference all of the allegations set forth in the previous paragraphs.

32.     In violation of 42 U.S.C.§1981, Defendant interfered with Plaintiff's benefits, privileges, terms, and conditions of employment due to her race.

33.     In particular, Mr. Sun treated Plaintiff less favorably than Barna and Fell, similarly situated Caucasian SSRs who were either not meeting Defendant's performance expectations concerning sales quotas or had far lower sales rankings than Plaintiff. Specifically, he overly criticized and scrutinized Plaintiff's work, issued unwarranted disciplinary actions to her, and caused Plaintiff to lose bonuses, stock options, and the opportunity to apply for other positions and promotions with Defendant. But for Plaintiff's race, Mr. Sun would not have treated her less favorably than Barna and Fell, both of whom had lower sales than Plaintiff.

34.     In addition to Plaintiff, Mr. Sun treated several Black SSRs, i.e., William White, Krystle Allen, and Brian Calloway, less favorably than Fell and Barna, their non-minority comparators by overly scrutinizing and unfairly critiquing their performance. But for race, Mr. Sun would not have treated the Black SSRs more harshly than their comparators. Mr. Sun also would not have discharged or constructively discharged two Black male SSRs who, like Plaintiff, were meeting Defendant's sales quotas but for race.

JA14

35.    Notably, Mr. Sun did not overly scrutinize, issue unwarranted discipline, discharge, or constructively discharge Fell the Caucasian SSR who was not meeting Defendant's sales quotas.

36.    As a result of Mr. Sun's unequal treatment because of race, Plaintiff lost bonuses, stock options, and the ability to apply for job vacancies and promotions. She also suffered anguish, depression, anxiety, fear, humiliation, embarrassment, loss of self-esteem, loss of income, and other damages. Later, she felt forced to resign from her job.

37.    Finally, the conduct of Defendant's supervisor, Mr. Sun, was malicious, willful, and intentional and caused tangible harm to Plaintiff that affected the terms, conditions, and privileges of her employment as compared to similarly situated co-workers outside her protected classes.

WHEREFORE, Plaintiff seeks pecuniary, and nonpecuniary damages against Defendant in excess of $100,000 plus costs, interest, expenses, attorney fees, and such additional relief as the Court deems just.

## COUNT IV- RETALIATION
## IN VIOLATION OF 42 U.S.C. § 1981

38.    Plaintiff adopts and incorporates by reference all of the allegations set forth in the previous paragraphs.

39.    In violation of 42 U.S.C.§ 1981, Defendant interfered with Plaintiff's terms, conditions, benefits, and privileges of employment in retaliation for her protected activity.

40.    Between June 2019 and November 2019, Plaintiff engaged in protected activity when she informed HR that Mr. Sun discriminated against her due to her race. Within days of Mr. Sun's meetings with HR regarding Plaintiff's October 2019 discrimination complaint, he retaliated against Plaintiff. In particular, he denied her the same opportunities, benefits, and

conditions of employment that were afforded to her colleagues with no prior protected activity,

namely, bonuses, stock options, and the opportunity to apply for vacancies and promotions due

to her race.

     41.    Because of Defendant's unequal treatment due to retaliation, Plaintiff felt forced

to resign from her position in December 2019, just two months after she filed her October 2019

internal and EEOC discrimination complaints against Mr. Sun.

     42.    Due to these events, Plaintiff suffered from anguish, depression, anxiety,

humiliation, embarrassment, loss of self-esteem, loss of income, and other damages.

     43.    Defendant's conduct was malicious, willful, and intentional and caused tangible

harm to Plaintiff that affected the terms, conditions, and privileges of her employment as

compared to employees outside her protected classes.

     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of

Plaintiff and against Defendant for:

A.    Damages in excess of $100,000 or such other amount as determined at the trial of this matter;
B.    Costs, interest, and expenses as required by law.
C.    Plaintiff's attorneys' fees; and
D.    Such other and further relief, including monetary and non-monetary damages as this Court deems necessary based upon the facts and circumstances of this case.

Respectfully submitted,

/*s/Janice Williams-Jones*
Janice Williams-Jones (#25701)
Law Office of Janice Williams-Jones
3545 Ellicott Mills Drive, Suite 308
Ellicott City, Maryland 21043
Ph: 410-203-1246
Fax: 410-203-2301
Lawofficeofjwjones@gmail.com

Counsel for Plaintiff

9

JA16

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues.

Respectfully submitted,

/s/*Janice Williams-Jones*
Janice Williams-Jones (#25701)
Law Office of Janice Williams-Jones
3545 Ellicott Mills Drive, Suite 308
Ellicott City, Maryland 21043
Ph: 410-203-1246
Fax: 410-203-2301
Lawofficeofjwjones@gmail.com

Counsel for Plaintiff

10

JA17

## CERTIFICATE OF SERVICE

On this 13th day of October 2021, I certify that the preceding was served upon counsel of

record via the ECF System and electronic mail as follows:

> Daniel Zev Herbst
> Reed Smith LLP
> 1301 K St NW Ste 1100 East Tower
> Washington, DC 20005
> 12024149200
> Fax: 12024149299
> Email: dherbst@reedsmith.com
> *Lead Attorney*
>
> Tyree Preston Jones, Jr.
> Reed Smith LLP
> 1301 K St NW Ste 1100 East Tower
> Washington, DC 20005
> 2024149296
> Fax: 2024149299
> Email: tpjones@reedsmith.com
> *PRO HAC VICE*

> */s/Janice Williams-Jones*
> Janice Williams-Jones (#25701)
> Counsel for Plaintiff

JA18

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TANJANEKA JONES,                    )
                                    )
        Plaintiff,                  )
                                    ) Case No.
v.                                  ) 8:20-cv-03564-GJH
                                    )
ELI LILLY AND COMPANY,              )
                                    )
        Defendant.                  )
_____     )

Deposition of TANJANEKA LA-SHAWN JONES

(Given Remotely)

Thursday, May 5, 2022

10:19 a.m. Eastern

Reported by:  Karen Kidwell, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



JA19

Page 2

```
 1   REMOTE APPEARANCES:

 2

 3   On Behalf of Plaintiff:

 4         JANICE WILLIAMS-JONES, ESQ.
           Law Office of Janice Williams-Jones
 5         3545 Ellicott Mills Drive
           Suite 308
 6         Ellicott City, MD  21043
           410.203.1246
 7         lawofficeofjwjones@gmail.com

 8

 9   On Behalf of Defendant:

10         SARAH K. WAKE, ESQ.
           McGuireWoods LLP
11         77 West Wacker Drive
           Suite 4400
12         Chicago, IL  60601
           312.849.8238
13         swake@mcguirewoods.com

14

15

16   Also Remotely Present:

17         Jared Dake, Document Technician

18

19

20

21

22

23

24

25
```



JA20

Page 3

1                          I N D E X

2    WITNESS/EXAMINATION                          Page

3    TANJANEKA LA-SHAWN JONES

4      By Ms. Wake                                  7

5      By Ms. Jones                               264

6      Further by Ms. Wake                        276

7

8

9

10

11

12                       E X H I B I T S

13     Number              Description             Page

14   Exhibit 1   Presentation, Lilly, Sales .......36
                 Representative Global
15               Competency Model,
                 Confidential, Bates
16               LLY-JONES001806-1811

17   Exhibit 2   Washington DC District ...........41
                 SOP-2019, Confidential, Bates
18               LLY-JONES001804-1805

19   Exhibit 3   Lilly US  Employee Handbook, ......46
                 Confidential, Bates
20               LLY-JONES001813-2068

21   Exhibit 4   12/9/2015 Written Warning to ......56
                 Tanjaneka Jones from Harold
22               Mendoza, Confidential, Bates
                 LLY-JONES001453-1454
23
     Exhibit 5   2015 Wrap up for Tanjaneka L. .....63
24               Jones, Confidential, Bates
                 LLY-JONES001465-1468
25



JA21

```
                                                     Page 4
 1                    E X H I B I T S (Cont'd)
 2      Number              Description              Page
 3   Exhibit 6    2018 Wrap Up for Tanjaneka L. .....69
                  Jones, Confidential, Bates
 4                LLY-JONES001475-1478

 5   Exhibit 7    6/28/19 Performance ...............81
                  Improvement Plan for Tanjaneka
 6                Jones from David Sun,
                  Confidential, Bates
 7                LLY-JONES000021-23

 8   Exhibit 8    E-mail chain, top e-mail ........115
                  5/6/2019, Mark Ryan Hudson to
 9                Grace Faulkner, FW: Field
                  Note: 3/21/19, Confidential,
10                Bates LLY-JONES000206-208

11   Exhibit 9    E-mail chain, top e-mail ........120
                  5/6/2019, Mark Ryan Hudson to
12                Grace Faulkner, Subject: FW:
                  Field Note: 4/10/19,
13                Confidential, Bates
                  LLY-JONES000209-210
14
     Exhibit 10   Living our mission:  Be the ......129
15                Leader in Patient Outcomes
                  document, Confidential, Bates
16                LLY-JONES000211-212

17   Exhibit 11   E-mail chain, top e-mail ........141
                  8/2/2019, Jing Wei David Sun
18                to Tanjaneka Jones, Subject:
                  August Coaching Report - Tanj,
19                with attachment, Confidential,
                  Bates LLY-JONES000283-286
20
     Exhibit 12   E-mail chain, top e-mail ........149
21                8/2/2019 Jing Wei David Sun to
                  Tanjaneka Jones, Subject: RE:
22                Check in - TJ, Confidential,
                  Bates LLY-JONES000287
23

24

25
```



Page 5

```
 1                   E X H I B I T S (Cont'd)
 2      Number            Description              Page
 3   Exhibit 13  E-mail chain, top e-mail ........154
                 8/23/2019, Jing Wei David Sun
 4               to Tanjaneka Jones, Subject:
                 August Coaching Report - Tanj,
 5               with attachments, Bates
                 LLY-JONES000036-39 with
 6               attachments 283-286

 7   Exhibit 14  8/27/2019 E-mail, Jing Wei .......159
                 David Sun to Tanjaneka Jones,
 8               Subject: PM Check-In
                 Feedback/Tanj, Confidential,
 9               Bates LLY-JONES000040

10   Exhibit 15  9/25/2019 Field Date, Coaching ...164
                 report for Tanjaneka Jones
11               from Jing Wei Sun,
                 Confidential, Bates
12               LLY-JONES000270-272

13   Exhibit 16  10/14/2019 Field Date, ..........167
                 Coaching report for Tanjaneka
14               Jones from Jing Wei Sun,
                 Confidential, Bates
15               LLY-JONES000451-453

16   Exhibit 17  10/16/2019 Notice of Probation ...171
                 for Tanjaneka Jones from David
17               Sun, Confidential, Bates
                 LLY-JONES000026-30
18
     Exhibit 18  Lilly Diabetes BU, Primary .......188
19               Care Sales Representative,
                 July-December 2019 Incentive
20               Compensation Plan Details,
                 Confidential, Bates
21               LLY-JONES001724-1731

22   Exhibit 19  Payroll for Tanjaneka Jones, .....191
                 2018, Confidential, Bates
23               LLY-JONES001106

24   Exhibit 20  Payroll for Tanjaneka Jones ......191
                 2019, Confidential, Bates
25               LLY-JONES001107
```



Page 6

1                 E X H I B I T S (Cont'd)

2      Number            Description               Page

3   Exhibit 21   Typewritten notes, ...............212
                 Confidential, Bates
4                LLY-JONES001713-1716

5   Exhibit 22   Charge of Discrimination, ........234
                 Maryland Commission on Civil
6                Rights, Tanjaneka L. Jones,
                 Bates Jones v. Lilly 000267
7
    Exhibit 23   U.S. Equal Employment ............237
8                Opportunity Commission
                 Dismissal and Notice of
9                Rights, Tanjaneka L. Jones,
                 Bates Jones v. Lilly 000266
10
    Exhibit 24   Third Amended Complaint  .........238
11
    Exhibit 25   Plaintiff's Responses and ........241
12               Objections to Defendant's
                 First Set of Interrogatories
13
    Exhibit 26   Progress Notes of Tanjaneka ......252
14               Jones 10/21/2019, Bates Jones
                 v. Lilly 000210-212
15

16

17

18

19

20

21

22

23

24

25



Page 7

```
 1                    THURSDAY, MAY 5, 2022
 2                    P R O C E E D I N G S
 3                         - - -
 4           THE COURT REPORTER:  All parties to this
 5      deposition are appearing remotely and have
 6      agreed to the witness being sworn in remotely.
 7                TANJANEKA LA-SHAWN JONES
 8  being first duly sworn, testified as follows:
 9           MS. WAKE:  Okay.  Good morning, everyone.
10           Let the record reflect that this is the
11      deposition of Tanjaneka Jones, taken pursuant to
12      the Federal Rules of Civil Procedure and notice.
13                       EXAMINATION
14  BY MS. WAKE:
15      Q.   Ms. Jones, good morning.  My name is Sarah
16  Wake, and I am one of the attorneys representing
17  Eli Lilly in this matter.
18           I'm going to ask you a series of questions
19  today.  Please answer each question fully, as fully
20  and carefully as you can.  If for any reason you do
21  not understand a question or you need me to clarify,
22  please just stop me and ask me to rephrase the
23  question or make it more clear to you.  I don't ever
24  want you to answer a question that you're unclear
25  about.  Do you understand?
```



Page 8

1          A.   Yes.

2          Q.   And if you answer my question, I'm going

3   to assume that you understood the question.  Is that

4   fair?

5          A.   Yes.

6          Q.   The court reporter is here taking down

7   everything that we say today.  So please make sure

8   that you answer my questions with a spoken response,

9   whether -- rather than just shaking your head or

10  nodding, because the court reporter needs to get

11  everything down.  Do you understand?

12         A.   Yes.

13         Q.   Also, please try to let me finish my

14  question before you answer, and I'll do the same;

15  I'll try to make sure that I let you finish answering

16  before I ask my next question.  That way we won't

17  talk over each other, and it's easier for the court

18  reporter to get everything down.  Do you understand?

19         A.   Yes.

20         Q.   And if you need to take a break for any

21  reason at all, please just let me know; I'm happy to

22  give you a break at any point.  But my only request

23  is that you please just answer any question that's

24  pending before we take a break.  Okay?

25         A.   Yes.



Page 9

```
 1        Q.   And thank you for your patience this
 2    morning with the exhibits and getting everything
 3    settled.  If for any reason you're having trouble
 4    seeing the exhibits when we pull them up, just let us
 5    know, and we'll make sure that we rearrange to -- to
 6    make sure that you can see them appropriately.  Okay?
 7        A.   Okay.
 8        Q.   Please state and spell your full name for
 9    the record.
10        A.   Tanjaneka La-Shawn Jones.
11    T-a-n-j-a-n-e-k-a.  L-a-s-h-a-w-n.  J-o-n-e-s.
12             MS. WAKE:  Karen, I'm getting a little
13         feedback.  Can you -- can you hear okay?
14             (Discussion off the record.)
15    BY MS. WAKE:
16        Q.   All right.  Let's try that question again.
17             Can you please state and spell your full
18    name for the record.
19        A.   Tanjaneka La-Shawn Jones.
20    T-a-n-j-a-n-e-k-a, L-a-s-h-a-w-n, J-o-n-e-s.
21             MS. WAKE:  I can hear very well now.
22         Thank you both.
23    BY MS. WAKE:
24        Q.   Do you go by any nicknames?
25        A.   Tanj.  T-a-n-j.
```



Page 26

```
 1          A.    Hampton University, Hampton, Virginia.
 2          Q.    When did you graduate from Hampton?
 3          A.    2000.  May of 2000.
 4          Q.    And what degrees did you receive from
 5   Hampton?
 6          A.    Bachelor of science in biology.
 7          Q.    And did you receive any other post college
 8   education?
 9          A.    I have a master's degree from the
10   University of Maryland Global Campus.
11          Q.    And when did you get your master's?
12          A.    In May of 2013.
13          Q.    What do you have a master's in?
14          A.    Business management.  MBA.
15          Q.    MBA.  Do you have any other degrees or
16   certificates?
17          A.    Yes, I'm a realtor, as well as a -- I have
18   a title license, and I'm a notary public.
19          Q.    And when did you get -- I think you named
20   three.  When did you get those three licenses?
21          A.    My real estate license, I got in June
22   of -- June or July of 2021.  My notary license was
23   licensed in June of 2021.  And my title license, I
24   was licensed in August of 2021.
25          Q.    And do you have any other forms of
```



Page 27

1    educational or vocational training?

2          A.    I was a mortgage loan officer as well,

3    so . . .

4          Q.    When were you a mortgage loan officer?

5          A.    In -- I got my license in January of 2020.

6          Q.    But you aren't a loan officer anymore?

7          A.    No, I'm not.

8          Q.    Have you ever served in the armed forces?

9          A.    No.

10         Q.    Prior to working for Eli Lilly, have you

11   ever been terminated from any job that you worked at?

12         A.    Not terminated.  Laid off.

13         Q.    From which company were you laid off?

14         A.    I was laid off from Cardinal Financial.

15         Q.    Prior to working at Lilly?

16         A.    I'm sorry.  Forgive me.  I was laid off

17   from --

18         Q.    That's okay.

19         A.    -- a company called New Star.

20         Q.    And do you remember why you were laid off

21   from New Star?

22         A.    It was a mass layoff.  No, I don't.  They

23   just laid everybody off.

24         Q.    Okay.  I understand.

25                Prior to working for Lilly, have you ever



JA29

Page 28

1    experienced a break or a gap in employment?

2        A.   Yes.

3        Q.   Do you remember when?

4        A.   In 2011 I was laid off.  Oh -- yes, I was

5    laid off from my job.  Sorry.  From UniFirst.  Yes.

6        Q.   At any of the employers where you worked

7    prior to Eli Lilly -- I'm only asking about before

8    Lilly -- did you ever raise an internal complaint of

9    discrimination, harassment, or retaliation?

10       A.   No.

11       Q.   And do you believe that you were ever

12   discriminated against by any of those employers prior

13   to Lilly?

14       A.   No.

15       Q.   You've never filed a lawsuit against any

16   employers other than Eli Lilly?

17       A.   No.

18            I'm thinking; forgive me.

19            In -- when I was working at UniFirst,

20   there was a recovery of wages that I did file a suit

21   for.

22       Q.   A claim for unpaid wages, or something

23   like that?

24       A.   Correct.

25       Q.   When was that?



JA30

Page 29

1         A.    It might have been between 2011 and 2012.

2    I don't remember the dates specifically.

3         Q.    Okay.  And what was the result of the wage

4    recovery action?

5         A.    We settled, and I was -- received the

6    compensation that -- that we settled on.

7         Q.    Do you remember how much you settled for?

8         A.    About $2,500.

9         Q.    I'd now like to move to talk about your

10   employment with Eli Lilly.

11              So you began working at Lilly as a senior

12   sales representative in 2014, correct?

13        A.    Yes.

14        Q.    Can you tell me, what are the levels of

15   sales representatives?  So you were a senior sales

16   representative.  What were the other sales

17   representative titles that you --

18        A.    There was S3.  That's senior -- starting

19   out, senior sales rep.  I'm not for sure if S4 or --

20   it's S4 or S5, so that you can go senior sales rep,

21   executive rep, senior executive rep.

22        Q.    Can you also be just a regular sales rep?

23        A.    You can be a sales --

24              MS. JONES:  Just a minute.  Would you let

25        her finish the question before you start



Page 30

1          talking?  She's not -- you aren't finishing all
2          of your questions, and Ms. Jones is talking.  So
3          I'm just asking her to do that.
4    BY MS. WAKE:
5          Q.   You want me to repeat the question?
6          A.   Yes, please.
7          Q.   Can -- can you be just a regular sales
8    representative, like a step below senior?
9          A.   S2 is a sales rep.
10         Q.   So sales rep, senior sales rep, executive
11   sales rep, and senior executive sales rep?
12         A.   Yes.
13         Q.   What were your job duties as a senior
14   sales representative?
15         A.   Let's see.  Calling on physicians and
16   detailing them about the products that were offered
17   by Eli Lilly.  Providing them with samples.  Engaging
18   them in conversations around their patients, their
19   patients' needs for diabetes.  You might be required
20   to lead conversations for your team.  You want to
21   perform, your sales results.  You want to engage with
22   your teammates.
23         Q.   Did you also have to host events for your
24   health care provider customers?
25         A.   Yes.



Page 31

```
 1        Q.    Any other job duties you can think of?
 2        A.    No.
 3        Q.    Did senior sales representatives have
 4   supervisory authority over anybody else on your team?
 5        A.    No.
 6        Q.    Did senior sales representatives -- and
 7   you, specifically, I should say -- ever conduct a
 8   performance review for anybody else on your team?
 9        A.    No.
10        Q.    Did you sit in on performance reviews for
11   anybody on your team during your employment with
12   Lilly?
13        A.    No.
14        Q.    Did you ever review any of the performance
15   reviews that anyone on your team received at any
16   point during your employment with Lilly?
17        A.    No.
18        Q.    And did your -- any of your supervisors
19   ever ask you to contribute or to help write any of
20   the performance reviews for anybody on your team
21   during your employment with Lilly?
22        A.    No.
23        Q.    And you worked in what's called the
24   diabetes business unit for your entire employment
25   with Lilly, correct?
```



Page 32

```
 1        A.   Yes.
 2        Q.   I -- I assume that in the diabetes
 3   business unit, you're responsible for selling
 4   products that relate to diabetes?
 5        A.   Yes.
 6        Q.   Which products were you responsible for
 7   selling?
 8        A.   Jardiance, Trulicity, Basaglar, Glyxambi,
 9   Synjardy, Jentadueto, Tradjenta, Humalog.
10        Q.   Any more?
11        A.   I mean, the subsequents of Synjardy --
12   there's different doses and combinations.  But those
13   are the majority of those, yes.  That's it.
14        Q.   And those are all diabetes-related
15   products?
16        A.   Yes.
17        Q.   And you were a senior sales representative
18   for your entire employment with Lilly from 2014 to
19   2019, right?
20        A.   Yes.
21        Q.   And as a senior sales representative, what
22   type of compensation could you receive from Lilly?
23        A.   You can go max -- based out, it would be
24   like at 110,000.
25        Q.   Were senior sales representatives eligible
```



MAGNA
LEGAL SERVICES

JA34

Page 33

1   for increases in the base salary every year?

2      A.   Yes.

3      Q.   And do you remember when those base

4   increases would go into effect?

5      A.   Typically the following year after your

6   review.  So it would be around February or March.

7      Q.   So just to make sure I -- I understand:

8   If you in 2018 were going to receive a salary

9   increase, you would get that around February of 2019?

10      A.   Yes.

11      Q.   And you received several salary increases

12   during your employment with Lilly, correct?

13      A.   Yes.

14      Q.   Tell me a little bit about incentive

15   compensation.  How did incentive compensation work?

16      A.   Every year they roll out the incentive

17   comp, usually typically in January, to show you the

18   metrics that you need to hit to achieve the payouts.

19   The last one that we received, the max was 24,000 --

20   that I received was 24,000.

21      Q.   And when you say they would give you the

22   document to show you the payout, so at the beginning

23   of the year, they're saying, if you hit X number, you

24   get Y dollars?

25      A.   Correct.



Page 38

```
 1              MS. JONES:  No, the whole document.  She
 2       wants you to read through it.
 3  BY MS. WAKE:
 4       Q.   Ms. Jones, are you saying you're done with
 5  that first page?
 6       A.   Give me one moment.
 7              MS. JONES:  I can't see where -- Lilly
 8       Global Sales Rep Mission, Traits, Enablers; I
 9       can't read that part.
10              MS. WAKE:  Would you like me to read it to
11       you?
12              MS. JONES:  No, he just blew it up.  Okay.
13              Okay.  Are you ready?
14              MS. WAKE:  Jared, I think you can unzoom
15       now.  Thank you.
16  BY MS. WAKE:
17       Q.   All right, Ms. Jones, you can go ahead and
18  read the second page, just to yourself.
19              MS. JONES:  I can't see it.  Can you blow
20       it up more?
21              THE WITNESS:  I'm done.
22              MS. WAKE:  Okay.  You can go to the purple
23       one, Jared, and then I'm going to ask you to
24       pause.
25              THE WITNESS:  I'm done.  I'm finished.
```



Page 39

```
 1              MS. WAKE:  Okay.  Jared, could you go back
 2        to that first page that Ms. Jones read, please.
 3   BY MS. WAKE:
 4        Q.   Ms. Jones, does the document that you just
 5   read accurately reflect your job duties?
 6        A.   Yes.
 7        Q.   Was there anything that you just read
 8   there that you would say wasn't part of your job
 9   duties?
10        A.   No.
11        Q.   And under the "Understand," that orange --
12   orangish-reddish arrow right there, it says,
13   "Understands the healthcare marketplace; the payer
14   environment; customer (account and stakeholder)
15   priorities; patient, product and monetary flows;
16   patient disease states and therapeutic options; and
17   Lilly resources, processes, policies and procedures."
18              Did you understand that this was an
19   important part of your job at Eli Lilly?
20        A.   Yes.
21        Q.   And right there, under the blue arrow that
22   says "Plan," it says, "Analyzes patient, product and
23   monetary flows; prioritizes opportunities; builds
24   territory and account plans; and secures needed
25   resources."
```



Page 40

1              Did you understand that that was important
2    to your job at Eli Lilly?
3         A.   Yes.
4         Q.   And then finally that purple one.  It
5    says, "Executes territory and account plans; achieves
6    territory and account plan goals and completes
7    actions on a timely basis; and regularly assesses and
8    adjusts territory and account plans as needed."
9              Did you understand that that was important
10   to your job at Lilly?
11        A.   Yes.
12             MS. WAKE:  And Jared, could we zoom in on
13        "Lilly Global Sales Representative Mission" so
14        Ms. Williams-Jones can see it.
15   BY MS. WAKE:
16        Q.   So it says -- the second one there is to
17   deliver "improved outcomes for patients through easy
18   interactions that enable people to feel they are
19   genuinely cared for and able to trust us."
20             Did you understand that how you formed
21   relationships with your customers was important to
22   your role?
23        A.   Yes.
24        Q.   Did you understand that there were many
25   skills that go into being a successful sales



Page 41

1    representative at Lilly?

2        A.   Yes.

3        Q.   And that there was a certain way that

4    Eli Lilly expected its sales representatives to

5    engage with the customers?

6        A.   Yes.

7             MS. WAKE:  All right.  We can close out of

8        that one, Jared, and you can pull up the exhibit

9        labeled Number 2, which is Lilly Jones 1804.

10            Could you zoom in on that for Ms. Jones

11       for me?  Make it any bigger?

12            Okay, Ms. Jones, I'm showing you what I

13       would like to please ask Karen to mark as

14       Exhibit 2.

15       (Exhibit 2 was marked for identification.)

16   BY MS. WAKE:

17       Q.   This is a 2019 SOP, which I think means

18   "standard operating procedure," for the Washington DC

19   District.  Correct?

20       A.   Yes.

21       Q.   Was this your district in 2019?

22       A.   Yes.

23       Q.   And are you familiar with this document?

24       A.   Yes.

25       Q.   It sets forth the expectations for your



```
                                              Page 42
 1   team and your district, correct?

 2        A.   Yes.

 3        Q.   And same thing -- this one's about a page

 4   and a half.  Take your time to read through it to

 5   yourself, and then just let me know when you're done.

 6             And Jared can then flip to the next page.

 7        A.   I'm all set.  Thank you.

 8             MS. WAKE:  Okay, Jared, you could scroll

 9        down under "Customer" for her, please.

10             THE WITNESS:  I'm all set.  Thank you.

11             MS. WAKE:  And scroll down for her, Jared,

12        please, under "P2P Programming."

13             THE WITNESS:  I'm all set.  Thank you.

14   BY MS. WAKE:

15        Q.   And then this is the last page.

16        A.   I'm all set.  Thank you.

17             I'm finished.  Thank you.

18        Q.   Great.

19             MS. WAKE:  Jared, could you flip back to

20        the first page for Ms. Jones, please?  Thank

21        you.

22   BY MS. WAKE:

23        Q.   Is there anything in the SOP that you just

24   read that wasn't part of your job duties at Lilly,

25   Ms. Jones?
```



JA40

Page 43

1        A.    No.

2        Q.    If you look under "Customer," that looks
3   like it's highlighted in yellow --

4             MS. WAKE:   Jared, could you scroll down a
5        little bit, so she can see that "Customer"
6        section.   Thank you.   That's good.

7   BY MS. WAKE:

8        Q.    It says, "Portfolio precall planning.  Use
9   Tableau to precall plan.  Utilize PerQs on every
10  call!"

11            Can you tell me what "Tableau" is?

12       A.    It's a system there where they track the
13  physicians' writing habits, or data about how many
14  scripts the physician might write, what they're
15  writing, how often they're writing, the frequency of
16  what they're writing.

17       Q.    So just data about the customers?

18       A.    Yes.

19       Q.    And what is "PerQs"?

20       A.    Patient expectations, results, question --
21  I forget what the last one was.  But it basically
22  outlines the precall plan.

23       Q.    That's an impressive memory.  So it's a --
24  it's an acronym for precall planning?

25       A.    Correct.



Page 44

1        Q.   All right.  How were you supposed to use

2   Tableau?

3        A.   So when you're in the ride-along with your

4   manager, you pull up the physician's information that

5   you're going to call on.  You review all three

6   products that you're responsible for, and basically

7   analyze how they're writing and which brands they're

8   writing.

9        Q.   And why would that be important?

10       A.   Because it allows you to see what they're

11  actually doing, so you know that you -- if they're

12  just telling you -- you know the difference if

13  they're just telling you something, or if they're

14  actually doing it.  It helps you to plan for

15  precall -- use the information for precall planning.

16       Q.   Okay.  And then how were you supposed to

17  use PerQs, or precall planning?

18       A.   So basically you talk about who the

19  patient is, what's the expectation or conversation

20  with the physician that you're trying to get, you

21  know, the result or -- you know, action that you want

22  them to take, in terms of acting on behalf of the

23  patient, what question you're going to ask.

24            Like I said, I forget what the last "S"

25  meant.



JA42

Page 45

1          So -- and then you just kind of plan out

2    the situation, or rehearse what you're going to go in

3    there and ask.

4         Q.   And there in red, it says you're supposed

5    to use PerQs, or precall planning, for every call?

6         A.   Yes.

7         Q.   And you understood that using Tableau and

8    the PerQs method to precall plan were important to

9    Eli Lilly?

10         A.   Yes.

11         Q.   If you look under "Business Results" --

12          MS. WAKE:  So, Jared, if you could scroll

13      down a little bit for Ms. Jones, please.

14   BY MS. WAKE:

15         Q.   There are several things listed under

16    "Business Results."  One of them is called "CAT

17    Execution."  Could you explain to me what "CAT

18    Execution" means?

19         A.   Call Attainment Tool.

20         Q.   And how are you supposed to use CAT

21    execution?

22         A.   It allows you to see how much touches you

23    have in the month that you're calling on a physician.

24    So if you say you have to call on a physician three

25    times, you know how many times you called, to reach a



**MAGNA**
LEGAL SERVICES

JA43

Page 46

1    reach.

2         Q.   And for these items listed in the SOP that

3    you just reviewed, you knew that these categories of

4    the Culture and the Customer and the Business Results

5    were important to Lilly, correct?

6         A.   Yes.

7         Q.   Okay.  Now we're going to go to the next

8    exhibit, which is the handbook.  It's numbered 3 in

9    the ZIP file.  This is a very big document, but

10   luckily we're only going to look at a couple pages.

11           Lilly had a policy prohibiting

12   discrimination and retaliation in the workplace,

13   correct?

14        A.   Yes.

15        Q.   And Lilly prohibits discrimination on the

16   basis of both sex and race?

17        A.   Yes.

18           MS. WAKE:  And Karen, I'm going to ask you

19      to please mark this handbook as Exhibit 4.

20      (Exhibit 3 was marked for identification.)

21           MS. WAKE:  This is Eli Lilly's

22      U.S. employee handbook.  And Jared, if you'll go

23      to the very, very last page for Ms. Jones,

24      page 242, I would just like to show Ms. Jones

25      that this is marked as revised January 1st,



Page 47

```
 1        2019.
 2              THE COURT REPORTER:  I believe this is
 3        Exhibit 3.  Thank you.
 4              MS. WAKE:  That's correct.  Yes.
 5   BY MS. WAKE:
 6        Q.   Do you see there where it says "Revised
 7   January 1st, 2019"?
 8        A.   Yes.
 9        Q.   And do you recognize this document?
10        A.   Yes.
11        Q.   And have you looked at Eli Lilly's
12   handbook before?
13        A.   Yes.
14              MS. WAKE:  Jared, now I'm going to ask you
15        to go all the way back to page 2.  And at the
16        bottom, it would be marked "Page 2 of 242."
17        Right there, yeah.
18   BY MS. WAKE:
19        Q.   So there in that second paragraph under
20   "Reporting Discrimination or Harassment," it says
21   employees are expected to report discrimination that
22   they experience to management or HR so that the
23   company can promptly investigate.  Correct?
24        A.   Yes.
25        Q.   And did you know how to report
```



Page 48

1   discrimination and harassment at Eli Lilly?

2        A.   Yes.

3             MS. WAKE:  And now if you could go to

4        page -- at the bottom, it would be labeled

5        page 17, Jared.

6             Great, right there.  Yes.

7   BY MS. WAKE:

8        Q.   This page talks about disciplinary action.

9   And where it says "Performance Management," it says,

10  "Performance Management helps employees prioritize

11  their goals and align their individual work to the

12  goals of the company.  Supervisors provide ongoing

13  coaching to help their employees learn, grow, and

14  progress in their work.  Where appropriate, the

15  company uses discipline to correct behavioral or

16  performance issues.  And the goal of discipline is to

17  provide an employee the chance to improve performance

18  and to meet expectations for his or her job."

19           Correct?

20       A.   Yes.

21       Q.   Would weekly check-ins with your

22  supervisor be a way to help correct performance

23  concerns?

24       A.   If they happen.

25       Q.   So that's a yes, they would be?



JA46

Page 49

```
 1          A.   Yes, if they happen.
 2          Q.   And what about providing specific examples
 3     on ways to improve performance:  Would that be a
 4     helpful way to improve on performance?
 5          A.   Please rephrase your question?  Sorry.
 6          Q.   And what about a supervisor providing you
 7     with specific examples on how -- how to do your job:
 8     Would that be a helpful way to improve performance?
 9          A.   If they could give that, yes.
10          Q.   And let's look where it says -- part that
11     starts "Supervisors" there.  So "Supervisors will
12     work with employees to address any aspects of
13     performance or behavior that require correction.
14     Please note that either an employee or a supervisor
15     may call upon human resources in connection with
16     disciplinary action.  If disciplinary action is
17     warranted, it may range anywhere from a warning to
18     separation."
19          So did you understand that your
20     supervisors had the right to discipline you?
21          A.   Yes.
22          Q.   And did you understand that both you and
23     your supervisors could talk to and work with HR about
24     any discipline?
25          A.   Yes, but -- yes.
```



Page 50

1          MS. WAKE:  And there under "Probation,"
2     Jared, if you could scroll down so she could see
3     "Probation," please.
4  BY MS. WAKE:
5          Q.   In that second sentence there, it says,
6  "The maximum probationary period is three months."
7  Is that right?
8          A.   Yes.
9          Q.   And under "Probation" there, it says,
10 "probation provides a period during which an employee
11 is given an opportunity for immediate improvement."
12 Right?
13         A.   Yes.
14         Q.   And in that same paragraph, it says, "As
15 with some other discipline, eligibility for and/or
16 the amount of certain elements of compensation may be
17 affected as a result of probation."
18              So did you understand that your
19 compensation could be impacted if you were deemed not
20 meeting performance expectations?
21         A.   Yes.
22         Q.   And then the next -- last sentence in the
23 "Probation" section, it says, "Upon satisfactory
24 completion of probation, an employee is removed from
25 probation."



Page 51

```
 1              So if you meet the probation criteria, you
 2     are removed from probation.  Correct?
 3          A.   Yes.
 4              MS. JONES:  Could you hold a second?
 5          FedEx just came in.  Let me see if this is our
 6          package, okay?
 7              MS. WAKE:  Can she answer the question
 8          first?
 9              MS. JONES:  Okay.  I'm sorry.  Go ahead.
10              THE WITNESS:  Can you repeat the question?
11     BY MS. WAKE:
12          Q.   That's okay, sure.  So what I just read to
13     you was, "Upon satisfactory completion of probation,
14     an employee is removed from probation."
15              And my question to you was, so if the
16     employee meets the criteria of a probation, they are
17     removed from probation, correct?
18          A.   Yes.
19          Q.   Okay.
20              MS. WAKE:  Ms. Jones -- Ms. Jones,
21          actually, do you want to take just a five-minute
22          break so Ms. Jones can stand up, stretch, go to
23          the restroom, you can check FedEx --
24              MS. JONES:  Yeah, that's fine.  That's
25          perfect.
```



Page 52

1            MS. WAKE:  All right.  Let's take five
2       minutes for everybody.
3            MS. JONES:  Okay.
4            (A recess transpired from 11:18 a.m. to
5            11:26 a.m.)
6            THE COURT REPORTER:  Back on the record.
7            MS. WAKE:  Okay.  Great.  Thank you.
8            We now have paper copies of the exhibits
9       delivered to Ms. Jones.
10  BY MS. WAKE:
11      Q.   So we're going to start now talking
12  about -- specifically about your employment at Lilly
13  and your different supervisors, Ms. Jones.
14           MS. WAKE:  So, Jared, you can pull down
15       that exhibit.  We're done with that one.  Thank
16       you.
17  BY MS. WAKE:
18      Q.   Okay.  Ms. Jones, when you started at
19  Eli Lilly in 2014, was a man named Harold Mendoza
20  your supervisor?
21           I'm sorry.  You're on mute.
22      A.   Yes.
23      Q.   What district were you in?
24      A.   Baltimore District.
25      Q.   And do you remember what territory you



JA50

Page 53

1    were in?

2         A.    Towson.

3         Q.    Towson?

4         A.    Yes.

5         Q.    Did you have a sales partner when you were

6    in the Towson, Maryland, territory?

7         A.    Yes.

8         Q.    Who was the sales partner?

9         A.    Tim -- Timothy Schott.

10        Q.    And can you explain to me, how did it work

11   when you had a sales partner?  Did you have different

12   clients you were supposed to call on?  Did you call

13   on them together?  Just tell me a little bit about

14   how working in a team works.

15        A.    You basically call on those same

16   customers.  However, you might have different

17   products, or the amount of times that you call on

18   that customer might vary.  But depending on the lead

19   product that you're calling on with.

20        Q.    So you and Timothy could both call on the

21   same customers, just to sell different products?

22        A.    Correct.

23        Q.    And would you get sales credit for the

24   products that your partner or your teammate was

25   selling?  Or were your business results numbers just



Page 54

1    the products that you were responsible for selling?

2         A.    So when we started, my lead product was

3    Jardiance; his lead product was Trulicity.  It was

4    separate then.  And you got credit based on the

5    weight of your lead product, but you still got -- so

6    if it wasn't your lead product, you got what he got,

7    and vice versa:  He got what I got.  For -- in terms

8    of the result, business result.

9         Q.    So would you and your partner -- I saw

10   some examples where like your sales results were

11   106 percent of your goal.  Would Timothy's also have

12   been then 106 percent of his goal, or could his have

13   been different than yours?

14        A.    I don't remember.  I'm -- it's been a

15   while.

16        Q.    Okay.

17        A.    I don't remember that.  I don't remember.

18   I just know that --

19        Q.    That's all right.

20        A.    I believe your weight -- your first

21   product is weighted a little differently, because

22   it's your lead product.  That's what you're

23   responsible for.

24        Q.    So you would get like a little more credit

25   for the one you were responsible for?



Page 55

```
 1        A.   I don't want to say -- I don't recall
 2   exactly.  I don't know.  I don't -- I don't know.
 3        Q.   Okay.  If you don't -- if you don't know,
 4   I don't want you to answer.  So that's fine.
 5        A.   Okay.
 6        Q.   Do you remember how long Mr. Mendoza
 7   supervised you for?
 8        A.   From August 2014 to July of 2017.
 9        Q.   Do you know his sex or his gender?
10        A.   Male.
11        Q.   Do you know his race?
12        A.   Hispanic, or -- I don't know.  White.
13   Caucasian.
14        Q.   Did Mr. Mendoza ever issue --
15             MS. WAKE:  I'm sorry, did someone want to
16        say something?
17             THE WITNESS:  No.
18   BY MS. WAKE:
19        Q.   Did Mr. Mendoza ever issue discipline to
20   you?
21        A.   Yes.
22             MS. WAKE:  Okay, Jared, why don't you go
23        ahead and bring up what I think will be Lilly
24        Jones 4.  It should start with Lilly-Jones 1453
25        at the bottom.
```



Page 56

1           (Exhibit 4 was marked for identification.)

2                MS. WAKE:  And Karen, this is Exhibit 4,

3       correct?

4    BY MS. WAKE:

5           Q.   Okay.  So I'm showing you what's been

6    marked as Exhibit 4.  Do you recognize this document?

7                MS. JONES:  You need to -- look.

8                MS. WAKE:  I'm sorry.  I can't hear what

9       you are saying.

10               THE WITNESS:  I have the document.

11   BY MS. WAKE:

12          Q.   Okay.  Do you recognize this document?

13          A.   Yes.

14          Q.   What is it?

15          A.   It's a warning.

16          Q.   This is a December 9th, 2015, written

17   warning from Harold Mendoza, correct?

18          A.   Yes.

19          Q.   To you?

20          A.   Yes.

21          Q.   And did you sign the document on the

22   second page?

23          A.   Yes.

24          Q.   And up there at the top of the first page,

25   it says that you had a discussion with Mr. Mendoza on



Page 57

1  December 9th, and that someone named Laura Lemons was

2  present for that.  Is that correct?

3        A.   Yes.

4        Q.   Do you remember that meeting?

5        A.   Yes.

6        Q.   What was the purpose of that meeting?

7        A.   It was a warning for my performance.

8        Q.   And in that first paragraph there,

9  Mr. Mendoza says, "This disciplinary action is being

10  taken in response to your unacceptable performance."

11  Correct?

12        A.   Yes.

13        Q.   And in the document, he gives some

14  specific examples of the performance issues.  And he

15  writes, "Failure to consistently engage customers in

16  a meaningful selling dialogue including using active

17  listening skills, asking effective questions and

18  demonstrating agile communication skills."  Correct?

19        A.   Yes.

20        Q.   And in that same paragraph, Mr. Mendoza

21  says that he gave you significant coaching.  He calls

22  it significant coaching.

23             MS. JONES:  You know what, I'm going to

24        just object here and say, we will stipulate that

25        the document says whatever it says.  You don't



Page 62

1   value-based selling during field visits and

2   collaboration days."  Correct?

3        A.   Yes.

4        Q.   And then if you look down near the bottom

5   there, when it says -- again, calls this document

6   "disciplinary action," in the second to last

7   paragraph.  It says, "I will document this action in

8   your performance management year-end summary and

9   consider it in determining your year-end performance

10  level and total compensation."  Correct?

11       A.   Yes.

12       Q.   And you understood when you signed this

13  that there were certain things that you needed to do

14  for your performance to be considered improved,

15  correct?

16       A.   Yes.

17       Q.   And Mr. Mendoza in this document gives you

18  several specific instructions about what you need to

19  do for your performance to improve, correct?

20       A.   Yes.

21       Q.   Why do you think that Mr. Mendoza issued

22  this performance document to you?

23            MS. JONES:  Objection.  Calls for

24       speculation.

25



Page 63

1  BY MS. WAKE:

2      Q.   Why do you think that he issued the

3  document to you?

4          MS. JONES:  Same objection.

5          You can answer.

6          THE WITNESS:  I don't know.  I don't know.

7          MS. WAKE:  Okay.  All right, we're going

8      to go ahead and pull up the next exhibit, Jared,

9      which is -- starts at the bottom Lilly Jones

10     1465.  This will be Number 5.

11      (Exhibit 5 was marked for identification.)

12  BY MS. WAKE:

13     Q.   Ms. Jones, what -- are you ready,

14  Ms. Jones?

15     A.   Yes.

16     Q.   Ms. Jones, what's a wrap-up document?

17     A.   It's an end-of-the-year performance

18  review.  It tells you --

19     Q.   Do sales representatives -- I'm sorry.  Go

20  ahead.

21     A.   It tells you everything that -- your

22  performance for the year, for that year-end.

23     Q.   And it looks to me like you filled out

24  part of this and then your supervisor filled out part

25  of this.  Is that how the wrap-ups would work?



JA57

Page 64

1          A.    Yes.

2          Q.    And this is a wrap-up from 2015?

3          A.    Yes.

4          Q.    So why don't you turn to the third page,

5    which is where the supervisor comments come into

6    play.

7                And this wrap-up document would have been

8    given to you by Mr. Mendoza, correct?

9          A.    Yes.

10         Q.    And on page 3 there, under "Customer

11   Engagement," it talks about not consistently engaging

12   customers in a meaningful selling dialogue.  Correct?

13               MS. JONES:  Same objection, that we'll

14         stipulate the document says what it says, and

15         continuing.

16   BY MS. WAKE:

17         Q.    Ms. Jones, you can answer the question.

18         A.    Yes.

19         Q.    And he also, again, mentions value-based

20   selling, and several field visits that he did with

21   you, correct?

22         A.    Yes.

23         Q.    Down there at the very bottom, Mr. Mendoza

24   for 2015 rates you as not sufficiently meeting job

25   expectations for the year, correct?



Page 65

1          MS. JONES:  Can we have the -- Jared move

2     this?  I can't see it, because I don't have the

3     hard copy.  I gave that to my client.

4          Could you go down to where you're

5     referring to?

6          MS. WAKE:  Yes.

7          It's all the way at the bottom, Jared.

8  BY MS. WAKE:

9     Q.  So for 2015, Ms. Jones, Mr. Mendoza rated

10  you as not sufficiently meeting job expectations,

11  correct?

12     A.  Yes.

13     Q.  And this was your first full year at

14  Eli Lilly?

15     A.  Yes.

16     Q.  And you signed the document, correct?

17     A.  Yes.

18     Q.  And why do you think Mr. Mendoza gave you

19  the rating of not sufficiently meeting job

20  expectations?

21          MS. JONES:  Objection.  Calls for

22     speculation.

23          You can answer.

24          THE WITNESS:  Because he felt like I

25     wasn't meeting the job expectations.



Page 66

1   BY MS. WAKE:

2        Q.   Any other reasons?

3        A.   No.

4        Q.   And after receiving this 2015 wrap-up, did

5   Mr. Mendoza set up weekly check-ins with you?

6        A.   Yes.

7        Q.   What do you think the purpose of the

8   weekly check-ins was?

9        A.   To improve my performance.

10            MS. WAKE:  You can take the document down

11       now, Jared.  Thank you.

12  BY MS. WAKE:

13       Q.   And was someone named Andrea Gibson your

14  next supervisor at Lilly?

15       A.   Yes.

16       Q.   And what district did you work in when

17  Andrea Gibson supervised you?

18       A.   Baltimore.

19       Q.   Do you remember how long Andrea Gibson

20  supervised you?

21       A.   July of 2017 until February of 2018.

22       Q.   Do you know Andrea Gibson's sex or gender

23  identity?

24       A.   Yes.

25       Q.   What is it?



Page 67

```
 1          A.    Female.
 2          Q.    And do you know their race?
 3          A.    Yes.
 4          Q.    What is it?
 5          A.    African-American.
 6          Q.    Did Andrea Gibson ever discipline you?
 7          A.    No.
 8          Q.    And was Jacquelyne or Jax Porter your next
 9     supervisor at Eli Lilly?
10          A.    Yes.
11                MS. JONES:  Excuse me.  What was the name
12          again?  I didn't catch the last name.  Jack who?
13                MS. WAKE:  Jax Porter.
14                MS. JONES:  Okay.
15     BY MS. WAKE:
16          Q.    Was that your next supervisor at
17     Eli Lilly?
18          A.    Yes.
19          Q.    What district were you in when Jax Porter
20     supervised you?
21          A.    The Washington district.  Washington, D.C.
22          Q.    Why did you move from the Baltimore
23     district to the Washington district?
24          A.    I was transferred.
25          Q.    Do you remember when you were transferred?
```



Page 68

```
 1          A.   February 1st of 2018.

 2          Q.   Do you remember why you were transferred?

 3          A.   They said it was a realignment.

 4          Q.   Did you have a sales partner when

 5     Jax Porter supervised you?

 6          A.   Yes.

 7          Q.   Who was your sales partner?

 8          A.   I had two.  Sharon Boggs and Tricia

 9     Schroll.

10          Q.   When you say you had two, do you mean you

11     had two different teams, or were you a group of

12     three?

13          A.   We were the only group of three.

14          Q.   Do you remember how long Jax Porter

15     supervised you for?

16          A.   From February 1st of 2018 until February

17     of 2019 -- February 1st of 2019.

18          Q.   Do you know Jax Porter's sex?

19          A.   Yes.

20          Q.   What is it?

21          A.   African-American.

22               MS. JONES:  She said "sex."

23               THE WITNESS:  I'm sorry -- I'm sorry.

24          Sex:  Female.  Forgive me.  I'm sorry.

25
```



Page 69

1   BY MS. WAKE:

2           Q.   That's okay.

3                Do you know Jax Porter's race?

4           A.   Yes.

5           Q.   What is it?

6           A.   African-American.

7        (Exhibit 6 was marked for identification.)

8                MS. WAKE:  Jared, if you could please pull

9           up the next exhibit, which starts at the bottom

10          Lilly Jones 1475.

11  BY MS. WAKE:

12          Q.   Ms. Jones, take your time to look through

13       the hard copy, and just let me know when you're done.

14               MS. JONES:  And for the record, could

15          you -- is "Jax Porter" the same as "Jacquelyne

16          Porter" on this document?

17               MS. WAKE:  Yes.

18               MS. JONES:  Okay.  Maybe you can -- can

19          the witness clarify that, please?

20  BY MS. WAKE:

21          Q.   Is Jacquelyne Porter Jax Porter?

22          A.   Yes.

23          Q.   And this is your 2018 wrap-up or

24       performance review, correct?

25          A.   Yes.



Page 70

1      Q.   And if you look to page 3 there, under
2   "Supervisor Documentation," Ms. Porter says, under
3   "Comments by Jax Porter" and "Customer Value" --
4            MS. JONES:  Can you wait a minute while
5       Jared gets there, you know, so I can see it
6       also?
7            MS. WAKE:  Yes, I'm speaking to tell Jared
8       what page it's on.
9            So, Jared, it's on page 3.
10           Thank you.  So under "Results and
11      Behaviors," where it says "Comments by
12      Jax Porter," you can scroll to that part, Jared.
13  BY MS. WAKE:
14     Q.   Ms. Jones, are you there in the physical
15  copy?
16     A.   Yes.
17     Q.   So under the comments by Jax Porter, it
18  says "Customer Value," and it talks again about
19  precall planning and VBS, correct?
20     A.   Yes.
21           MS. JONES:  Same objection.
22  BY MS. WAKE:
23     Q.   And it says there that you acknowledged
24  that you needed to invest more time and practice in
25  reviewing studies and data.  Correct?



Page 71

1          A.    Yes.

2          Q.    Do you remember telling Ms. Porter that

3    you knew that you needed to spend more time doing

4    that?

5          A.    Yes.

6          Q.    And Ms. Porter set a weekly check-in with

7    you after receiving this wrap up, correct?

8          A.    Yes.

9          Q.    Down there at the bottom, Ms. Porter is

10   telling you how to focus your development for 2019.

11   Do you see that part?

12         A.    Yes.

13         Q.    She's telling you that in 2019, you need

14   to focus on precall planning and value-based selling.

15   Do you remember being told in 2019 that you needed to

16   focus on precall planning and value-based selling?

17         A.    Based on the document, yes.

18         Q.    And then if you turn to the next page,

19   under "Performance Assessment," Jax Porter ranks you

20   as not sufficiently meeting job expectations for the

21   performance period, correct?

22         A.    Correct.

23         Q.    And why do you think Jax Porter gave you

24   this performance rating?

25              MS. JONES:  Objection.  Calls for



JA65

Page 72

```
 1      speculation.
 2              You can answer.
 3              THE WITNESS:  I don't know.
 4  BY MS. WAKE:
 5      Q.   When Jax Porter supervised you --
 6              MS. WAKE:  Jared, we're done with the
 7      document.  Thank you.
 8  BY MS. WAKE:
 9      Q.   When Jax Porter supervised you, do you
10  remember missing a lunch with a customer?
11      A.   Yes.
12      Q.   And do you remember that that customer
13  asked Jax Porter that you not return to the office?
14      A.   No.  That's inaccurate.
15      Q.   So if Ms. Porter said that a customer
16  asked you not to return to the office, she would be
17  lying?
18      A.   It wasn't the customer.  It was somebody
19  else.
20      Q.   Who was it?
21      A.   The office manager, who was fired.
22      Q.   The office manager worked at the customer,
23  right?  The doctor's office?
24      A.   I don't call on the office manager.  I
25  call on the customer.
```



Page 73

```
 1          Q.   Well, the office is your customer, right?

 2          A.   Correct.

 3          Q.   And somebody at the office asked that you

 4   not return?

 5          A.   Correct.

 6          Q.   And you didn't tell Jax Porter about

 7   missing the lunch with the customer, right?

 8          A.   No, I did.

 9          Q.   So did she first find out about it from

10   another sales representative on your team?

11          A.   Yes.  She found out from my partner.

12          Q.   Not from you?

13          A.   No.

14          Q.   So you didn't tell Ms. Porter that you

15   missed the lunch?

16               MS. JONES:  Objection.  She said that.

17               THE WITNESS:  I just said that.

18   BY MS. WAKE:

19          Q.   So you didn't talk to Ms. Porter about

20   missing the lunch; she found out about it from --

21               MS. JONES:  That's been asked and

22          answered.  That's what she said when you asked

23          her the first time.

24   BY MS. WAKE:

25          Q.   Can you answer the question, please?
```



Page 74

1     A.   After my partner told on me about the

2  missed lunch, there was -- there was a communication

3  issue, and I explained that to her.

4     Q.   You didn't proactively tell Ms. Porter

5  about it until your teammate told Ms. Porter?

6     A.   Correct.

7     Q.   Your next supervisor at Eli Lilly was Mark

8  Hudson, correct?

9     A.   He wasn't my supervisor.

10    Q.   Mr. Hudson was not your supervisor?

11    A.   He was an interim, I guess.  He was

12  filling in for -- until a manager came.  He wasn't my

13  manager.  He was an interim.

14    Q.   And do you mean "interim"?

15    A.   Yes.

16    Q.   So he supervised you from February 2019

17  until about May 2019?

18    A.   Yes.  He's a trainer.

19    Q.   But he supervised you from that time?

20    A.   Yes, the trainer.  Yes, he did.

21    Q.   Okay.  I understand that he was a trainer.

22  But from February 2019 to May 2019, he functioned as

23  your supervisor, correct?

24    A.   He wasn't my supervisor.  He was the

25  trainer who oversaw our team.



Page 75

1        Q.   He was the interim district sales manager

2   from February 2019 to May 2019; is that correct?

3        A.   Yes.

4        Q.   And a district sales manager is

5   responsible for supervising the team, correct?

6        A.   Yes.

7        Q.   So on an interim basis, from February 2019

8   to May 2019, Mr. Hudson functioned as your

9   supervisor, correct?

10        A.   An acting supervisor, yes.

11        Q.   And he performed ride-alongs with you,

12   correct?

13        A.   He performed two ride-alongs with me, yes.

14        Q.   So he went into the field with you to see

15   your customers, correct?

16        A.   Yes.

17        Q.   And he offered you feedback on your

18   performance, correct?

19        A.   Yes.

20        Q.   And Mark Hudson was the Mid-Atlantic area

21   sales trainer for the DBU, correct?

22        A.   Yes.

23        Q.   Did you know him before he became your

24   interim district sales manager?

25        A.   Yes.  He was a trainer, yes.



Page 76

```
 1          Q.   Did he provide you with training prior to
 2     February 2019?
 3          A.   Yes.
 4          Q.   Do you remember what he trained you on?
 5          A.   Again, patient VBS.
 6          Q.   And as an area sales trainer, Mr. Hudson
 7     would be very familiar with expectations for Lilly
 8     sales representatives, correct?
 9               MS. JONES:  Objection.  Calls for
10          speculation about what Mr. Hudson is familiar
11          with.
12               You can answer.
13     BY MS. WAKE:
14          Q.   Mr. Hudson trained you -- Mr. Hudson
15     trained you on expectations for Lilly sales reps,
16     correct?
17          A.   Yes.
18          Q.   How long had you known Mr. Hudson when he
19     became your interim district sales manager in
20     February 2019?
21          A.   Four months?  A few months.
22          Q.   Prior to him becoming your district sales
23     manager?
24          A.   Yes.
25          Q.   And how many times did he have training
```



Page 77

1    sessions with you prior to becoming your district

2    sales manager?

3         A.   One.

4         Q.   Do you remember the topic of the training,

5    other than VBS?

6         A.   That's what we were there, we were on a

7    field ride.

8         Q.   Do you know Mr. Hudson's race?

9         A.   Yes.

10        Q.   What is it?

11        A.   Caucasian.

12        Q.   Do you know Mr. Hudson's sex?

13        A.   Yes.

14        Q.   What is it?

15        A.   Male.

16        Q.   And your next district sales manager at

17   Eli Lilly was someone named David Sun, correct?

18        A.   Yes.

19        Q.   And he became your district sales manager

20   in May of 2019, correct?

21        A.   Officially, no, no.  No.

22        Q.   So when did he become your district sales

23   manager?

24        A.   June 1st.

25        Q.   Of 2019?



Page 82

1   Exhibit 7.  Do you recognize this document?

2        A.   Yes.

3        Q.   And this is a copy of the Performance

4   Improvement Plan that you received on June 28th,

5   2019, correct?

6        A.   Correct.

7        Q.   And on the first page -- is really the

8   last page -- you signed this document, correct?

9        A.   Yes.

10       Q.   And let's go back to that -- the actual

11  first page of the document, so Lilly Jones 23.

12            You received this document during a

13  meeting with Mr. Sun and someone named

14  Grace Faulkner, correct?

15       A.   Yes.

16       Q.   Who is Grace Faulkner?

17       A.   She's an HR representative.

18       Q.   Did you know her before this meeting?

19       A.   No.

20       Q.   The meeting was the first time that you

21  talked to her?

22       A.   Yes.  Yes.  I mean -- I might have one

23  other conversation with her, yes.

24       Q.   And you received this document during a

25  meeting with Mr. Sun and Grace Faulkner.  Was



JA72

Page 83

1    Mr. Hudson at this meeting?

2         A.   Yes.

3         Q.   And the first paragraph says this, but

4    this document was issued to you for unacceptable

5    performance, correct?

6         A.   Yes.

7         Q.   And do you recall the reason that you

8    received this document was related to inadequate

9    precall planning, lack of technical knowledge and

10   disease state, inability to achieve consistent --

11   consistently effective call progression and

12   consistent sales results, and the lack of

13   demonstrated team leadership at an S3 level?

14        A.   Can you repeat the question?

15        Q.   Yes.  Do you recall that --

16             MS. WAKE:  Karen, could you read the

17        question back to me, please -- or back for

18        Ms. Jones.

19             (Whereupon the Court Reporter read the

20             previous question.)

21             THE WITNESS:  Yes.

22             MS. JONES:  I'm going to object again.

23   You know, the document says what it says.

24             Also, Jared, can you scroll down so I can

25        read what counsel is talking about?  Thank you.



JA73

Page 84

1   BY MS. WAKE:

2       Q.   In that first bolded paragraph there,

3   Ms. Jones, do you see where it says that there was a

4   trend of unacceptable performance related to precall

5   planning and customer-facing abilities?

6       A.   Yes.

7       Q.   And precall planning and customer-facing

8   abilities are the same areas that Mr. Mendoza and

9   Ms. Porter discussed with you, right?

10      A.   Yes.

11      Q.   And this document makes it clear that the

12  gaps in performance were observed primarily by

13  Mr. Hudson, right?

14      A.   Yes.

15      Q.   But Mr. Sun says that he also observed

16  gaps in performance during a field ride with you on

17  June 26th, 2019, correct?

18      A.   After one field ride, yes.

19      Q.   But you remember that field ride with

20  Mr. Sun?

21      A.   Yes.

22      Q.   Why do you think that Mr. Hudson

23  contributed towards this disciplinary document for

24  you?

25           MS. JONES:  Objection.  Calls for



Page 85

1     speculation.

2           You can answer.

3           THE WITNESS:  I don't know.  I don't

4     recall.

5 BY MS. WAKE:

6       Q.  And at the time that Mr. Sun and

7 Ms. Faulkner and Mr. Hudson met with you about this

8 Performance Improvement Plan, Mr. Sun had only been

9 your supervisor for approximately one month, correct?

10     A.  Yes.

11     Q.  And do you remember during this meeting

12 that they discussed inadequate precall planning with

13 you?

14     A.  Yes.

15     Q.  And do you remember discussing specific

16 field rides where Mr. Hudson had observed inadequate

17 precall planning within the VBS model?

18     A.  Repeat the question, ma'am.

19         MS. WAKE:  Karen, can you read it back,

20    please.

21         (Whereupon the Court Reporter read the

22         previous question.)

23         THE WITNESS:  Yes.

24 BY MS. WAKE:

25     Q.  And under that "Inadequate precall



Page 86

1   planning within the VBS model" section there, that

2   Jared has up on the screen, Mr. Hudson and Mr. Sun

3   are acknowledging that your sales numbers improved in

4   2019, right?

5          A.   Yes.

6               MS. JONES:   Where are you reading from?

7        I'm sorry.   I don't see that.

8               Okay.   Yeah, I see it.

9   BY MS. WAKE:

10         Q.   It says, "While sales numbers have

11  improved in 2019, precall planning and other customer

12  facing skills have not improved sufficiently."

13  Correct?

14         A.   Yes.

15         Q.   And then this document goes on to give you

16  examples of how you were not effectively precall

17  planning within the VBS model, correct?

18         A.   Yes.

19         Q.   And there are other areas discussed in

20  this document, such as lack of technical knowledge,

21  inability to achieve adequate call progression, lack

22  of consistent leadership.   Correct?

23         A.   That's what the document says.

24         Q.   And you remember discussing these areas

25  during the meeting with Mr. Sun, Mr. Hudson, and



Page 87

1   Ms. Faulkner?

2          A.   It was read, yes.

3          Q.   And then on the last page of the document,

4   which is Lilly Jones 21, where your signature

5   appears --

6          A.   Yes.

7               MS. WAKE:  Could you scroll up a little

8          bit, Jared, where it says, "In order to improve

9          your performance."

10  BY MS. WAKE:

11         Q.   This sets forth four specific areas that

12  you need to improve on in order to meet the PIP

13  expectations, correct?

14         A.   Yes.

15         Q.   And did you understand these four areas

16  when you signed the document?

17         A.   Yes.

18         Q.   And did you understand that if you didn't

19  meet the expectations, that you could face additional

20  disciplinary action?

21         A.   Yes.

22         Q.   And Mr. Sun set up weekly check-ins with

23  you after receiving this document, correct?

24         A.   No.

25         Q.   So your testimony is that he did not try



Page 88

1    to set up weekly meetings with you?

2          A.    No.  He did not.

3          Q.    Did you try to set up weekly meetings with

4    him?

5          A.    Yes, I did.

6          Q.    You tried to meet with him every week, and

7    he told you --

8          A.    Yes.

9          Q.    -- no?

10          A.    Yes.  He did -- there was ignorance of

11    calls.  I was supposed to call him every Friday.  And

12    I did.

13          Q.    And did you receive a pay cut when you

14    received this disciplinary action in June of 2018?

15          A.    No.

16          Q.    And you didn't receive any reduction in

17    your incentive compensation when you received this

18    document, right?

19          A.    No.

20          Q.    Did you receive any type of demotion?

21          A.    No.

22          Q.    Did your job duties change at all?

23          A.    No.

24          Q.    Did any of your customers get taken away

25    from you when you got the PIP?



Page 89

1        A.    No.

2        Q.    After you received the PIP, did you have

3   regular check-ins with HR?

4        A.    Yes.

5        Q.    Who in HR?

6        A.    Grace Faulkner.

7        Q.    What was the purpose of your regular

8   check-ins with HR?

9        A.    To monitor the progress of my performance.

10       Q.    Do you remember how often those check-ins

11  with Ms. Faulkner occurred?

12       A.    Frequently.  At least -- it depends on the

13  month, but at least every two weeks.

14       Q.    And was it you asking Ms. Faulkner for the

15  meetings, or Ms. Faulkner reaching out to you to ask

16  for the meetings?

17       A.    Both.

18       Q.    Did they occur at a regular cadence, or

19  what -- like a scheduled cadence, or was it just kind

20  of as needed?

21       A.    Both.

22       Q.    What was the regular schedule for the

23  meetings, then?

24       A.    I believe it was every two weeks, if I

25  recall.  I think it was every two weeks.



Page 94

1   were throughout the three months in which I was on

2   the performance -- I had to meet with her.

3        Q.   But do you remember specifically meeting

4   with Ms. Faulkner?

5        A.   Yes.

6        Q.   I'd like you to tell me every time that

7   you met with Ms. Faulkner that you complained

8   specifically about Mr. Sun.

9        A.   All of them?  I don't remember how many

10  times I met with her, but I do remember telling her

11  that there were specific issues.

12       Q.   What issues are those?

13       A.   I told her that he wasn't able to

14  demonstrate the precall planning at all, never once.

15  So if he was asking me to do it, how could I learn if

16  he wasn't able to do so?

17            I told her that he was -- if -- if the

18  call or the provider didn't want to answer, then he

19  dinged me for it.  If -- he didn't do weekly

20  check-ins.  He was just adding petty nuisances

21  about -- he was just kind of being petty about the

22  whole interaction.

23            I could -- if I went start to finish with

24  a physician and I made one small mistake, the whole

25  interaction was wrong.  If -- I believe out of the



Page 95

1   five, you know, physicians that we saw, three or four

2   of the interactions would be good, and he would

3   negate the other one or two; if we saw them in a

4   lunch, or something like that, he would negate the

5   whole day as just not performing.

6          Q.   Anything else?

7          A.   No.

8          Q.   In your complaint -- when I say

9   "complaint," I mean the lawsuit you filed in this

10  case -- you talk about a meeting with Ms. Faulkner on

11  October 15th, 2019, which was the day before you

12  received probation.  Do you remember that meeting?

13         A.   Yes.

14         Q.   And during this meeting on October 15th,

15  2019, Ms. Faulkner told you that you were going to be

16  placed on probation, right?

17         A.   Yes.

18         Q.   And what was your response to that?

19         A.   I was very upset.

20         Q.   Do you remember what you said to

21  Ms. Faulkner during that October 15th, 2019, meeting?

22         A.   I think I called him a liar.  I think I --

23  I told her that David was lying.

24         Q.   Was anyone else at that meeting?

25         A.   No.



Page 96

1        Q.   Do you remember, during that October 15th,

2   2019, meeting, saying that you felt Mr. Sun was

3   discriminating against you on the basis of your sex?

4        A.   I did.

5        Q.   Do you remember telling her that you felt

6   he discriminated against you on the basis of your

7   race?

8        A.   I did.

9        Q.   What exactly did you say to her about

10  discrimination on the basis of your sex?

11       A.   He told me that I was overemotional.  He

12  just talks down to me.  For instance, in a meeting in

13  September, I asked -- we were having a meeting as a

14  team, and I asked a very, very good question about

15  Sparta to one of my colleagues.  And he shut down the

16  question and would not allow me to ask the question.

17  And then when one of my white colleagues asked for

18  the person who was facilitating the meeting to answer

19  it, he allowed the question to go through, only

20  because my white colleague asked.  And he was male.

21       Q.   And you told Ms. Faulkner that during this

22  meeting?

23       A.   I gave her --

24       Q.   That specific example?

25       A.   We talked about things that were



Page 97

1    happening, yes.

2         Q.   But do you remember telling her that

3    specifically, about the meeting with your --

4         A.   I don't remember.  I don't remember.

5         Q.   What do you remember saying to her about

6    feeling like you were discriminated against on the

7    basis of race during that October 15th meeting?

8         A.   Basically the thing of -- the issue about

9    the lunch, she told me that the -- the office said

10   that I was insincere or unapologetic about the lunch,

11   which was not true.  I was very sincere and held

12   myself accountable.  And I apologized immediately.

13   And she allowed me to reschedule lunch, and I did the

14   lunch three weeks later, and I was allowed to go back

15   in and do the lunch.

16        Q.   Do you remember telling Ms. Faulkner

17   during that October 15th meeting that you thought

18   Mr. Sun was unfair?

19        A.   I did.

20        Q.   And other than what you've already told

21   me, do you remember any other things that you told

22   Ms. Faulkner about your interactions with Mr. Sun

23   during that October 15th meeting?

24        A.   I just told her that he was -- his

25   approach came off very abusive, very demeaning, very



Page 106

```
 1        Q.   And so you told her about those issues on
 2   October 15th, 2019.  And then she started
 3   interviewing -- interviewing your colleagues that
 4   same day.  Are you aware of that?
 5        A.   Yes.
 6        Q.   Okay.  Did you know that she interviewed
 7   other women on your team?
 8        A.   Yes.
 9        Q.   Did you know that she interviewed other
10   black women on your team as well?
11        A.   Yes.
12        Q.   And do you have any way to dispute that
13   not one person she interviewed said Mr. Sun
14   discriminated against them on the basis of sex or
15   race?
16        A.   She didn't allow them to answer freely,
17   either.
18        Q.   What do you mean by that?
19        A.   She didn't -- there was no -- she just
20   asked questions, specific questions.  She did not
21   allow them to elaborate or provide questions or
22   statements.  Based on what I was told, that she
23   asked -- she asked them questions where they couldn't
24   elaborate on situations.
25        Q.   And who told you that?
```



Page 107

```
 1          A.   I don't recall off the top of my head.

 2   That's what I was -- when I spoke to somebody, that's

 3   what I was told.  I don't remember who I -- who it

 4   was.

 5          Q.   Well, you just told me that Krystle

 6   Allen told you that --

 7          A.   Right.  I spoke to Krystle Allen, but I

 8   don't remember if it was Krystle or somebody else I

 9   had spoken to.  I had spoken to a few

10   African-American colleagues during that time.

11          Q.   Okay.  So just -- just to clarify, when I

12   ask you a question, I would ask that you give a full

13   answer to my question.

14               So when I asked you who did you -- how did

15   you know that Mrs. Faulkner interviewed your

16   colleagues, what is the answer to that question?

17          A.   I told -- I told you I had spoken -- she

18   said that -- I spoke with Krystle Allen, and she had

19   told me that she had an interview with

20   Grace Faulkner.  But there were other colleagues that

21   she interviewed, as well, that I had spoken to

22   briefly, done briefly.

23          Q.   And how do you know that she interviewed

24   other colleagues?

25          A.   She told me.
```



Page 108

1       Q.   Who is "she"?

2       A.   Grace Faulkner.

3       Q.   So Krystle Allen told you that she was

4  interviewed by Ms. Faulkner, and then Ms. Faulkner

5  also told you that she interviewed other people?

6       A.   Yes.

7       Q.   So who told you that Ms. Faulkner did not

8  let them elaborate on their answers?

9       A.   Like I told you, I don't recall who told

10  me that.  I spoke with a few people.  I spoke with

11  William White.  I spoke with Krystle Allen.  I don't

12  recall who said it, but I remember in conversation

13  having specifically -- she didn't ask me questions

14  where I could elaborate on the situation or tell her

15  any more information; she just asked specific

16  questions to control the conversation.

17      Q.   So then you also, in addition to Krystle

18  Allen, you spoke to William White about

19  Ms. Faulkner's interview of her -- him?

20      A.   Yes.

21      Q.   Okay.  I'm going to ask again, because I

22  feel like I'm not getting a straight answer.

23       Who else besides William White and

24  Krystle --

25       MS. JONES:  Objection.  She's doing the



JA86

Page 109

```
 1        best she can in her memory.  I don't know what
 2        you mean by "a straight answer."
 3              MS. WAKE:  She's changing her answer.
 4        So --
 5              MS. JONES:  No.
 6   BY MS. WAKE:
 7        Q.   Who else did you talk to, besides William
 8   White and Krystle Allen, about Ms. Faulkner's
 9   interview of them?
10        A.   Those are the two specific people that I
11   spoke to.
12        Q.   Nobody else?
13        A.   Not -- no.
14        Q.   Okay.  So now have we talked about all of
15   your conversations, the best that you can recall,
16   related to Ms. Faulkner speaking to your peers?
17        A.   Yes.
18        Q.   And you've told me about the
19   conversations, all of the conversations that you had
20   with HR about Mr. Sun, correct?
21        A.   There was -- Grace Faulkner did not
22   understand why or how I could achieve the results
23   that I was achieving if I wasn't having
24   patient-centered conversations.  She seemed to
25   understand some of the things that I was going
```



Page 118

```
 1          A.   Yes.
 2          Q.   And do you remember him discussing that
 3   with you in person, during this field ride or after?
 4          A.   We discussed it, yes.  But he -- it wasn't
 5   a field ride.  It was -- he attended a lunch.
 6          Q.   A lunch -- are you talking about in
 7   November of 2018, or a different time?
 8          A.   March of 2019.
 9          Q.   So he came to a lunch with you in March of
10   2019, and that's what this is an evaluation of?
11          A.   It was scheduled as a field ride for the
12   day.  However, he was three hours late.  So I still
13   had to continue on with my day.  Everything I had
14   planned that day was offset because he came late.  So
15   he only attended the lunch.
16          Q.   Okay.  So the field -- is it fair to just
17   call it a field visit, then?
18          A.   Correct.
19          Q.   Okay.  So the field visit on March 21st,
20   2019, is what we're talking about, and these are the
21   notes that he sent you after that field visit, right?
22          A.   Correct.
23          Q.   Putting aside this e-mail, do you remember
24   talking to him about that field visit in person?
25          A.   We spoke after the lunch, yes.  And we
```



Page 119

1   spoke after -- yes, we did.

2        Q.   Okay.  Do you remember what you talked

3   about during that meeting?

4        A.   Precall planning.

5        Q.   And did he tell you in person during that

6   meeting that that was an area for improvement?

7        A.   That's all -- yes, it's always going to be

8   an area of improvement for, you know, what we do,

9   yes.

10       Q.   Okay.  And he, in this e-mail, he's giving

11  you seven steps related to precall planning, right?

12       A.   Yes.

13       Q.   And these are pretty specific questions on

14  how to engage in precall planning, right?

15            MS. JONES:  Objection.  The questions are

16       what they are.

17            Could you, Jared, move the page up,

18       please, so I can see the question?  Thank you.

19            You can answer, if you can.

20            THE WITNESS:  Yes.

21  BY MS. WAKE:

22       Q.   Ms. Jones, you can answer.

23       A.   Yes.

24       Q.   Okay.  And he's telling you that you

25  need -- if you look under Number 7 -- not Number 7



Page 120

```
 1   itself, but the paragraph under Number 7 -- he's
 2   telling you that you should be doing this precall
 3   planning, these seven steps, on every call you do,
 4   right?
 5        A.   Yes.
 6        Q.   And then on the last page, kind of right
 7   above his signature line, he's telling you that he
 8   really wants to help you, right?
 9        A.   Yes.
10             MS. JONES:  I don't see it on the
11        document -- okay.
12             MS. WAKE:  Okay, Jared, we can take that
13        one down, and we can pull up the next one, which
14        would be Exhibit Number 9 -- started Lilly 209.
15        (Exhibit 9 was marked for identification.)
16   BY MS. WAKE:
17        Q.   And again, Ms. Jones, you see up at the
18   top there, Mr. Hudson is forwarding it to
19   Grace Faulkner on May 6th, right?
20        A.   Yes.
21             MS. WAKE:  Can you scroll down, Jared, to
22        the part where Ms. Jones is the actual
23        recipient.  Thank you.
24   BY MS. WAKE:
25        Q.   So, Ms. Jones, this is an e-mail that
```



Page 121

1   Mr. Hudson sent to you on April 12th, 2019, correct?

2        A.   Yes.

3        Q.   And he is summarizing a field ride or a

4   field visit that you did together on April 10th,

5   2019, right?

6        A.   Yes.

7        Q.   Do you remember that April 10th, 2019,

8   field visit?

9        A.   Yes.

10       Q.   What do you remember about it?

11       A.   It wasn't the best day for either of us.

12       Q.   What do you mean by that?

13       A.   Part of my -- I just felt like, you know,

14  no matter -- oftentimes when reps bring managers out,

15  they bring them out to the customers that will sit

16  there and interact with them -- and not every

17  customer will do that; most customers -- some

18  customers will just only give you a signature, and

19  you have to go and talk to them during a lunch.

20            And on my field visit with -- that was the

21  day that I had, because I had two other partners that

22  I have to route around.  I brought him to a few

23  offices that give me limited time to engage with

24  them.  They either don't want me to, or you can't ask

25  my questions; they will only give you a signature.



JA91

Page 122

1          And so because of that, he basically said

2    I didn't do a good job that day.  And then also, in

3    the discussions in the car, after we debriefed, he

4    said he believed that precall planning was the core

5    of our job.  And he's like, "Do you agree?"

6          And I told him I didn't, and it became a

7    disagreement, because I didn't agree with him.

8      Q.    Tell me more about that disagreement.  How

9    did it go?

10     A.    It wasn't -- no yelling.  But it just

11   was -- I voiced my opinion about the situation, and

12   he didn't like it.  He didn't like that I didn't

13   agree with him.

14          So I felt like because he didn't like what

15   I said, then he continued to proceed to what he

16   was -- he did.  Like -- "Well, she doesn't like it;

17   she's not going to precall plan, I'm going to write

18   her up."

19          So it became one of those things, and it

20   became an intense discussion.  I was like, "There are

21   other areas about our job and what we do that have

22   nothing to do with precall planning.  So I can't make

23   that the sole importance of our job, because we make

24   an impact based on relationships, engaging with

25   our -- our customers, engaging with HTPs, providing



JA92

Page 123

```
 1   resources for them, talking about their patients,
 2   engaging their staff, doing peer-to-peer programs,
 3   showing up every day to deliver those samples that
 4   are needed for patients.
 5             So there's other impacts that I just felt
 6   like -- like precall planning was important, but it
 7   just wasn't the most -- he made it like -- "Is this
 8   the most important thing?"  And I just didn't agree
 9   with him on that.  And he got mad.
10        Q.   Okay.  So he told you that for him,
11   precall planning is one of the most important things
12   you could do as a rep?
13        A.   Yes.
14        Q.   And you don't agree with that?
15        A.   I didn't say that I didn't -- I didn't
16   agree that it was the most important thing.  I think
17   it was important.  I told him, I said, "I think it's
18   important, but I don't think it's the most important
19   thing, no."
20             Because there are situations where you're
21   precalling planning, and you can precall plan, you
22   say, "I'm going to ask this question; I'm going to
23   talk about these things," and the conversation can go
24   completely different when you get in there with that
25   provider, based on what's going on in that office.
```



Page 124

1  Or the question doesn't land properly, or the

2  physician's not feeling it, and you have nowhere else

3  to go.

4          So it's very subjective when you go in

5  there.  You don't know what you're going to be

6  dealing with, and you don't know how the provider is

7  going to respond.

8          Q.   Okay.  And in this e-mail to you, he's

9  telling you that he thinks there's nothing more

10  important for you than showing improvement in precall

11  planning, right?

12          A.   Uh-huh.  Yes.

13          Q.   Do you remember him saying that to you in

14  person?

15          A.   I just told you that, yes.

16          Q.   Well, just to clarify, what we talked

17  about before was that he told you that he thought

18  precall planning was the most important element of

19  the role.  And what I was asking you is slightly

20  different.

21          Do you remember him telling you in person

22  that the most important thing for you to do was to

23  show improvement in that area?

24          A.   As I said, I told you that.  Yes.

25          Q.   And if you look through this, just like



Page 125

1   you said, he's kind of summarizing in this document

2   that -- it sounds like both of you were in agreement

3   that the calls on Wednesday were not the strongest,

4   right?

5          A.   The day just -- it wasn't the strongest,

6   no, but there were times and moments where it wasn't

7   all bad.  It just wasn't a good day.  It just wasn't

8   a good day for him to be with me.  It wasn't a good

9   day, period.

10         Q.   And do you remember him telling you, after

11  the field ride, that he had mentioned this issue of

12  precall planning to you the last two times that you

13  did field rides?

14         A.   Yes, but I also told him that I had been

15  out for that time of precall planning, when I went --

16  that training took place.  So, you know, how they did

17  precall planning in March of 2018, I wasn't there for

18  that training.

19              I explained to him that engaging with

20  customers had been a challenge, because now I had to

21  re-establish relationships with those customers that

22  I didn't have.  I wasn't returning back to a familiar

23  territory.  I returned back to an unknown territory,

24  a new team, and a new manager.

25         Q.   When did you come back from your leave of



Page 126

1  having your child?  That was in August of 2018?

2      A.    That was in -- June 3rd or 5th, June 5th

3  of 2018.

4      Q.   And then you -- but then you went on

5  another leave --

6      A.    Yes.

7      Q.    -- in July and August?

8      A.    July -- July 10th through October 3rd of

9  2018.

10     Q.    October 3rd.  So when you came back from

11  the leave on October 3rd, 2018, when Jax Porter was

12  still your supervisor, you had missed the training,

13  either when you had your child or when you were on

14  that kind of second leave in the fall?

15     A.    Correct.

16     Q.    Mr. Hudson did a field ride with you when

17  you came back in November of 2018, right?

18     A.    Correct.

19     Q.    And we talked about that already.

20          And then he did a field ride with you on

21  March 21st, 2019, that we just talked about, too,

22  right?

23     A.    Yes.  It was a field visit, yes.

24     Q.    And then we're now talking about the kind

25  of third field ride that he did with you since you



Page 127

1   came back from your leaves on April 10th, 2019,

2   right?

3           MS. JONES:  Objection.  Mischaracterizes

4       the testimony.

5           You can answer.

6           THE WITNESS:  Yes.

7   BY MS. WAKE:

8       Q.   He had three visits with you after you

9   came back from your leave in 2018, right?

10      A.   Yes.

11      Q.   And on all three of those visits, he was

12  observing interactions you had with customers and

13  providing you with feedback?

14      A.   Yes.

15      Q.   And in this document that we're looking at

16  here, the April 12th, 2019 e-mail, he refers you back

17  to the kind of seven-steps process that he told you

18  about previously?

19          MS. WAKE:  So, Jared, if you scroll down

20      to the second page, so Ms. Williams-Jones can

21      see it.  That one right there, yeah.

22  BY MS. WAKE:

23      Q.   He says, "I've already sent you the

24  stepwise process," and "I recommend you walk through

25  it line by line on every call"?



JA97

Page 128

```
 1          A.   Yes.

 2          Q.   Do you remember him telling you that in

 3   person as well?

 4          A.   He told me to write out the interactions,

 5   the same way that the -- the same specific thing I

 6   told you about with Grace.  That was his example and

 7   suggestion, for me to write out all my calls.  That's

 8   what the example he told me that I needed to do.

 9          Q.   But he gave you that seven-step process

10   that we talked about in the last exhibit, right?

11          A.   Yes.

12          Q.   And he's telling you in this e-mail, he's

13   already sent you that process?  And then he --

14          A.   He sent it in March, uh-huh.

15          Q.   He's saying, "Please take my advice to

16   print that out," right?

17          A.   Yes.

18          Q.   Or use the attached PerQs sheet on every

19   call.  Do you see that?

20          A.   Yes.

21          Q.   Okay.  So he's reminding you again of the

22   steps that he wanted you to use and of the PerQs

23   method, right?

24          A.   Yes.

25               MS. WAKE:  Okay.  We can take that one
```



Page 129

1          down, and we can pull up the next exhibit, which

2          is the attachment to the e-mail.

3                    MS. JONES:  Is it page 211?

4                    MS. WAKE:  Yes.

5          (Exhibit 10 was marked for identification.)

6                    MS. WAKE:  Okay.  So I'm going to mark

7          this, I think, as Exhibit 10.

8   BY MS. WAKE:

9          Q.   This is the attachment to the e-mail that

10  we were just talking about that Mr. Hudson sent to

11  you.  Do you recognize this document?

12         A.   Yes.

13         Q.   And you produced this document in the

14  litigation, correct?

15         A.   Yes.

16         Q.   And it's called:  "Be the Leader in

17  Patient Outcomes."  The -- right there under the

18  title, the first paragraph there, it says, "VBS and

19  Medical Professionalism help us uncover customer

20  needs."

21                   Do you see that?

22         A.   I see it.

23         Q.   And do you remember reading this document

24  while you were a sales representative?

25         A.   Yes.



Page 130

1     Q.  And do you remember Mr. Hudson sending

2  this document to you?

3     A.  I don't remember that.

4     Q.  Well, how did you get the document to

5  produce it in this litigation?

6     A.  I had it.  Everyone has a copy of it.

7  That's something you just keep in your car.  I had

8  it.  Everyone is given a copy.  Mr. Hudson -- I don't

9  remember Mr. Hudson giving me that.  I already had

10  one.

11     Q.  All right.  So you were familiar with this

12  document during your time with Lilly?

13     A.  Yes.

14     Q.  And if we look at back -- if you look back

15  to the e-mail that we were just talking about, when I

16  just asked you, he said, "Please take my advice" to

17  print out those seven steps, and use that or the

18  attached PerQs sheet on every call?

19     A.  Yes.

20     Q.  So he was sending this to you attached to

21  that e-mail, correct?

22     A.  Yes.

23     MS. JONES:  Do you know?

24     THE WITNESS:  I don't.

25     I told you already that I didn't know.  So



Page 131

1          I -- I guess no.  I don't know.

2    BY MS. WAKE:

3          Q.   Okay.  So just so the record reflects, so

4    your lawyer just told you to change your answer.

5               MS. JONES:  I did not tell her to change

6          her answer.  She had already told you she had no

7          recollection of him sending it to you.  So you

8          keep asking the same question.

9               She doesn't remember; big deal.  You have

10         Exhibit 9, and it says what it says.  And you

11         have Exhibit 10.  If she doesn't recall, that's

12         fine.

13              THE WITNESS:  I don't remember the e-mail.

14   BY MS. WAKE:

15         Q.   You don't remember getting this e-mail, or

16   you don't remember --

17         A.   I got the e-mail, but I don't remember

18   this document being attached, about him giving me

19   PerQs.  I already had the PerQs, as I explained.

20         Q.   Okay.  But this document is attached to

21   this e-mail, and you said you got this e-mail,

22   correct?

23         A.   I got the e-mail, yes.

24              MS. JONES:  Asked and answered, four

25         times.



Page 132

1              MS. WAKE:  Jan, I'm going to ask the
2         questions I want to ask.  Thank you.
3    BY MS. WAKE:
4         Q.   And this document is reminding you how to
5    engage in precall planning, right?
6         A.   Yes.
7         Q.   And then on that second page, its title is
8    "Precall Planning," and it goes through the PerQs
9    steps, correct?
10        A.   Yes.
11             MS. JONES:  You're not looking.
12             THE WITNESS:  I know it.  I saw it.
13             MS. JONES:  Would you turn the document to
14        the second page, Jared, please?  Okay.
15   BY MS. WAKE:
16        Q.   And up there at the top, it's -- before
17   you leave your car, you're supposed to ask yourself,
18   what do I know from my last call, right?
19        A.   Yes.
20        Q.   And were you aware of the fact that when
21   you were a sales rep, you were supposed to be
22   building on information learned in your prior calls?
23        A.   Yes.  However --
24        Q.   And you were supposed --
25        A.   However, there are times when the



Page 133

1  physician is not -- out for months on end.  There are

2  times where you might be out.  And there are times

3  that you can't remember what you last talked about.

4       Q.   Well, aren't you supposed to document what

5  you talked to the customers about?

6       A.   No, you're not.

7       Q.   You're not supposed to document what

8  you --

9       A.   You're not supposed to --

10       Q.   -- speak to your customers about?

11       A.   -- because it's a HIPAA violation when

12  we're talking and discussing patients.  We weren't

13  allowed to take notes.

14       Q.   Your testimony is that as a sales rep, you

15  weren't allowed to take notes about your interactions

16  with your customers?

17       A.   You're not supposed to, no.

18       Q.   Are you sure about that?

19            MS. JONES:  Objection.  Asked and

20       answered.  Move on.  She said no.

21  BY MS. WAKE:

22       Q.   So then how were you supposed to build on

23  your prior visits to your customers, if you weren't

24  allowed to take any notes?

25       A.   We go back to when I told you about



Page 138

1        A.    I believe -- yes.

2        Q.    And during that conversation, do you

3    recall telling Grace that you -- you know you've

4    always needed to improve on progressing the calls and

5    asking more patient-focused questions, right?

6        A.    Yes.

7        Q.    And did you tell her that you didn't get

8    along with Jax Porter?

9        A.    Yes.

10        Q.    And that Mark Hudson was nitpicky?

11        A.    He did, yes.

12        Q.    I'm not asking if you thought Mark Hudson

13    was nitpicky.  I'm asking if you remember telling

14    that to Grace Faulkner on June 28th.

15        A.    I told Grace about the interaction I had

16    with Mark on -- after our ride-along, yes.

17        Q.    But do you remember saying he was very

18    nitpicky?

19        A.    I don't recall.

20        Q.    And do you remember telling Grace Faulkner

21    during that June 28th meeting that you thought David

22    Sun was going to be totally different as a manager?

23        A.    Yes.

24        Q.    And do you remember telling Grace Faulkner

25    that David gave you helpful information during your



Page 139

1  first ride-along?

2      A.   I -- yes.

3      Q.   And do you remember telling her that David

4  had some suggestions for you, about reaching out to

5  new people, that you felt like you never got from

6  Mark Hudson?

7      A.   I don't recall that.

8      Q.   And do you recall telling Grace that you

9  and David were going to work together on things that

10 you knew you needed to improve?

11     A.   I did.

12     Q.   Is it fair to say that before you received

13 the PIP, you were fairly positive about Mr. Sun as a

14 supervisor?

15     A.   I wanted to be, yes.

16     Q.   Were you aware that Mr. Sun also spoke

17 with Grace Faulkner on June 28th about his field

18 visit with you?

19     A.   Yes.

20     Q.   And how were you aware of that?

21     A.   Because she called me and told me that I

22 was going to be receiving a PIP.

23     Q.   Did she call you and tell you that on that

24 same day, June 28th?

25     A.   I don't remember.  I don't recall what



Page 140

1  days.

2       Q.   You got the PIP on June -- on the next

3  day, June 29th.  And so do you remember receiving a

4  voicemail from her on June 28th saying that you were

5  going to receive the PIP?

6       A.   I think she left the voicemail and I

7  called her back.  I don't remember how it happened,

8  but yes, there was some kind of communication around

9  a PIP, yes.

10           I knew that well in advance.

11      Q.   How did you know it well in advance?

12      A.   Because Mark Hudson had told me that I was

13  going to be receiving a PIP.  It was not from David.

14  It was from Mark.

15      Q.   When did Mr. Hudson tell you that?

16      A.   In May of 2019.

17      Q.   But you didn't receive it until June 29th,

18  2019?

19      A.   Correct, and I made note of that to Grace

20  as well.  I said, "Why did this take so long?"  And

21  she thought it was odd as well.

22      Q.   All right.  I'm going to now turn to talk

23  with you about field visits with Mr. Sun.

24           MS. WAKE:  So we can take down this

25      precall planning exhibit.



Page 141

1          And for this one, I'm going to ask, Jared,

2     to please pull up on the screen Lilly Jones --

3     let me see here -- 283 to 286.  It's at the

4     bottom of the SharePoint file.  It's the very

5     last attachment in the file.

6          MS. JONES:  283 -- I don't have that.

7          MS. WAKE:  You should have 283.

8          MS. JONES:  I thought you said 283

9     through 286.

10          MS. WAKE:  Yep, and that's why I'm having

11     him pull it up, because you're missing the last

12     three pages for some reason.

13          MS. JONES:  Yes.

14          MS. WAKE:  So we're going to pull up the

15     full document on here.

16          MS. JONES:  Right.

17          MS. WAKE:  Right.

18      (Exhibit 11 was marked for identification.)

19  BY MS. WAKE:

20      Q.   So Mr. Sun did several field rides with

21  you -- or field visits; what do you prefer I call it?

22  "Field ride" or "field visit"?

23      A.   Like I said, because Mr. Hudson only

24  rode -- was there for a lunch, and I think one other

25  customer, maybe.  It wasn't a whole day, so it wasn't



JA107

Page 142

1   a field ride; it was just a visit.

2           Mr. Sun, there were field visits.

3       Q.   Okay.  So I'll just call them "field

4   visits," and if for any of them --

5       A.   I'm sorry.

6       Q.   -- that isn't the right --

7       A.   Field rides, yes, uh-huh.

8       Q.   Okay.  If for any of them "field ride"

9   isn't the right thing, please just correct me; but

10  I'll call them "field rides" until you tell me not

11  to.

12          So Mr. Sun did several field rides with

13  you after you got your PIP in June.  Correct?

14      A.   Uh-huh.  Yes.

15      Q.   Okay.  So this -- this document, Lilly

16  Jones 283, this is Mr. Sun sending you the -- what

17  he's calling a coaching report from a field ride.  Do

18  you see that?

19      A.   Yes.

20      Q.   What's a coaching report from a field

21  ride?

22      A.   It's the details of what happened on your

23  field ride.

24      Q.   Is this something only Mr. Sun did, or did

25  all supervisors do these kind of coaching reports



Page 143

1  after field rides?

2      A.   That's the difference between Mr. Hudson

3  and Mr. Sun.  That would make the difference.  A

4  manager is supposed to tell what happened and --

5  throughout your day on the field ride, and they put

6  it in Veeva.  Mr. Hudson didn't.

7      Q.   What's Veeva?

8      A.   Veeva is our sales force tool.

9      Q.   So Mr. Hudson didn't upload it into Veeva?

10      A.   I don't remember -- I don't recall ever

11  getting a coaching report from Mr. Hudson, because he

12  was not my manager.  I don't recall that.

13      Q.   We just talked about the e-mails where he

14  sent you summaries of the visits and rides, right?

15      A.   That's not the same thing, though.

16      Q.   How is it not the same thing, if he's

17  evaluating your performance on visits with customers?

18      A.   For instance, Mr. Hudson sent an e-mail.

19  This is a coaching report.

20      Q.   But the e-mails Mr. Hudson sent you had

21  reviews of your field visits and field rides,

22  correct?

23          MS. JONES:  Objection.  Argumentative.

24      She says it's not a coaching report.  It's

25      different.  I mean, can we move on?



Page 144

          1              MS. WAKE:  No.

          2    BY MS. WAKE:

          3         Q.    Mr. Hudson sent you e-mails with summaries

          4    of your field visits, right?

          5         A.    Summaries, yes.  Not a coaching report.

          6    It's an e-mail.

          7         Q.    What does a coaching report contain?

          8         A.    That's what you're looking at on the

          9    screen, on the right-hand side there.

         10         Q.    And it's a summary of your field visit?

         11         A.    Right.  It's a summary of a field visit,

         12    put into Veeva.

         13         Q.    Okay.  So do you remember receiving the

         14    August coaching report from Mr. Sun?

         15         A.    Yes.

         16         Q.    Okay.  And let's look at the actual report

         17    itself.  Why don't you just kind of skim through it,

         18    and tell Jared when you're ready to flip pages.  And

         19    let me know when you're done.

         20              MS. JONES:  Well, he needs to blow it up.

         21         I can't see it.  The second page.

         22              And again, we don't have it; we just have

         23         the first page.  Page 283 of Exhibit 12, in the

         24         hard copy.

         25              MS. WAKE:  Yep.  It's up on the screen



Page 145

1       here.

2                 THE WITNESS:  Yes, I'm done.

3                 MS. WAKE:  Okay, Jared, you can go to the

4       next page there.

5                 THE WITNESS:  I'm done.

6                 MS. WAKE:  All right.  We can go back to

7       the first page.

8    BY MS. WAKE:

9       Q.   So do you remember Mr. Sun telling you

10   that one of the purposes of your field rides with him

11   would be to review the progress of the PIP?

12      A.   Yes.

13      Q.   And specifically about your progress with

14   precall planning?

15      A.   Yes.

16      Q.   And it looks like he visited five offices

17   with you on this field visit on July 30th, 2019.  Do

18   you remember visiting five offices?

19      A.   Yes.

20      Q.   And under "Precall Planning," he's telling

21   you that you did use PerQs and Tableau.  So you

22   remember him giving you that positive feedback?

23                MS. JONES:  Where is that?

24                MS. WAKE:  Under "Precall Planning."

25                THE WITNESS:  Can you move it up, please?



Page 150

1    patients.  We did not interact or dialogue about five

2    patients on a weekly basis.  I scheduled calls with

3    David because if I did not, I would have gotten

4    written up for a PIP.  But just because I schedule

5    them does not mean that they took place.

6         Q.    Right.  But you just told me they never

7    took place.  And this e-mail, to me, looks like a

8    summary of a phone conversation that -- phone

9    conversation check-in that you had with him.

10        A.    It was a check-in through the field ride

11   on the 30th.

12        Q.    So you're saying this wasn't separate from

13   your field ride?

14        A.    No.

15        Q.    Okay.  So -- but you had a phone

16   conversation with him about your progress, right?

17        A.    There might have been a phone

18   conversation, but -- there's a difference between a

19   phone conversation and actually dialoguing with a

20   manager about patients.

21        Q.    But you had phone conversations with him

22   about your progress.  That's what this e-mail is

23   summarizing?

24             MS. JONES:  Objection.  Argumentative.

25        She . . .



JA112

Page 151

```
 1              THE WITNESS:  As I said before, just
 2         because it was scheduled does not mean that it
 3         took place.  There might have been a brief
 4         conversation about, you know, continue precall
 5         planning; but check-ins are not progress
 6         improvement.
 7              You know, it was -- you're supposed to
 8         dialogue with your manager about patient-focused
 9         questions, dialogue about the patients, dialogue
10         what would you ask the provider; things of that
11         nature.  He did not do that.
12    BY MS. WAKE:
13      Q.   Ms. Jones, this e-mail says, "Thanks for
14    scheduling our weekly check-in."
15              And then he says, "As per our phone
16    conversation," and lists what you talked about on the
17    phone.
18              And then he says, "Please continue working
19    on these areas next week and schedule our weekly
20    check-in for my further assessment."
21              MS. JONES:  I'm going to object.  The
22         document says what it says.  She's already
23         testified this was not a weekly check-in for her
24         PIP.  It was a summary of something else.
25              And she was supposed to discuss five
```



Page 152

```
 1      patients, according to her PIP.  They didn't do
 2      that.  And this is about a ride-along.  She
 3      already told you all of that.
 4            Now, if you don't agree, you don't agree.
 5      But she told you what her recollection is,
 6      irrespective of what Exhibit 12 says.
 7  BY MS. WAKE:
 8      Q.   So, Ms. Jones, you do not believe that
 9  this phone call that you had with Mr. Sun, that he's
10  calling a weekly check-in, you do not think that was
11  a weekly check-in?
12      A.   No, it wasn't.
13      Q.   Okay.  So in this e-mail, he's telling
14  you, "As per our phone conversation, here are the
15  areas where you need to continue to improve."  Right?
16      A.   Yes.
17            MS. JONES:  Objection.  Asked and
18      answered.
19  BY MS. WAKE:
20      Q.   And do you remember talking to him about
21  this during this phone conversation?
22      A.   No, I don't.
23      Q.   Do you remember receiving this e-mail?
24      A.   Yes, I do.
25      Q.   And you read the e-mail?
```



Page 153

 1          A.   Yes, I did.

 2          Q.   And he's telling you in that e-mail, he's

 3   giving you some specific steps on what type of

 4   questions to ask, right?

 5                MS. JONES:  Objection.  The e-mail says

 6           what it says.

 7   BY MS. WAKE:

 8          Q.   You can answer the question.

 9          A.   I don't even remember the question.

10   What's the question, ma'am?

11          Q.   He's giving you specific steps in this

12   e-mail of things he'd like to see you do.  For

13   example, "provide insights or follow-ups from

14   previous visits" so you can progress the calls.

15   "Move away from these questions and focus on patient

16   questions."  Do you see that?

17          A.   Yeah.

18                MS. JONES:  Same objection.  The e-mail

19           says what it says.  We don't need to read it.

20   BY MS. WAKE:

21          Q.   Can you answer my question, please,

22   Ms. Jones?

23          A.   I said yes already.  Yes.

24          Q.   Okay.  Thank you.

25                MS. WAKE:  We can pull that one down, pull



Page 154

1         up another -- another exhibit.

2              The one we're going to pull up next --

3         it's the same thing, and this is the last one

4         where this happens, where for some reason

5         Ms. Jones didn't get the full document.

6              So this is Lilly 36 in the SharePoint

7         file.  It's the second-to-last document.

8         Ms. Jones has the cover e-mail, which is Lilly

9         Jones 36.

10        (Exhibit 13 was marked for identification.)

11   BY MS. WAKE:

12        Q.   Okay, Ms. Jones, this is Exhibit

13   Number 13.  This is a -- another transmittal e-mail

14   from Mr. Sun, where he's sending you a coaching

15   report from a field ride.  Correct?

16        A.   Yes.

17        Q.   And he says it's in Veeva?

18        A.   Yes.

19             MS. WAKE:  And then if you scroll to the

20        next page, Jared, the field visit date here is

21        August 20th, 2019.

22   BY MS. WAKE:

23        Q.   Do you remember doing a field ride with

24   him on August 20th, 2019?

25        A.   I do.



Page 155

1          Q.   Okay.  And in here, he says, "You were

2     expected to schedule 30 minutes on my office days to

3     have weekly check-in on your precall planning

4     improvement."

5               We talked about this.  You said that you

6     scheduled them, and he just didn't show up, or they

7     were canceled?

8          A.   Yes.

9          Q.   And do you remember receiving this

10    coaching report and reviewing it?

11         A.   Yes.

12         Q.   And this coaching report -- I'm going to

13    give you a minute to look at it.  So just let Jared

14    know when you're -- when you're ready to go to the

15    next page.

16         A.   I read it.

17              MS. WAKE:  Okay.  Then next page, please,

18         Jared.  Please.

19              THE WITNESS:  Yes, I read it.

20              MS. WAKE:  Okay.  Let's go back to the

21         page that's Lilly Jones 37, so the first page of

22         the coaching report.  That one.  Yeah.

23    BY MS. WAKE:

24         Q.   So he's -- again, he goes through "Precall

25    Planning," "Customer Facing Skills," "Product and



Page 156

1   Disease State Knowledge," and a few other categories

2   in this document, right?

3          A.   Yes.

4          Q.   And do you see, under "Precall Planning"

5   and "Customer Facing Skills" and "Product and Disease

6   State Knowledge," in every one of those sections, he

7   has a portion that's called "Example."  And then he

8   gives you an example of what he's talking about.  Do

9   you see that?

10         A.   Yes.

11         Q.   And then if you look to the next page,

12  under "Summary," he's saying that "During our field

13  ride today I used several examples to share with you

14  what good looks like and you told me that you were

15  clear about the expectation . . . from my coaching."

16              Do you remember telling him that you were

17  clear on the expectation?

18         A.   I was clear.  However, he documented it as

19  insufficient improvement.

20         Q.   But do you remember telling him that you

21  were clear on the expectation?

22         A.   Just because I was -- I didn't agree with

23  it, but I was clear.  It was clear for me that --

24  what he said.

25         Q.   Okay.  And if you look down there at your



JA118

Page 157

1  numbers, you're doing very well with your sales,

2  right?

3       A.   Yeah.

4       Q.   Including 108 percent of your target,

5  110 percent of your target.  That's very good, right?

6       A.   Yes.

7       Q.   Okay.  And then back there under "Summary"

8  again, he's telling you that "the interim result of

9  the PIP assessment is no sufficient improvement

10 because the areas of improvement remain . . . the

11 same."  Do you see that?

12      A.   Yes.

13      Q.   And do you remember him telling you that

14 during the field ride, that you weren't making

15 sufficient improvement?

16      A.   And I disagreed with him.  Yes.

17      Q.   Tell me about that interaction.

18      A.   I told him that we had saw five customers;

19 three of the interactions with the customers went

20 very well.  I can name the providers that I

21 interacted with.

22           Maybe two others, they weren't bad, but

23 they might not have been to the level or degree of

24 satisfactory as the other three.  And he actually --

25 instead of putting any of that in my coaching report,



Page 162

1  required us to put all these lunches on our calendar,

2  because -- so it made -- I couldn't see what was

3  going on.

4          And because of that, I had already

5  scheduled another lunch and confirmed that lunch.  So

6  when that office had called, I didn't realize that I

7  had double-booked the lunch.  So when I spoke to that

8  office manager, I apologized, automatically, and I

9  took accountability of my mistake that I made, and I

10  asked her if I could -- would she allow me to

11  reschedule, reschedule the lunch.

12          I rescheduled the lunch.  That happened in

13  July, and I rescheduled the lunch and did the lunch

14  in August.  However, Mr. Sun did not bring it up

15  until September 25th.

16      Q.   Did you know that the staff of that

17  office, or that customer, asked your partner about

18  the missed lunch?

19      A.   No, she brought him in there to ask about

20  that lunch.  Ms. Boggs, the same person that did the

21  previous lunch as well.  Which I thought was

22  interesting.

23          And I also --

24      Q.   Why do you think that --

25      A.   Because I had talked -- I had spoken with



JA120

Page 163

1   my partner, Krystle Allen, and I was like -- when I

2   asked, it was like, "Did you know that she was in

3   that office?"  And she said -- she didn't tell me

4   that she was going to that office.

5           And we both thought that was interesting,

6   because we typically tell each other where we're

7   going so we can avoid running into our manager.

8   Because it's just -- you know, best practice is not

9   to be at the same office at the same time.

10          So when she did that, we both realized

11  that she had brought him in the office.  Because it's

12  in the book as "canceled last minute," or something

13  like that.

14          But oftentimes things happen.  Things

15  change.  It's a lunch; things happen, and you just

16  have to -- you just reschedule and move on.  Offices

17  have canceled on me, at the last minute, things that

18  happen with offices previously in the past.

19          So the lunch that was missed, it was --

20  you know, if I missed a lunch, one out -- of I don't

21  know, 80 lunches -- I'm sorry.  That's just a small

22  error on my part.

23      Q.   Okay.

24          MS. WAKE:  Let's go ahead and pull up what

25      will be Exhibit 15, Lilly Jones 270.



JA121

Page 164

1          (Exhibit 15 was marked for identification.)

2              TRIAL TECHNICIAN:  And I believe this one

3      should be Exhibit 14.

4              (Discussion off the record.)

5              MS. WAKE:  The August 27th, 2019, e-mail

6      was 14.

7              TRIAL TECHNICIAN:  Yes.

8              MS. WAKE:  And so this is September 25th,

9      2019 field ride, should be 15?

10             TRIAL TECHNICIAN:  Okay.  We'll have to

11     figure it out off the record.

12             MS. WAKE:  Okay.  Thank you.

13  BY MS. WAKE:

14         Q.  This is a summary of a field visit.  Do

15  you remember having a field visit on September 25th,

16  2019, with Mr. Sun?

17         A.  I do that day, I do.

18         Q.  Do you remember using an incorrect

19  detailing piece on that field visit?

20         A.  No.  I don't.  That day was flawless from

21  start to finish.  And if he was, it was reported

22  as -- you know, he didn't like it.  Mr. Sun often

23  would do -- like if he didn't like something, he

24  would make it a negative for you.

25             So no, I don't remember that.  So, no.



MAGNA

LEGAL SERVICES

JA122

Page 165

1     Q.   Do you see under "Precall Planning" on

2  this document, it says, "That being said, you

3  detailed Basaglar" -- sorry if I'm saying that wrong

4  -- "in the fifth office without precall planning with

5  me and used the inappropriate detailing piece as a

6  result.  You should ensure you follow the precall

7  planning and detail customers only after proper

8  precall planning."  Do you see that?

9     A.   Yes.  However, Mr. Sun knows that we were

10  supposed to detail three patients set up in a lunch.

11  We're supposed to talk about what we get paid on is

12  -- what we get paid on, Trulicity, Jardiance and

13  Basaglar.

14          And that's what I did with my customer.  I

15  had no other product to discuss with her, and as a

16  rule of mine, I talk about all three products,

17  because -- just because a physician might not write

18  it doesn't mean they won't write it eventually, or

19  might not make an exception for a patient.

20          And he didn't like that, because -- he

21  just didn't like it.  We're supposed to talk about

22  the products:  Trulicity, Jardiance, and Basaglar.

23     Q.   And then do you see under "Customer Facing

24  Skills," he's giving you another example of how to

25  ask a question?



JA123

Page 166

 1        A.   Yes.

 2        Q.   And then under "Business Planning and

 3   Organization," I think that that's the same lunch

 4   that we just talk about.  Is that fair?

 5        A.   Yes.  However, there was no mention of

 6   anything that I did right in this report, as well,

 7   based on that day.

 8        Q.   Well, under "Precall Planning," it says,

 9   "You were able to precall plan based on PerQs and

10   Tableau throughout the day," and that you brought

11   more previous interactions to the call, and --

12        A.   It's still -- it's still insufficient.

13        Q.   And then he says, "We agreed that the

14   first and the fourth office today were the

15   strongest."  And he lists things that you did

16   successfully, right?  And he says that you asked good

17   questions.  Do you see that?

18        A.   Yes.

19        Q.   And if you turn to the next page, under

20   "Summary," he talks about the importance of

21   consistency, and he -- he tells you that given the

22   kind of canceled lunch, the gap towards meeting the

23   expectations of the role was actually widened.

24   Right?

25        A.   According to him, okay.  Yes.



Page 167

1      Q.   Do you remember him telling you that?

2      A.   Yes, and I also remember -- I do remember

3   him telling me that.

4      Q.   During a conversation?

5      A.   We had a conversation where I told him,

6   "Why are you just bringing this up now?  The lunch

7   was canceled and missed in July; why are you just now

8   bringing it up on September 25th?"

9           And he -- he gave -- he's like, "Oh, I

10   just found out about it."

11          But if the lunch was canceled, if the

12   lunch was missed and I rescheduled it, what are we

13   talking about now?  Lunches get canceled all the

14   time.  Lunches get missed.  You know, problems happen

15   all the time around lunches.  So why are we making

16   this an issue, and why am I being docked for a small

17   oversight that happened based on the excessive

18   calendar invites on my calendar?

19      Q.   Okay.

20          MS. WAKE:  We can go ahead and take that

21      down, and pull up the next document, which is

22      the summary of the October 14th, 2019 field

23      ride.

24       (Exhibit 16 was marked for identification.)

25          MS. WAKE:  Lilly 451.



JA125

Page 168

1    BY MS. WAKE:

2         Q.    And do you remember receiving this

3    coaching report from an October 14th, 2019, field

4    visit?

5         A.    Yes.

6         Q.    And do you remember making six detailing

7    calls in four offices on that day?

8         A.    Yes.

9         Q.    And again, in this document, Mr. Sun is

10   reviewing precall planning, customer-facing skills,

11   and business planning with you?

12        A.    Yes.

13        Q.    And you remember reading this document?

14        A.    Yes, and I remember telling him that what

15   he put down was inaccurate throughout the day,

16   specifically with the call that I had, two provider

17   calls that I had.  And he got mad.

18        Q.    What did he get mad about?

19        A.    Because the -- from start to finish, the

20   interaction went really, really well, to the point

21   that the physician at the end of it shook my hand,

22   how well I detailed her.  And in the -- and in his

23   notes, he doesn't reflect any of that.

24             So he -- I'm trying to get off of a PIP,

25   and he's inaccurately documenting me, or just trying



JA126

Page 169

1   to find small -- you know, small nuisances to write

2   in my report.

3              Specifically -- "Oh, well, that provider

4   told you that he doesn't write, you know, a product."

5              I was like, "But he only did one detail

6   for him."

7              We're supposed to sell the portfolio.

8   That's the mission for VBS, is to sell the portfolio.

9   Regardless, you're supposed to do two stand-up calls

10  per conversation with a provider.

11             And he got mad, because I mentioned -- or

12  suggested maybe considering Glyxambi.  He didn't like

13  it.  "Well, this provider doesn't write any other of

14  our drugs other than Jardiance," so I'm only supposed

15  to talk about one drug.  So -- I mean, it's kind

16  of -- you still have to continue doing what you're

17  supposed to do, in terms of selling the portfolio and

18  making them aware about a patient that might come

19  down the line, about a product that might benefit

20  that patient.

21             And he didn't like it.  He didn't like it

22  because the physician gave me kudos.  He didn't like

23  it that I was engaging her.  He didn't like it that

24  the office liked me.  He didn't like it that good

25  things were -- they were acknowledging that I was a



JA127

Page 170

1  good rep.

2      Q.   So you -- I mean, you clearly disagree

3  with Mr. Sun's assessment of your performance in

4  these --

5      A.   Yes.

6      Q.   -- field rides?

7      A.   Because I did improve.  I did improve.

8  And he didn't note that.  He did, but not to the

9  point where -- he said I was inconsistent.  So --

10 which would lead to me being on a PIP still.

11     Q.   Do you have any doubt that Mr. Sun had

12 concerns about your performance?

13     A.   I had doubts from the very first day that

14 Mr. Sun became my manager, after writing me up on a

15 PIP for one field ride.

16     Q.   You had doubts about what?

17     A.   I had -- he only observed one field ride.

18 All that information is based off Mr. Hudson's

19 observation.  He had one field -- and we had agreed

20 that we would be able to -- he had already -- had

21 placed bias against me, because of the way he came in

22 and he wrote me up on a PIP.  He didn't give me new

23 start.  He didn't try to get along with me.  He

24 didn't try to collaborate with me.  He just tried --

25 everything -- all our rides were just him documenting



Page 171

1    me of what I didn't do or what he think I didn't do,

2    or the way he didn't like it, or what I said.

3            It became just -- typically, most managers

4    don't discredit a whole day based off of small issues

5    that you have, something you did or didn't do.  I was

6    engaging with my providers.  I was asking questions.

7    I was dialoguing with them.

8            Mr. Sun, if you read this report, it

9    doesn't accurately depict the way that day went at

10   all.

11           MS. WAKE:  Okay.  We can take that down

12       and pull up the next document, which is Lilly

13       Jones 26.  I believe it's Exhibit 17.

14       (Exhibit 17 was marked for identification.)

15           MS. WAKE:  It's a notice of probation.

16           Thank you for the zoom.

17   BY MS. WAKE:

18       Q.   Ms. Jones, do you recognize this document?

19       A.   Yes.

20       Q.   And do you remember receiving this

21   document?

22       A.   Yes.

23       Q.   And this is a copy of the notice of

24   probation that you received on October 16th, 2019.

25   Right?



JA129

Page 172

 1          A.   Yes.

 2          Q.   And you received this during a meeting

 3    with Grace Faulkner and David Sun?

 4          A.   I did.

 5          Q.   And you did not receive any discipline

 6    from Mr. Sun after October 16th, correct?

 7          A.   No.

 8          Q.   And you refused to sign this document; is

 9    that right?

10          A.   Right.

11          Q.   Why was that?

12          A.   As I told you previously, David was

13    inaccurately documenting the day, or how the

14    interactions were going, based on his lack of

15    knowledge around VBS.  He could not demonstrate -- he

16    had limited time as a manager, and he had limited

17    understanding of how dialoguing or interaction with

18    providers should go, or detailing it as a manager.

19               So that's why I didn't sign it, because,

20    like I said, in that office, that physician stopped

21    and shook my hand at the end of the conversation.

22    Providers would tell him what a great rep I was.  I

23    was engaging with conversations with providers.

24               So if -- if the conversation on one

25    question went bad, it was all bad.  So that doesn't



Page 173

1  reflect that in the report.

2      Q.   And this document is placing you on

3  probation for three months, right?

4      A.   Correct.

5      Q.   And the basis of this document was

6  "unacceptable performance since being put on a

7  Performance Improvement Plan in June 2019."  Right?

8      A.   Correct.

9      Q.   And the document gives you specific areas

10  where you needed to improve over the next three

11  months.  Do you remember going through each of those

12  areas during your meeting with Mr. Sun and

13  Ms. Faulkner?

14      A.   I remember Grace Faulkner reading it.

15      Q.   Did she read straight from the document?

16      A.   Straight from the document.

17      Q.   I'll give you a minute to flip through

18  this document, if you want to review it to refresh

19  your memory.  I know you produced it, so you're

20  familiar with it.  But go ahead and flip through it

21  if you need to.

22          MS. JONES:  I hope we aren't going to just

23      go over the words in the document, because I'll

24      stipulate the words say what they say.  And

25      she's already established a foundation that it



JA131

Page 174

```
 1      was read to her.  So whatever is in there is in
 2      there.
 3              Do you need more time?
 4              THE WITNESS:  No.
 5              MS. JONES:  She doesn't need any more
 6      time.
 7  BY MS. WAKE:
 8      Q.   Okay, Ms. Jones, is there anything in this
 9  document that Ms. Faulkner did not review with you
10  during your meeting with her?
11      A.   No.
12      Q.   And what was your response to receiving
13  this document?
14      A.   I called David a liar.
15      Q.   Is that all?
16      A.   I told them that I wasn't signing it, and
17  that was the end of the conversation.
18      Q.   Do you remember saying that he was crazy,
19  and that "You guys are bogus"?
20      A.   It was bogus.  I mean, I know what
21  happened throughout the day, so -- what does that
22  have to do with it?  That's just my opinion about the
23  situation, so . . .
24      Q.   That's not what I asked you.  Do you
25  remember saying --
```



Page 175

1        A.    Yes, I do now.  I do.

2        Q.    -- "You are crazy," and "You guys are

3   bogus"?

4              Yes?

5        A.    I already answered your question:  Yes.

6        Q.    And do you remember shouting that he was a

7   liar?

8        A.    Yes, I do.

9        Q.    And do you remember doing that multiple

10  times?

11       A.    I do.

12       Q.    And do you remember shouting any other

13  things at him?

14       A.    I said, "You're a liar."  That's what I

15  recall.

16       Q.    You were not fired after this meeting,

17  were you?

18       A.    No.

19       Q.    And the document that you just reviewed,

20  that Ms. Faulkner talked to you about during the

21  meeting, you were given specific things that you

22  needed to do to improve, right?

23       A.    Yes.

24       Q.    In a three-month time frame?

25       A.    Yes.



Page 176

1        Q.   And there are five different areas where

2   you needed to improve listed there?

3        A.   Yes.

4        Q.   With instructions below each one, right?

5        A.   The document says that, yes.

6        Q.   And Ms. Faulkner talked to you about,

7   right?

8        A.   She read it.

9             MS. JONES:  She read it.

10            THE WITNESS:  She read it.

11  BY MS. WAKE:

12       Q.   She talked to you about it during that

13  meeting?

14       A.   She read the document.  That's what she

15  did.

16       Q.   Okay.  So you were aware of these

17  expectations after your meeting with Ms. Faulkner and

18  Mr. Sun?

19       A.   Yes.

20       Q.   And in the document, at the very end -- so

21  it's the second-to-last page -- at the bottom:  "As a

22  result of receiving this disciplinary action."

23  There.

24            So, as a result of receiving this

25  disciplinary action, you were told that it would be



Page 177

1  documented in your performance management year-end

2  summary -- that's the wrap-up that we talked about --

3  and that you would be deemed as not sufficiently

4  meeting expectations for 2019.  Right?

5       A.   Yes.

6       Q.   And you can't dispute that Mr. Sun

7  believed you were not meeting expectations, right?

8            MS. JONES:  Objection.

9            Listen, it says what it says.  She agrees

10      that that's what Mr. Sun wrote here.  Okay?  I

11      mean -- come on.

12 BY MS. WAKE:

13      Q.   So you can't dispute that Mr. Sun believed

14 you were not meeting expectations?

15           MS. JONES:  Objection.  Calls for

16      speculation about what's in Mr. Sun's mind, when

17      she can't talk about what he believed.

18 BY MS. WAKE:

19      Q.   You can answer the question, Ms. Jones.

20      A.   I don't recall.  I don't know.

21      Q.   This document shows that Mr. Sun believed

22 you weren't meeting expectations, right?

23           MS. JONES:  Objection.  The document

24      speaks for itself.  That's what the document

25      says.



JA135

Page 182

1   that you were meeting performance expectations in

2   2019?

3           A.    No.

4                 MS. JONES:  Objection.  Calls for

5       speculation.

6                 MS. WAKE:  Okay.  She just answered the

7       question, "no."

8                 THE WITNESS:  Because I'm tired of this.

9   BY MS. WAKE:

10          Q.    Okay, well, we're going to keep --

11                MS. JONES:  She doesn't know what Mr. Sun

12      thought.

13  BY MS. WAKE:

14          Q.    Did you receive documentation from Mr. Sun

15  that gave you any impression that he thought you were

16  meeting performance expectations in 2019?

17          A.    I didn't need to receive any documents.  I

18  knew what I was doing.

19          Q.    Did -- you knew what you were doing?

20          A.    I knew what I was doing in the field, in

21  terms of my provider, in terms of my results, in

22  terms of conversations I had.

23                I knew what he was doing, too.

24          Q.    Did Mr. Sun give you any indication that

25  he thought you were meeting performance expectations



Page 183

1    in 2019?

2         A.    Yes.  And on our September ride-along, he

3    told me that it was a great day.  It was a good day.

4              But that's not reflective in that

5    document.  It just says little things that I had

6    improved upon.  And he said it was "small

7    improvement," or however -- he tried to minimalize

8    it.  Or there was small -- you know, insufficient

9    improvement, as he would try to say.

10        Q.    But Mr. Sun gave you three, four, five --

11   I think it's actually six documents where he told you

12   he thought you weren't meeting expectations, right?

13        A.    If the document said that, then yes.

14        Q.    And if you look at the bottom of the

15   document there, where it says that you weren't

16   meeting performance expectations for 2019, it says,

17   "You will be ineligible for a base pay increase."  Do

18   you see that?

19        A.    I see the document, yes.

20        Q.    So you were ineligible for a base pay

21   increase, based on this performance review?

22        A.    That's what the document says, yes.

23        Q.    And you were ineligible for promotional

24   consideration?

25        A.    That's what the document says, yes.



Page 184

1          Q.   And ineligible for a total equity program

2     grant, if applicable, right?

3          A.   That's what the document said, yes.

4          Q.   What is a total equity program grant?

5          A.   Stock, I believe.

6          Q.   And you told me earlier that you

7     weren't -- that you never received stock at Lilly,

8     right?

9          A.   I received stock, but not as an incentive.

10    It was given to everyone.

11         Q.   For what?

12         A.   As a part of a benefit.

13         Q.   And you did not receive a performance

14    review for 2019, or a wrap-up for 2019, correct?

15         A.   Correct.

16         Q.   And that's because you resigned prior to

17    when they were issued?

18         A.   Yes.

19         Q.   And the document on the next page says

20    that you would be ineligible for incentive pay under

21    the Premier Rewards Plan, right?

22         A.   Correct.

23         Q.   And the document doesn't address any

24    deficiencies with your sales, correct?

25         A.   It doesn't address any of the interactions



Page 185

1   that I had either.  It just --

2        Q.   The document --

3        A.   It just -- it's just specific ones that he

4   wanted to nitpick, call out, or deem as not

5   performing.

6        Q.   But the document didn't say --

7        A.   Or -- or subjective.  Subjective.

8        Q.   But you weren't disciplined for not

9   meeting your sales numbers?

10       A.   I was told it didn't matter.  So that's

11  discipline enough, to disregard someone's producing

12  at that level, even separating themselves from their

13  own partners, it's a dismissal, as you're not doing

14  your part, or you're not being acknowledged to the --

15  to the success that I had with my sales results.

16       Q.   But you did not receive discipline because

17  you didn't hit your sales targets?

18       A.   No.

19       Q.   And during this meeting where you received

20  a probation document, on October 16th, 2019, do you

21  remember telling Ms. Faulkner that you had more to

22  share about David's leadership and how he was telling

23  lies?

24       A.   And then that's what -- I was talking

25  about the document.  Yes, I did.



Page 186

```
 1        Q.   And do you remember Ms. Faulkner setting

 2   up a meeting with you on October 21st, 2019, to

 3   follow up on that?

 4        A.   Yes, but I didn't have -- I didn't want to

 5   share anything with her at that point.

 6        Q.   And why was that?

 7        A.   Because she was conspiring with David to

 8   get me discharged.  Why would I want to tell you

 9   anything about -- I've been talking to you for the

10   last six months; why would I ever confide in you

11   about anything else, when I know you use it against

12   me?

13        Q.   And she asked you to write down your

14   thoughts, but you told her no.  Right?

15        A.   Told her no.

16        Q.   Okay.  Are you aware that Mr. Sun made the

17   decision to place you on probation in September?

18        A.   No.  That's funny.  After -- it's supposed

19   to take three months, but you had already made the

20   decision.  That's interesting.

21             I was told that after I spoke with Grace

22   on October 14th or 15th, that that's when the

23   decision was made.  So he had already placed me on

24   probation, not even after three months, even though

25   that September field ride was near perfection.  All
```



JA140

Page 187

1  those details with those five interactions were very

2  good.  So he would have been lying.

3          Q.   Ms. Jones, but it wasn't the PIP that had

4  the three-month improvement period, right?  It was

5  the probation document that you got in October --

6          A.   I wasn't on probation.  This is the

7  probation document; it says 10-16.  So if he was

8  writing to write me up in September, that wouldn't

9  have been justified.  Because I had a September

10  ride-along on September 25th.

11          Q.   And -- right.  Are you aware that after

12  that ride-along, he made the decision to put you on

13  probation?

14          A.   No, because Grace Faulkner did not tell me

15  that in any of our interactions, nor did she tell me

16  that -- she didn't tell me that until October 14th.

17          Q.   October 15th, I think, right?

18          A.   Whatever.  No, I talked to her on

19  the 14th, after our call -- or our ride-along.

20          Q.   Well, when we talked before --

21          A.   Whatever day I talked to him -- it's one

22  of those days where I talked to her after I rode with

23  him.  Maybe it was the next day.

24          Q.   When we talked before, we talked about you

25  got the probation on the 16th, and you met with



Page 188

1    Ms. Faulkner on the 15th.

2         A.    But I had --

3         Q.    That's when you found out.

4         A.    I had called her.  I had called her one of

5    the days.  I don't remember what date it was, but I

6    called her either the 14th or the 15th, telling her

7    about what happened, and what happened throughout

8    that day on that field ride.

9         Q.    And that was --

10        A.    So she didn't -- she didn't tell me that

11   until -- that I was getting on probation until

12   October -- 14th or 15th.

13        Q.    Right, but so -- during that phone call

14   with Ms. Faulkner, which we talked about before as

15   the 15th; but either way, that was the call where you

16   found out you were going to be on probation?

17        A.    I told you that just now, yes.

18        Q.    Okay.

19             MS. WAKE:  We can take that document down,

20         and we can pull up the next one, which is Lilly

21         Jones 1724.

22         (Exhibit 18 was marked for identification.)

23   BY MS. WAKE:

24        Q.    So this document -- Ms. Jones, do you

25   recognize this document?



Page 189

```
 1        A.   Yes.
 2        Q.   And at the beginning of the dep, you told
 3   me that every year, Lilly would set incentive
 4   compensation goals and timing, right?
 5        A.   Yes.
 6        Q.   And that's what this document is?
 7        A.   Yes.
 8        Q.   If you look to page 6 of this document,
 9   which is Lilly Jones 1729, this is what you were
10   telling me about earlier, I think, where there were
11   kind of four different days throughout the year where
12   you would get your incentive comp payments; is that
13   right?
14        A.   Yes.
15        Q.   And so for 2019 incentive comp, you would
16   have got -- you would have gotten that in March,
17   June, September, and December.  Is that right?
18        A.   Yes.
19        Q.   And do you remember receiving incentive
20   comp in March, June, and September?
21        A.   And December, yes.
22        Q.   So you got your incentive comp payment on
23   December 13th, 2019, right?
24        A.   Got a partial bonus.
25        Q.   And you had resigned on the 5th of
```



JA143

Page 190

 1  December?

 2      A.   Uh-huh.  Yes.  I still got a partial.

 3      Q.   And if you look on the next page, Lilly

 4  Jones 1730, "Termination of Participation" -- the

 5  bottom, there -- were you aware that you were no

 6  longer eligible for incentive comp once your

 7  employment with the company ended for any reason?

 8      A.   Yes, I was aware, but I still got my

 9  payout.

10      Q.   And if you look under "Conditions on

11  Incentive Pay," it says that incentive pay is not

12  guaranteed or automatic.  Do you see that?

13      A.   Yes.

14          MS. WAKE:  Okay.  We can take that one

15      down, and we can pull up the next one, which is

16      Lilly Jones 1106.  And I would ask that you

17      please blow this up for Ms. Williams-Jones it's

18      a little small.  Thank you.

19          MS. JONES:  Well, I actually have the hard

20      copy here, so . . . thank you.

21          MS. WAKE:  Oh, okay.  Never mind, then.

22          MS. JONES:  All right.

23          MS. WAKE:  No problem, then.

24  BY MS. WAKE:

25      Q.   I'm showing you what I think is



Page 191

1    Exhibit 19.  This is --

2          (Exhibit 19 was marked for identification.)

3          MS. JONES:  Yes.  Exhibit 19.

4    BY MS. WAKE:

5      Q.   This is a summary of your compensation

6    from Lilly in 2018.  Is that right?

7      A.   That's what it says, yes.

8      Q.   So in -- is it right that in 2018, your

9    compensation from Lilly was $111,101.49?

10     A.   I don't see 111,000; I see 105.  Can you

11   scroll down?

12          Okay, I see that, yes.  Yes.

13     Q.   Okay.  And it looks like $82,652.53 of

14   that was your salary?  Is that right?

15     A.   Yes.

16     Q.   And that you got $15,807 in that -- in

17   that Premier Rewards Program; is that right?

18     A.   Yes.

19     Q.   Is Premier Rewards incentive compensation?

20     A.   Yes.

21          MS. WAKE:  And we can take this one down,

22          and let's pull up the next one, which is Lilly

23          Jones 1107.

24       (Exhibit 20 was marked for identification.)

25



Page 192

1    BY MS. WAKE:

2         Q.   So this is the same type of document; it's

3    a summary of your earnings from Lilly in 2019, right?

4         A.   Yes.

5         Q.   And in 2019, you earned your total

6    compensation.  So down a little bit lower, your total

7    compensation there in the middle, projected on the

8    screen, is $115,710.15, right?

9         A.   Yes.

10        Q.   And that's more than you earned in 2018,

11   right?

12        A.   Yes.

13        Q.   And it's actually the highest annual

14   compensation you earned when you were at Lilly,

15   right?

16        A.   Yes.

17        Q.   And it was $83,082 in your salary, right?

18        A.   Yes.

19        Q.   And $20,320 in that incentive

20   compensation, right?

21        A.   Yes.

22        Q.   And that is more than you earned in

23   incentive compensation in 2018, correct?

24        A.   Due to a -- due to an incentive pay

25   increase, yes.



JA146

Page 193

```
 1        Q.   An incentive pay increase in 2019, you
 2   mean?
 3        A.   It didn't reflect until 20 -- it would
 4   have reflected in 2018, so that's why -- it's odd
 5   that it's less.
 6        Q.   No, it's more.  In 2019 --
 7        A.   No, I'm saying -- yeah, it's more, but it
 8   should -- it took place in -- yeah, it took place in
 9   February, March of 2019, forgive me.  Yes.
10        Q.   Okay.  All right.  You resigned your
11   employment from Eli Lilly on December 5th, 2019,
12   right?
13        A.   Yes.
14        Q.   And you resigned to a woman named Bernice
15   Anthony?
16        A.   Yes.
17             MS. WAKE:  You can take that exhibit down.
18        Thanks, Jared.
19   BY MS. WAKE:
20        Q.   Who is Bernice Anthony?  Do you know?
21        A.   She's an investigator.
22        Q.   At Lilly?
23        A.   At Lilly.
24        Q.   And she was calling you to ask you about a
25   compliance-related investigation, right?
```



Page 194

```
 1          A.   Yes.

 2          Q.   And you -- your employment was not

 3     terminated, correct?

 4          A.   No.

 5          Q.   And your probationary period was still

 6     going on when you resigned, right?

 7          A.   Yes.

 8          Q.   All right.  Let's just maybe do -- maybe

 9     10, 15 more minutes, and then we can take a quick

10     break.  Does that sound okay to you?

11          A.   Yes.

12          Q.   Or would you rather do one now?

13          A.   No, go ahead.

14          Q.   Okay.

15               So in your complaint -- and by

16     "complaint," I mean the lawsuit that you filed in

17     this case -- you allege that Mr. Sun retaliated

18     against you on the basis of your race and sex when he

19     issued you the October probation document, correct?

20          A.   Correct.

21          Q.   And you've already told me everything

22     about the way in which you believe he retaliated

23     against you with that October 16th document, correct?

24          A.   Some of it, yes.

25          Q.   What haven't you told me?
```



Page 195

1      A.   That he wasn't doing it to not --

2   nonminorities as much as he was doing it to minority

3   employees.

4      Q.   What else?

5      A.   That's it.

6      Q.   So now you've told me everything that

7   supports your allegation that that October 16th

8   probation document was retaliatory?

9      A.   Basically, the things that I was -- that I

10  were written up for, other people were even given

11  leniency, or it was not deemed as much of an issue as

12  they made it with me.

13     Q.   Anything else?

14     A.   No.

15     Q.   Other than Mr. Sun, with the probationary

16  document from October, are there other ways in which

17  you feel Lilly retaliated against you?

18     A.   Well, for instance, if -- if you put

19  somebody on a warning or a probation, then if I

20  have -- if I lost my pay, my incentive pay, I was

21  ineligible for incentive pay for four quarters, and

22  other people who were nonminorities got the same type

23  of probation or warning, when they were allowed to

24  still receive 50 percent of their incentive pay until

25  they reached 100 percent to pay it back, that's not



JA149

Page 196

1  the same thing.

2          I was -- I was -- basically I was

3  restricted from incentive pay for a full year, based

4  on what my sales results were, so I would have been

5  working for free.

6      Q.   That goes back to --

7      A.   Other employees -- other employees were

8  allowed to still receive their incentive pay.  Other

9  employees were not given a PIP.  They were -- they

10 were given a longer period of time.  Other employees

11 were given the excuse of only having themselves in

12 the territory.  Other employees were given excuses of

13 being able to have mismanaged samples in storage.  I

14 did not have any of those issues.

15     Q.   I appreciate that clarification.  That

16 relates to that -- to the actual October 16th, 2019,

17 probation, though, right?

18     A.   In general, yes.  Yes, all of it.

19     Q.   So we talked about the actual

20 October 16th, 2019, probation.  But were there --

21 taking that probation document aside, were there any

22 other ways that you think Lilly retaliated against

23 you when you worked there?

24     A.   As I go back to -- had I not received a

25 nonperforming in 2018, and given the sufficient



JA150

Page 197

1  training that I should have received when I was out
2  on my maternity leave, this would not have led up to
3  these occurrences of PIPs, Performance Improvement
4  Plans, warnings, and probations.
5       Q.   So you think the 2018 "not meeting
6  expectations" that Ms. Porter gave you was
7  retaliatory?
8       A.   It was an FMLA violation.  Because she
9  retaliated the day I came back.  I don't know how
10 else you would take that.  The day I rode with her is
11 the day that she told me I would be receiving a
12 nonperforming.
13      Q.   But you didn't receive a demotion?
14      A.   That has nothing to do with that.  That --
15 that nonperforming is reason enough for another
16 hiring manager -- manager to not hire you, or give
17 you a promotion, or give you -- let you go to
18 specialty, or transfer to another position.
19           So it didn't matter.  It was there.  It
20 was documented.  It's in your file.  They go back and
21 they look at your performance over the years.  So if
22 you're given any type of performance issue, they
23 don't want to hire you.
24           And they typically make you wait three
25 years to get off that one nonperforming.  So, say, if



MAGNA
LEGAL SERVICES

JA151

Page 210

1          A.   I can tell you that in -- August 30th, I

2     spoke with Victoria Ajaoudi, and I think -- I'm not

3     specifically remembering why she called me, but -- I

4     don't know; it was like a kind of a check-in-in team

5     call.  And she was aware that her partner, William

6     White, was having issues with Mr. Sun, and she

7     mentioned that she was not having similar issues with

8     him, or having the same difficult time with him.

9               And like I said, I also knew that other

10     people did not get their incentive pay suspended.  I

11     also knew that other people had more serious

12     violations that were not immediately -- caused them

13     to receive -- you know, not have a bonus pay.

14               I know that -- that's it.

15          Q.   When you say that people had more serious

16     violations that didn't impact their bonus pay, who

17     had more serious violations?

18          A.   Brandon Fell.

19          Q.   And what were his violations?

20          A.   His violations was he used an unapproved

21     app, called Coverage, to detail a provider.  He also

22     used the app, Coverage, and mobility to -- it was

23     unapproved, so it wasn't supposed to be on your

24     iPad at all.  He had a sample violation, storage

25     violation.  He didn't set up two patient detail calls



Page 211

1    on a stand-up call.  If he didn't do it on a stand-up
2    call, he didn't do it in a lunch either.  He's
3    supposed to talk about three patients.  He missed
4    field rides.
5              There were a number of different things
6    that were done that he wasn't doing, that if I had
7    done those things -- like for instance, I did my
8    routing and my action plan.  That's like every
9    quarter, everyone knows it's mandatory.  He did not
10   do that.  And still his incentive pay was not
11   suspended.  So he --
12        Q.   How do you know that?
13        A.   I just know.  Because I -- I talked to
14   people.  I talked -- I heard about it, and I knew
15   about it.
16        Q.   You heard about what?
17        A.   That Mr. Sun was having issues -- I mean
18   Mr. Fell; forgive me -- Mr. Fell was having issues.
19        Q.   And you heard from other people about
20   those issues, and that he wasn't disciplined?
21        A.   Correct.  And then he was given the excuse
22   that he was in the territory alone.  You can still
23   run a territory without another -- a partner.
24        Q.   Okay.  Can you identify any other employee
25   at Lilly who had performance issues with four



JA153

Page 212

1   different supervisors who wasn't put on probation?

2        A.   No, I don't know that.

3        Q.   Did you know a woman named Stephanie Long

4   in human resources?

5        A.   I spoke to her one time.

6        Q.   Do you remember calling her on

7   November 1st, 2019?

8        A.   Yes.

9        Q.   What did you talk to Stephanie Long about?

10       A.   My issues, that I felt like David Sun was

11  retaliating against me.  I talked to her about race

12  and sex discrimination.

13           MS. WAKE:  Okay.  And let's mark this next

14      document here, and after we go through this

15      document, we'll take a break.

16           This is Lilly Jones 1713.

17      (Exhibit 21 was marked for identification.)

18  BY MS. WAKE:

19       Q.   Ms. Jones, do you recognize this one?

20       A.   Yes.

21       Q.   And what is this?

22       A.   This is a statement that I made.

23       Q.   And did you send this statement to someone

24  named Richard Ruth?

25       A.   Yes.



Page 213

1      Q.   Do you remember sending it to him on

2  November 5th, 2019?

3      A.   Yes.

4      Q.   Why did you send it to Mr. Ruth?

5      A.   Because I didn't trust that Grace Faulkner

6  was going to do anything about it.  She had already

7  caused a problem between Mr. Sun and I.  Instead of

8  trying to make the -- reconcile the situation or try

9  to make it better, it just seemed that it went in the

10 wrong direction every time -- every month that I was

11 with him.

12     Q.   How did you know who Mr. Ruth was, or that

13 he was the person that you should send this to?

14     A.   I didn't.  I talked to Stephanie.  I asked

15 to speak to her supervisor.

16     Q.   So Stephanie referred you to Richard Ruth?

17     A.   Correct.

18     Q.   Okay.  And flip to page 3.

19          You have a section that you call

20 "Questions and Concerns"?

21     A.   Yes.

22     Q.   Above that, it says on October 15th, you

23 spoke with Grace and told her about the things that

24 had happened.  "I told her about how I felt he was

25 abusive in his tone and demeanor and that he lied and



Page 214

1    . . . gave me negative feedback."  Do you see that?

2          A.    Yes.

3          Q.    And that was the meeting that we've

4    already talked about, right?

5          A.    Correct.

6          Q.    Do you remember telling Mr. Ruth that he

7    should interview Krystle Allen and William White?

8          A.    Yes.

9          Q.    Do you know if he did?

10         A.    He told me he did.  I think they talked to

11   him briefly, but I don't know -- you know, I don't

12   know.  He told me he did.

13         Q.    Were you aware that Krystle Allen and

14   William White both told Richard Ruth that they don't

15   believe that Mr. Sun engaged in race or sex

16   discrimination?

17         A.    No, I'm not.  That's not what I was told.

18         Q.    By who?

19         A.    I spoke to both of them.  Krystle Allen

20   and William White.

21         Q.    Did you know that when Ms. Allen spoke

22   with Mr. Ruth, she mentioned that she cried on a

23   field ride with David, but he apologized, and they

24   had resolved the issue?

25         A.    She did not tell me that.



JA156

Page 215

1          Q.   Did you know that Ms. -- or were you aware

2     that Ms. Allen told Mr. Ruth that she thinks that

3     David treats everybody consistently, and that his

4     treatment towards people is the same regardless of

5     race?

6          A.   No, I did not.

7          Q.   And were you aware that Mr. Ruth conducted

8     an investigation into your allegations?

9          A.   He never told me that.  He never called me

10    back about it, so no, I did not.

11         Q.   So you only spoke with him -- how many

12    times?

13         A.   One time.

14         Q.   And then you sent him this e-mail after

15    you spoke, or at the same time?

16         A.    Before.

17         Q.   So you sent him the e-mail November 5th,

18    and then you spoke with him sometime after that?

19         A.   I believe it was around like the --

20    November 11th, or -- something like that.  Middle of

21    November.

22         Q.   And then you never talked to him again?

23         A.   Never talked to him again.

24              MS. WAKE:  Okay, why don't we take a

25         break?



Page 216

```
 1        MS. JONES:  Counsel, was there any kind of
 2   report, or -- you know, we don't have any
 3   documents from Mr. Ruth showing that he
 4   interviewed Ms. Allen and Mr. -- where are
 5   those?
 6        MS. WAKE:  I produced it to you.  The
 7   entire report.
 8        MS. JONES:  Really?
 9        MS. WAKE:  Yeah.
10        MS. JONES:  Okay.  All right.
11        MS. WAKE:  Called an eyesight report?  And
12   it's Mr. Ruth's entire investigation, including
13   his interviews with the other reps.
14        THE WITNESS:  I saw notes on that.  I
15   didn't see . . .
16        MS. WAKE:  Okay.  Well, this is a good
17   time to --
18        MS. JONES:  Can you tell us what day this
19   is on?
20        MS. WAKE:  It's identified in the
21   discovery responses.  But I can pull that for
22   you later and e-mail it to you.  We produced it.
23        MS. JONES:  Okay.
24        MS. WAKE:  All right.  Let's take a quick
25   break.  We'll come back in about -- maybe five
```



Page 217

```
 1        minutes.
 2                 MS. JONES:  Well, let's come back --
 3                 MS. WAKE:  I can't hear you, Ms. Jones.
 4        You cut out.
 5                 THE COURT REPORTER:  I can't hear you,
 6        Ms. Jones.
 7                 MS. JONES:  Let's come back at 3:25.
 8                 MS. WAKE:  Okay.  That sounds good.
 9                 MS. JONES:  All right.
10                 (A recess transpired from 3:19 p.m. until
11                 3:28 p.m.)
12                 MS. WAKE:  Okay.  We're back on the
13        record, Karen, if you're ready.  Okay.  Great.
14   BY MS. WAKE:
15        Q.   In your lawsuit, you allege that Mr. Sun
16   did not overly scrutinize or criticize two white men,
17   Douglas Barna and Brandon Fell.  Is that right?
18        A.   Yes.  However, at that time I did not have
19   the --
20                 MS. WAKE:  There's an echo.
21                 THE WITNESS:  Can you hear me?
22                 Can you hear me?
23                 MS. WAKE:  There was some feedback.  It's
24        better now.  Yes.
25                 THE WITNESS:  Yes.
```



JA159

Page 218

```
 1              At the time, I was unaware -- I was
 2         unaware that Mr. Barna and -- where Mr. Barna
 3         and Mr. -- what I had was a December dashboard
 4         of 2019.  I now have knowledge that Mr. Fell and
 5         Mr. Barna were performing in their sales
 6         results; however, Mr. Fell's results were lower
 7         than mine.
 8    BY MS. WAKE:
 9         Q.   Okay.  That gets to my next question.
10              So you allege that Mr. Barna and Mr. Fell
11    had far lower sales rankings than you.  That was your
12    initial allegation, right?
13         A.   Correct.
14         Q.   And so you're saying now you know that
15    Mr. Barna's numbers were not lower than yours, but
16    Mr. Fell's were?
17         A.   I'm just, what -- I'm saying is that they
18    were not -- they were meeting their sales
19    expectations, but Mr. Fell's numbers were below mine.
20         Q.   I see.  And you were also meeting your
21    sales expectations?
22         A.   Correct.
23         Q.   And in your lawsuit, you allege that
24    Mr. Fell was treated better than you because he was
25    not placed on a PIP like you, right?
```



Page 219

1        A.    Correct.

2        Q.    Are you aware that Mr. Fell did receive

3   written discipline from Mr. Sun on March 13th, 2020?

4        A.    Yes, but that was after 2019.  He received

5   it performing for his 2019, but he got that in 2020.

6        Q.    How do you know what he received in 2019?

7        A.    How do I know?  Because I -- I saw the

8   document.

9        Q.    When did you see it?

10       A.    The discovery document?  When it was --

11       Q.    You weren't -- the first time you learned

12   of what his performance ranking was in 2019 was

13   through the discovery in this case?

14       A.    Oh, no, I'm sorry.  I was -- like I said,

15   it was based on the December 2019 payout document

16   that I received.

17       Q.    How would a December 2019 payout document

18   show you what Mr. Fell had received for the year?

19       A.    Because it shows the entire team, based on

20   their territory, and based on the territory they work

21   and all the products.

22       Q.    Right.  But right now, we're talking about

23   him receiving discipline.  So in your lawsuit, you

24   allege that Mr. Fell was treated better than you

25   because he wasn't placed on a PIP like you.



Page 220

1        A.   Right.

2        Q.   And my question to you is, were you aware

3   that Mr. Fell actually did receive written discipline

4   from Mr. Sun in March of 2020?

5        A.   Yes.  That was after the fact, yes.  After

6   I filed, yes.

7        Q.   And when did you become aware that

8   Mr. Fell had received written discipline from

9   Mr. Sun?  Was it through discovery in this case?

10       A.   Correct.  Yes, it was.

11       Q.   Okay.  Are you aware that Mr. Fell was

12  actually disciplined for seven different reasons by

13  Mr. Sun?

14       A.   Yes.

15       Q.   And you became aware of that through

16  discovery?

17       A.   Correct, yes.

18       Q.   And are you aware that one of the reasons

19  that Mr. Fell was disciplined was not using

20  promotional materials correctly?

21       A.   Yes, correct.

22       Q.   And you learned that through this lawsuit?

23       A.   Yes.

24       Q.   Were you aware that Mr. Fell was given

25  performance management goals, just like you were?



Page 221

1          A.   Yes, but his -- he was -- he was still

2     going to -- performing.

3          Q.   For 2019?

4          A.   For 2019.

5          Q.   Were you aware that he was actually given

6     more performance management goals than you were?

7          A.   I didn't see that.  No, I was not aware.

8          Q.   Were you aware that he was told that he

9     was going to be deemed as not sufficiently meeting

10    expectations in 2020?

11         A.   I wouldn't -- I am now, but I would not

12    have known that previously.

13         Q.   And are you aware that he actually did

14    receive a "not sufficiently meeting performance

15    expectations" rating from Mr. Sun in 2020?

16         A.   Yes.

17         Q.   You learned that through this lawsuit, the

18    discovery?

19         A.   Correct.  Yes.

20         Q.   Are you aware that at the time Mr. Fell

21    received the "not sufficiently meeting performance

22    expectations" in 2020, that he was meeting his sales

23    goals?

24         A.   Yes.

25         Q.   You learned that through the discovery in



JA163

Page 222

1  this lawsuit?

2         A.   Yes.

3         Q.   And are you aware that Mr. Fell was told

4  that assessment of customer-facing improvement

5  against the PIP would continue into 2021?

6         A.   He did not give -- I was aware of it;

7  however, he did not give specifics placed in his

8  warning at the same level that Mr. Fell received.  It

9  was just -- it states on my performance -- or

10  warning, it states insufficient call details, or VBS;

11  but on his, it states that you are required to do so.

12  There's no specifics on that warning.

13         Q.   But you both received not sufficiently

14  meeting performance expectations and were given

15  Performance Improvement Plans, correct?

16         A.   His was in 2020.  So he was allowed three

17  months before -- three or four months before he

18  received that.

19         Q.   But you both received not meeting

20  expectations and a Performance Improvement Plan from

21  the same supervisor?

22         A.   Yes.

23         Q.   And Mr. Fell is a white male?

24         A.   Yes.

25         Q.   And in your third amended complaint, you



Page 223

1    also allege that Mr. Sun discriminated against

2    William White and Brian Calloway, who you told me

3    were two black male sales representatives, correct?

4        A.   Yes.

5        Q.   So these are men that you think were

6    treated less favorably by Mr. Sun?

7        A.   Yes.

8        Q.   And you allege that Mr. Sun discharged, or

9    constructively discharged Mr. White and Mr. Calloway,

10   right?

11       A.   No, Mr. White was fired.  Mr. Calloway

12   resigned.

13       Q.   But in your complaint, you allege that

14   Mr. Sun discharged, or constructively discharged --

15       A.   Yes.

16       Q.   -- constructively discharged or received a

17   resignation?

18       A.   Yes.

19       Q.   Mr. White and Mr. Calloway, right?

20       A.   Yes.

21       Q.   And Mr. Calloway resigned for a serious

22   compliance issue, right?

23       A.   Yes.  He resigned for falsifying calls.

24       Q.   And as a sales rep, would you agree that

25   that's a pretty serious violation?



Page 224

1          A.   I don't know what -- in the manner, and
2     based on what I know about David, that could -- I
3     don't know what he was thinking, but based on what I
4     know, no.
5          Q.   Have you ever falsified sales calls?
6          A.   No, but it's -- how do I say, if you -- if
7     there are no "see physicians," and you can't see the
8     physician, you're still held accountable for them.
9     So whether that -- you might not see the physician,
10    but you still have to -- you're still responsible for
11    the physician.
12               So he could have marked it, and Mr. Sun
13         could have seen that as falsifying calls.
14         Q.   So you don't know any of the details of
15    what went into someone else's --
16         A.   I -- I --
17         Q.   -- call-in?
18         A.   I spoke to Mr. Calloway briefly, and
19    that's basically what he told me.  And that's what I
20    know.  When you can't see a physician, when they --
21    they don't want to see reps, you're still responsible
22    for that physician.  And it's still part of your
23    caller team.  You're still responsible to call on
24    them.
25               So that can -- even though you might not



JA166

Page 225

1    see them, you might leave something.  You might drop

2    off samples.

3         Q.   But as a sales rep, you personally knew

4    that you were not supposed to falsify sales calls,

5    correct?

6         A.   Correct.

7         Q.   And you mentioned to me earlier that

8    Mr. White's employment was terminated for performance

9    issues.  Is that right?

10        A.   For administrative and performance issues,

11   yes.

12        Q.   And he's a male, correct?

13        A.   Yes.  But -- however --

14        Q.   Were you aware --

15        A.   What I know about him is that when you're

16   a new rep -- Mr. White was a fairly new rep; and as a

17   few rep, you're typically given a "performing" your

18   first year, because you haven't been in the territory

19   long enough for them to really observe you, as a new

20   learner.  And the expectations are a little bit

21   different.

22        Q.   Were you aware that in 2019, Mr. White

23   received a performance rating of not meeting

24   expectations?

25        A.   Yes.



Page 278

```
 1              MS. WAKE:  Okay.  Thank you.  That's all.
 2              MS. JONES:  Okay.  We want to read and
 3         sign.
 4              MS. WAKE:  What's that?  You want to
 5         reserve signature?
 6              MS. JONES:  Yes.
 7              MS. WAKE:  Yes.
 8              THE COURT REPORTER:  And this is Karen.
 9         Who wants a copy of the deposition?
10              MS. WAKE:  I would like one, please.
11              MS. JONES:  I'd like to order a copy,
12         also.
13              (Discussion off the record.)
14              (Time Noted:  4:52 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```



Page 279

1                 CERTIFICATE OF REPORTER

2          I, Karen K. Kidwell, Registered Merit Reporter

3  and Notary Public for the State of Maryland at Large,

4  do hereby certify:

5          That the foregoing deposition was taken

6  remotely before me on the date and at the time stated

7  on page 1 of this transcript; that the deponent was

8  duly sworn to testify to the truth, the whole truth

9  and nothing but the truth; that the testimony of the

10 deponent and all objections made at the time of the

11 examination were recorded stenographically by me and

12 were thereafter transcribed; that the foregoing

13 deposition as typed is a true, accurate and complete

14 record of the testimony of the deponent and of all

15 objections made at the time of the examination to the

16 best of my ability.

17         I further certify that I am neither related to

18 nor counsel for any party to the cause pending or

19 interested in the events thereof.

20         Witness my hand this 17th day of May, 2022.

21

22         _____ Karen K. Kidwell _____
           Karen K. Kidwell,
23         Registered Merit Reporter
           Notary Public
24         State of Maryland at Large
           My Commission expires:
25         April 14, 2025



MAGNA
LEGAL SERVICES

JA169

Page 280

```
 1                INSTRUCTIONS TO WITNESS

 2           Please read your deposition over

 3  carefully and make any necessary corrections.

 4  You should state the reason in the

 5  appropriate space on the errata sheet for any

 6  corrections that are made.

 7           After doing so, please sign the

 8  errata sheet and date it.

 9           You are signing same subject to

10  the changes you have noted on the errata

11  sheet, which will be attached to your

12  deposition.

13           It is imperative that you return

14  the original errata sheet to the deposing

15  attorney within thirty (30) days of receipt

16  of the deposition transcript by you.  If you

17  fail to do so, the deposition transcript may

18  be deemed to be accurate and may be used in

19  court.

20

21

22

23

24

25
```



JA170

Page 281

 1                              ERRATA

 2    PAGE   LINE   CHANGE

 3    ____   ____   _____

 4                  REASON: _____

 5    ____   ____   _____

 6                  REASON: _____

 7    ____   ____   _____

 8                  REASON: _____

 9    ____   ____   _____

10                  REASON: _____

11    ____   ____   _____

12                  REASON: _____

13    ____   ____   _____

14                  REASON: _____

15    ____   ____   _____

16                  REASON: _____

17    ____   ____   _____

18                  REASON: _____

19    ____   ____   _____

20                  REASON: _____

21    ____   ____   _____

22                  REASON: _____

23    ____   ____   _____

24                  REASON: _____

25



Page 282

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, TANJANEKA LA-SHAWN JONES, do hereby

 4    certify that I have read the foregoing pages and that

 5    the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or

 8    changes in form or substance, if any, noted

 9    in the attached Errata Sheet.

10

11

12    _____

13    TANJANEKA LA-SHAWN JONES              DATE

14

15

16    Subscribed and sworn to before me this

17    _____ day of _____, 20 _____.

18    My commission expires: _____

19

20    _____

21    Notary Public

22

23

24

25
```



MAGNA
LEGAL SERVICES

JA172

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1 317.276.2000
www.lilly.com

---

Subject:  Performance Improvement Plan

---

Date: 6/28/19
To: Tanjaneka Jones
From: David Sun
Cc:  Personal History Folder

The purpose of this communication is to document our discussion on June 28, 2019 during which
Grace Faulkner, Human Resources representative, was also present when you received a Performance
Improvement Plan.  This disciplinary action is being taken in response to your unacceptable
performance.

**There has been a trend of unacceptable performance related to pre-call planning and customer
facing abilities.  These gaps have been observed primarily by your interim DSM Mark Hudson,
though I also observed gaps during our first field ride on 6/26/19. Specific examples of these
inadequacies include:**
   o  **Inadequate pre-call planning which has led to ineffective discussions with customers,
      lack of impact and influence during customer interactions.**
   o  **Lack of technical knowledge of disease state**
   o  **Inability to achieve consistently effective call progression and consistent sales results.**
   o  **Lack of demonstrated team leadership at an S3 level.**

1)  **Inadequate pre-call planning within the VBS model.**
    a)  Since, November 2, 2018, your leadership has been coaching you that you need to
        improve your pre-call planning as you had lower than goal sales results in 2018 and lack
        of impact during customer discussions. While sales numbers have improved in 2019, pre-
        call planning and other customer facing skills have not improved sufficiently.  A current
        example of this includes: The interaction that you had with Dr Ford on your field ride
        with your area trainer on 4/10/19. The question that you chose to ask the doctor was
        ineffective due to your inability to verbalize what you were trying to say.  It has been
        observed during field rides you seem to be at a loss for words or direction at times.
        Talking through and practicing how the question and dialogue may sound prior to going
        into the call would have avoided that.

**Exhibit B**

Jones v. Lilly 000028

JA173

b) On 3/20/19 an email was sent to you by your area trainer, acting as interim DSM, outlining the step-wise process to pre-call plan that was recommended by him. You responded to this email that you reviewed the notes and feedback, but you did not use this coaching tool to improve. The steps that were outlined in your first field note were not seen on the field ride on 3/21/2019, nor were they seen during the field ride on 4/10/19. Skilled pre-call planning will strengthen your ability to have productive conversations and is an expectation of your role.

2) **Lack of technical knowledge**

c) Dialogues with customers have been ineffective due to lack of background knowledge of customer's disease state management or the disease state itself. On multiple field rides, when asked what you knew about the customer during a pre-call plan, you referred to tableau data and stated that they liked your product, but there was no understanding of why or patient treatment challenges. It is expected that you be thorough in your understanding and planning for customer interactions.

3) **Inability to achieve adequate call progression**

a) Your lack of background knowledge on customer's disease state management prevented you from having progressive calls, examples of this include: No calls during your field rides started with "Last time". Every call that was planned for incorporated a discovery question. For the amount of time you have been calling on your customers, you should have sufficient background knowledge on their behaviors and habits to be able to continuously progress the call.

b) During discussions with customers, you did not demonstrate the ability to listen to what they were sharing with you and go deeper, using their provided information to progress the call, examples of which include: On 3/21 a customer shared that he is skipping over metformin and going right to a DPP4 or SGLT2 for his patients. At this point you could have gained information as to why, but you didn't.

4) **Lack of consistent leadership as outlined on the Sales Promotion and Performance Criteria under "Inclusive Culture", examples of which include:**

a) In your role as the compliance champ, it is expected that you send documented communications to your team regarding staying compliant with interactions, samples, communications, etc. There have been no documented communications to your team in regards to your compliance champ role in 2019. Even if peers may be getting the information in other ways, as the Compliance Champ, it is expected that you will directly inform and support the team's awareness of compliance best practices and requirements.

Jones v. Lilly 000029

b) As a senior sales representative, it is an expectation to consistently act as a mentor, either formally or informally to newer members of your team. There have been no examples of this seen.

**In order to improve your performance to an acceptable level, you are expected to satisfactorily meet Performance Management (PM) goals and demonstrate acceptable PM behaviors as well as meet the following Performance Improvement Plan (PIP) expectations:**

1. Consistent Value-Based Selling based on a structured pre-call plan
   o A weekly check-in will take starting place on Friday, June 28 2019 at 4:00pm. During this check-in, you will walk your DSM through each step of the pre-call planning process for 5 customers that you visited that week. You will provide specific details about your thought process when thinking through the steps of your plan(what I know about the customer, what is the goal of the call, what is my focused open-ended question, etc.). You will also provide specific details about the customer dialogue as a result of this plan, so that your DSM can assess impact. This check-in will recur weekly at the same time until sufficient improvement is seen, based on the judgement of your DSM.
2. Demonstrate adequate technical knowledge on disease state with customers
3. Conduct effective dialogues with customers to achieve adequate call progression and consistent at or above plan sales results
4. Conduct monthly communications to your district starting in July 2019 giving your teammates best practices on staying compliant with interactions, samples, communications, etc.

As a result of receiving this disciplinary action, I will document this action in your Performance Management year-end summary and consider it in determining your year-end performance level and total compensation.

Failure to meet these expectations and to sustain acceptable performance may lead to further disciplinary action, but I am confident in your ability to improve. I am here to provide coaching on improving your performance, but success is ultimately your responsibility. Please feel free to contact Grace Faulkner at 317-276-2159, or me for assistance.

---------------------------------------    2019 June 28
David Sun                                  ------------
                                           Date

I have read and understand this document.

---------------------------------------    July 8, 2019
Hanjaheka Jones

Jones v. Lilly 000030

JA175



**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

---

Subject:  Notice of Probation

---

Date: 10/16/2019
To: Tanjaneka Jones
From: David Sun
Cc:  Personal History Folder

CONFIDENTIAL

The purpose of this communication is to document our discussion on October 16, 2019 (during which Grace Faulkner, Human Resources representative, was also present) when you were informed that you were being placed on Probation as of October 16, 2019 for a period of three months.  This disciplinary action is being taken in response to your unacceptable performance since being put on a Performance Improvement Plan in June 2019. During this probationary period, your performance must immediately improve and remain acceptable or you will be subject to immediate dismissal.

Specific examples of your unacceptable performance include:

**Failure to provide positive customer experiences.** Per Global SR Competency Model, one of our missions for the sales representative is to deliver improved outcomes for patients through easy interactions that enable people to feel they are genuinely cared for and able to trust us.

- I was in office of Maryland Primary Care / Arnold the staff brought up to me a lunch that was cancelled by you.  They advised that they called you to confirm lunch the next day and you advised them that you would be unable to fulfill the commitment.  This is the second time that an office has complained about you not fulfilling your obligations to them for last minute rescheduling of a lunch.  when they called to confirm the previous day.  This created a negative customer experience, and poor impression of you and Lilly, for these offices.  The office manager for one of the offices indicated that though you apologized, the apology did not seem sincere.  You also did not proactively communicate these missed lunches to me and I was caught unawares when the office staff complained to me.

**Failure to pre-call plan effectively within the VBS model.** Per Global SR Competency Model one of the core competencies for the sales representative is to develop pre-call plan that is

# Exhibit C

Jones v. Lilly 000023

customer centric, sequential and anticipates customer needs, concerns and outcomes of the call.

- During our field ride on August 20, 2019, you did not show consistency in bringing what you knew about the customers from previous interactions to progress the calls. For example, in the second office you asked product or disease type of questions (i.e. SGLT2 vs. DPP4) in the discover phase of VBS although you had known the customer attended a recent program that you could have progressed the call on.
- During our field ride on September 25, 2019, you detailed a product (B) in an office without pre-call planning with me and used the inappropriate detailing piece as a result.
- During our field ride on October 14, 2019, you were not able to share why the provider in the fourth office spreads his use of diabetic oral medications before the call (during pre-call planning) and after the call. The progression has been limited due to the fact that it was the second time you detailed this provider with me in a field ride and he has been your target customer since the beginning of this year. In addition, you were not able to use the proper detailing piece of a product (B) despite my coaching on September 25, 2019.

**Failure to achieve adequate call progression.** Per Global SR Competency Model one of the core competencies for the sales representative is to engages the customer in patient-centric VBS dialogues and demonstrates high emotional intelligence and effective use of Lilly's Customer Experience Principles to add value to the entire office staff.
- During our field ride on August 20, 2019, in the fourth office you did not have the supporting detailing piece of a product (B) when the provider mentioned insurance coverage as a concern despite the fact you pre-call planned already.
- During our field ride on August 20, 2019, your use of verbatim for a product (T) Clover Reprint in the fifth office was ineffective because the provider waited for nearly 30 seconds for you to search verbatim materials on iPad.
- You did not demonstrate active listening during our field ride on October 14, 2019, during your detailing of product (G) to the second provider after he shared with you that he did not use combo pills often.
- During our field ride on October 14, 2019, you detailed a product (B) (as P3 call) to the fourth provider even though she clearly stated that she would refer patients to other providers for insulin.

Jones v. Lilly 000024

**Failure to complete administrative deliverables in a timely manner.** Per the 2019 Washington DC District SOP, sales representatives should respect and comply with deadlines set by DM and champs.

- During our field ride on August 20, 2019, I stated that you failed to meet the admin expectation due to the following.
    1. Unapplied credit card transactions over 30 days
    2. Submission of Asian Journey follow-up after deadline
    3. Lack of feedback on updated routing
- During our field ride on October 14, 2019, I stated that your administrative deliverables did not meet the expectation.
    1. I asked the entire district (you included) to complete and upload the Q4 routing on the Box by the end of October 5, 2019. Then I sent a version of Annapolis routing to the pod (you included) on October 8, 2019 for your review and confirmation. The fact that I did not hear any feedback from you until I asked about it during our October field ride was not acceptable.
    2. During our pod discussion on August 30, 2019, you agreed that when you send meeting invites to partners for lunch or breakfast, you should include me in the meeting invites. I have not receive any meeting invites from you since then. Although you mentioned the IT issues (i.e. your sending via personal e-mail account), the attempts of including me in the recipient list from you have been absent, which demonstrates the lack of execution on our agreed action items.

In order to improve your performance to an acceptable level, you are expected to satisfactorily meet Performance Management (PM) goals and demonstrate acceptable PM behaviors as well as meet the following Performance Improvement Plan (PIP) expectations:

1. Provide positive customer experiences
    o You are expected to follow Lilly's Customer Experience Principles to provide positive customer experiences to your customers, including the entire office staff.
    o You will need to communicate proactively to your DSM if you commit or foresee any incidents that may cause poor customer experiences and negative impression about Lilly.

2. Structure pre-call plan within the VBS model
    o You are expected to develop pre-call plan that is customer centric, sequential and anticipates customer needs, concerns and outcomes of the call.

Jones v. Lilly 000025

○ A bi-weekly check-in will take place starting October 25, 2019. You should walk your DSM through each step of the pre-call planning process for 5 customers that you visited before the check-in. You will provide specific details about your thought process when thinking through the steps of your plan (what I know about the customer, what is the goal of the call, what is my focused open-ended question, etc.). You will also provide specific details about the customer dialogue as a result of this plan, so that your DSM can assess impact. This check-in will recur bi-weekly until sufficient improvement is seen, based on the judgement of your DSM.

3. Achieve adequate call progression
   ○ You are expected to engage the customer in patient-centric VBS dialogues and demonstrates high emotional intelligence and effective use of Lilly's Customer Experience Principles to add value to the entire office staff.
   ○ A bi-weekly check-in will take place starting October 25, 2019. You should provide specific examples about how you progressed the calls among the action plan customers. Also, you should provide what you know about customers' attitude and belief before the call and your impact on their attitude and belief after the call. This check-in will recur bi-weekly until sufficient improvement is seen, based on the judgement of your DSM.

4. Communication
   ○ You are expected to communicate effectively and proactively with me on a consistent basis, this includes responded positively to coaching and feedback in a timely fashion, and communicating effectively with team mates

5. Meet administrative deadlines
   ○ You are expected to complete the administrative deliverables before the deadline set by your DSM.
   ○ You will need to communicate proactively to your DSM at least 3 business days before the deadline if deadline extension is needed. The original deadline should be respected until you reach an agreement with your DSM.

As a result of receiving this disciplinary action, I will document this action in your Performance Management year-end summary and you will be deemed as not sufficiently meeting expectations for performance for 2019  You will be ineligible for a base pay increase, promotional consideration, and Total Equity Program ("TEP") grant, if applicable, for 2019.

Jones v. Lilly 000026

In addition, you will be ineligible for any Incentive Pay under the Premier Rewards Plan as described below, regardless of the duration of your probationary period:

 (i) if you are normally eligible for quarterly incentive payouts, you will be ineligible for any Incentive Pay for this Financial Quarter and the following three Financial Quarters;

 (ii) if you are normally eligible for biannual payouts, you will be ineligible for any Incentive Pay for this Financial Semester and the following Financial Semester;

 (iii) if you are normally eligible for a mid-year draw plus an annual payout, you will be ineligible for any Incentive Pay for your next draw period and annual payout; and

 (iv) if you are normally eligible for a year-end payout, you will be ineligible for your next annual payout.

Failure to meet these expectations and to sustain acceptable performance may lead to further disciplinary action, but I am confident in your ability to improve. I am here to provide coaching on improving your performance, but success is ultimately your responsibility. Please feel free to contact Grace Faulkner at 317-276-2159, or me for assistance.

_____      10/16/2019
David Sun, District Sales Manager    Date

I have read and understand this Probation.    I read the document to Tanjaneka Jones with HR's presence. Tanjaneka Jones refused to sign.

_____
Tanjaneka Jones    Date

David Sun
10/16/2019

Jones v. Lilly 000027

JA180

Faulkner, Grace                                    June 29, 2022

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


TANJANEKA JONES              :

          Plaintiff          :

v.                           :   20-CV-03564 (GJH)

ELI LILLY AND COMPANY        :

          Defendant          :

--------------------------X


          Deposition of GRACE FAULKNER, held on

Wednesday, June 29, 2022, commencing at 10:00 a.m EST

via Zoom before Linda M. Bahur, Notary Public.


Reported by:  Linda M. Bahur, RPR

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

Faulkner, Grace                                         June 29, 2022

2

```
 1   A P P E A R A N C E S:

 2   ON BEHALF OF THE PLAINTIFF:

 3        Janice Williams-Jones, Esquire

 4        Law Office of Janice Williams-Jones

 5        3545 Ellicott Mills Drive

 6        Suite 308

 7        Ellicott City, Maryland 21043

 8        (410) 203-1246

 9        (410) 203-2301 (fax)

10        Lawofficeofjwjones@gmail.com

11

12   ON BEHALF OF THE DEFENDANT:

13        Sarah K. Wake, Esquire

14        McGuireWoods LLP

15        77 West Wacker Drive

16        Suite 4100

17        Chicago, IL 60601-1818

18        (312) 849-8238

19        swake@mcguirewoods.com

20

21

22   Also present:  Tanjaneka Jones
```

Henderson Legal Services, Inc.

JA182

Faulkner, Grace                                      June 29, 2022

3

1                        I N D E X

2

                    E X A M I N A T I O N
3
     Witness Name                              Page
4
     Grace Faulkner
5
         By Ms. Jones ........................... 4
6

7                      E X H I B I T S

8    Exhibit     Description                    Page

9    Exhibit A   Disciplinary Action policy, pages . 29

10               17-18 of 242 of employee handbook

11   Exhibit B   Disciplinary action policy, pages . 29

12               16-17 of 243 of employee handbook

13   Exhibit C   Case record re complaint of ....... 29

14               retaliation, pages 1-29

15   Exhibit D   Case notes re Ching Wei Sun ....... 65

16               Interview by Grace Faulkner

17   Exhibit E   Case notes re Ching Wei Sun  ...... 65

18               Interview by Stephanie Long

19

20

21

22

JA183

Faulkner, Grace                                    June 29, 2022

4

```
1                 P R O C E E D I N G S
2    Whereupon,
3                    GRACE FAULKNER
4    having been first duly sworn, was examined and
5    testified as follows:
6                    EXAMINATION
7    BY MS. JONES:
8         Q    Good morning.  Ms. Jones.  How are you
9    doing?
10        A    Good morning, everyone.  Good morning.
11        Q    Good morning, Ms. Faulkner.  I'm Janice
12   Williams-Jones.  I'm the attorney for Tanjaneka Jones.
13   How are you doing this morning?
14        A    I'm good.  How are you?
15        Q    Fine.  Have you ever been deposed before?
16        A    Yes, I have.
17        Q    Okay.  So I'm just going to go over the
18   rules of your deposition, what your counsel probably
19   discussed with you.  But, you know, certain things
20   like you have to make sure you answer verbally for the
21   record so the court reporter can take it down because
22   she can't take down nods of the head.  If you don't
```

JA184

Faulkner, Grace                                      June 29, 2022

5

1    understand my question, just feel free to ask me to

2    rephrase it, and I will do that.  But if you do answer

3    it, I'm going to assume that, you know, that's your

4    testimony.

5            If you need to take a break at any time,

6    that's perfectly fine.  I just ask that you, if there

7    is a question pending, just answer the question before

8    you take the break.

9            The other thing is try not to talk over top

10   of me.  I know I talk kind of slow sometimes.  Let me

11   finish the question and I'll let you finish your

12   answer.  Okay?

13       A    Okay.

14       Q    All right.  Would you state your full name

15   for the record, Ms. Faulkner?

16       A    Grace Karen Faulkner.

17       Q    And what is your educational background?

18       A    I have a degree from University of

19   Minneapolis in organizational leadership with a minor

20   in psychology.

21       Q    And what type of degree do you have?

22       A    It's a Bachelor of Science.

JA185

Faulkner, Grace                                June 29, 2022

58

1       **A    I don't have any recollection of that.**

2       Q    Can you tell me any steps you took to

3   resolve the problems that were going on between

4   Mr. Sun and Ms. Jones?

5       **A    I had multiple discussions with both of**

6   **them to discuss their concerns.  I followed our**

7   **investigative process to address issues.**

8       Q    So other than talk to the two of them, did

9   you do anything else?  Take any other steps to resolve

10  it?  I mean, you have Ms. Jones saying he's a liar.

11  He's not giving an accurate account of her

12  performance.  What other steps did you take besides

13  talking to the two of them?

14      **A    I interviewed, I believe, five other people**

15  **concerning his performance as a supervisor and I spoke**

16  **to his supervisor.**

17      Q    Okay.  Do you recall that Ms. Jones

18  presented a doctor's note supporting her request for

19  leave when she was under Mr. Sun?

20      **A    I'm not aware of what she may have**

21  **submitted related to her medical needs.**

22      Q    Do you have any duties with respect to

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA186

Faulkner, Grace                                    June 29, 2022

59

1    investigating discrimination complaints for Eli Lilly?

2        A    Yes.

3        Q    What are your duties?

4        A    If a complaint comes in to me, I'm expected

5    to look into it.

6        Q    What does that entail?

7        A    That entails following an investigative

8    process and determining if there's been a violation of

9    company policy.

10       Q    Okay.  So how do you do that?  What steps

11   do you take?

12       A    I interview the person who alleges that

13   there's been an act of discrimination.  I interview

14   any relative witnesses, look at any documentation

15   that's available.  Interview the person that's accused

16   of it.  Consult with subject matter experts.  Take the

17   appropriate actions if there's been a violation.

18   Document my findings.

19       Q    And how many discrimination complaints have

20   you investigated at Lilly?

21       A    I wouldn't know the number.

22       Q    Have you investigated one?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA187

Faulkner, Grace                                June 29, 2022

60

1       A    More than one.

2       Q    More than two?

3       A    Yes.

4       Q    More than five?

5       A    Yes.

6       Q    What is Lilly's policy about taking

7   FAMLA -- strike that.  Do you know what FAMLA is?

8       A    Yes, I do.

9       Q    What is FAMLA?

10      A    Family Medical Leave Act for time off.

11      Q    What's Lilly's policy about reporting time

12  off through FAMLA?

13      A    We have a separate organization that

14  manages any type of protected leave.  They're called

15  Sedgwick and through our Lilly leave and disability

16  center.

17      Q    And how many days before an employee is to

18  report it to Sedgwick under the FAMLA policy?

19           MS. WAKE:  Objection.  Vague.

20      Q    You can answer.

21      A    There's a prescribed number of days that a

22  person -- after which a person needs to report their

JA188

Faulkner, Grace                                    June 29, 2022

61

1   continued absence to the leave center.  I believe it's

2   the eighth working day or the eighth calendar day.

3   I'm not an expert on the leave process myself.

4            MS. JONES:  Okay.  I want to take about a

5       15-minute break and then I'm going to wrap up.

6       So it's 11:40.  Let's just come back at 12.

7       Does that work?

8            THE WITNESS:  Yes.

9            MS. WAKE:  Sure.

10           MS. JONES:  Okay.

11           (Break taken, 11:39 - 11:59 a.m.)

12   BY MS. JONES:

13       Q    Ms. Faulkner, can you tell me the date of

14   the notes that you reviewed for this deposition?

15           MS. WAKE:  Objection.  Vague.

16       Q    You can answer.

17       A    The dates would be on the top of the case

18   note forms.

19       Q    Okay.  What were the dates of your notes

20   that you reviewed for the deposition?

21       A    Each of the case notes that I looked at

22   have different dates.

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

JA189

Faulkner, Grace                                              June 29, 2022

66

```
1     CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Linda M. Bahur, Registered Professional

3     Reporter, the officer before whom the foregoing

4     proceedings were taken, do hereby certify that the

5     foregoing transcript is a true and correct record of

6     the proceedings; that said proceedings were taken by

7     me stenographically and thereafter reduced to

8     typewriting under my supervision; and that I am

9     neither counsel for, related to, nor employed by any

10    of the parties to this case and have no interest,

11    financial or otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 8th day of

14    July, 2022.

15

16    My commission expires August 27, 2023.

17

18

19    _____

20    NOTARY PUBLIC IN AND FOR

21    THE STATE OF MARYLAND

22
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA190

Faulkner, Grace                                        June 29, 2022

67

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4   acknowledge that I have read and examined the

5   foregoing testimony, and the same is a true, correct

6   and complete transcription of the testimony given by

7   me, and any corrections appear on the attached Errata

8   Sheet signed by me.

9

10  _____    _____

11   (DATE)                    (SIGNATURE)

12

13              NOTARIZATION  (If Required)

14  State of _____

15  County of _____

16  Subscribed and sworn to (or affirmed) before me on

17  this _____ day of _____, 20_____, by

18  _____, proved to me on the

19  basis of satisfactory evidence to be the person who

20  appeared before me.

21  Signature: _____

22                          (Seal)
```

JA191

*Lilly*

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

Subject:  Written Warning for Violation

Date: March 13, 2020
To: Brandon Fell
From: David Sun
Cc:  Personal History Folder

**CONFIDENTIAL**

 The purpose of this communication is to document our discussion on 3/13/2020 (during which Amy Waltman, Human Resources representative, was also present) when you received a Written Warning. This disciplinary action is being taken in response to your unacceptable performance.

Specific examples of your unacceptable performance include:

**Serious Compliance Violation to USCIQ-SOP-410-001 Utilizing Resources with HCPs**

During a field ride on February 11, 2020 you were observed using an unapproved app "COVERAGE" during a sales call with an HCP. The use of the "COVERAGE" app was evaluated as against our internal standards for review and approval for use as a promotional material. This app did not go through Lilly internal review and approval process and was deemed by Regulatory as being unapproved use and evaluated as a homemade material. Due to the seriousness of this violation, if you commit another Serious Compliance Violation you will be subject to immediate discharge.

**Violation to USCIQ-SOP-416-001 US Sales Samples and Vouchers**

During a routine inspection after a field ride on February 11, 2020 your refrigerated samples were observed to be stored improperly which can potentially impact product quality. Samples were observed touching the walls of the refrigerator and outside of the mesh flooring which required return of those samples.

**Violation to Global Procedure Using Electronic Resouces**

During a field ride on February 11, 2020 you were observed using two unapproved apps, NOTABILITY and COVERAGE in the conduct of business. The apps, NOTABILITY and COVERAGE, are not approved for use in conducting business on behalf of the company.

**Lack of Communication**

- On 12/16/19, I communicated with you that our field ride will be on 1/14/20. The morning of 1/14/20, I had to proactively reach out to you for your plan for the day and you responded that you forgot about the field ride. Per our district SOP, you should place a calendar invite via Outlook with address and time to meet at least 24 hours prior to the confirmed field ride date.

**Exhibit E**

- As of 3/12/20, you have not uploaded your action plan or routing files onto the team Box for Q1 2020. Per our district SOP, action plan and routing should be updated to the team Box quarterly by the first working day of that quarter.

**Failure to have all Promotional Materials**
- During our field ride on 2/11/20, I observed that you did not have the MVA and additional promotional resources for one of your products. Due to the lack of materials, you were not able to establish the appropriate brand patient for that product effectively.

**Failure to Set-Up Multiple Appropriate Brand Patients**
- On our field ride 2/11/20, I observed that you did not set up a second appropriate brand patients throughout the day. There was a lack of consistency when transitioning and building up to the second product.

**Insufficient HCP Business Meals**
- Based on Concur data, you had 4 total HCP meals in January 2020 and 8 total HCP meals in Febuary 2020. This is below the district SOP expectation of average per week of 3.

In order to improve your performance to an acceptable level, you are expected to satisfactorily meet Performance Management (PM) goals, demonstrate acceptable PM behaviors, and have no future policy, compliance or safety violations and meet the following Performance Improvement Plan (PIP) expectations:

1. Review USCIQ-SOP-410-001 Utilizing Resources with HCPs by 3/20/20 and confirm in email with your supervisor you understand the requirements of the procedure and can comply with those requirements in the future.

2. Review of USCIQ-SOP-416-001 US Sales Samples and Vouchers and USCIQ-TL-416-001-006 Use of the Panasonic Refrigerator and HOBO Temperature Monitoring Device by March 20, 2020 and confirm in email with your supervisor that you understand the requirements of the procedure and tool resource and can comply with those requirements in the future.

3. Review the Global Procedure Using Electronic Resources by March 20, 2020 and confirm in email with your supervisor that you understand the requirements of the procedure and can comply with those requirements in the future.

4. You are expected to adhere to all of the contents of the Washington DC District SOP (Standard Operating Procedures). I will be tracking this on a monthly basis.

5. You are expected to complete all administrative deliverables prior to the deadline set by me. You will communicate with me proactively at least 3 business days before deadlines if an extension is needed.

6. Within 48 hours of coaching/feedback, you are expected to consistently communicate effectively and proactively on a the coaching/feedback received.

7. You are expected to have at least 3 HCP meals per week on a monthly basis; excluding ones scheduled by your partner. Send to me your plan for HCP business meals for that week on every Monday morning.

8. You are expected to have compliant MVAs and additional promotional materials for all of your products. You are expected to utilize these resources on every call. I will assess your progress and provide coaching during our field rides.

9. All HCP dialogues are to be VBS patient-centric. You are expected to set up 2 patients in the majority of your calls (> 60% calls daily). Starting 3/20/20 and continuing every Friday, you will detail a 2-patient dialogue to me to demonstrate progress. You will be responsible for setting up this time with me until sufficient improvement is made. I will also observe your progress on field rides.

As a result of committing a Serious Compliance Violation and other Violations noted:
- I will document this action in your Performance Management year-end summary and you will be deemed as not sufficiently meeting expectations for performance for 2020. I will factor this in when determining your total compensation for 2020.
- A financial penalty will be assessed in the amount of 50% of your Prem1er Rewards annual sales incentive target for 2020. This penalty amount will be deducted from your incentive payouts until 100% of the penalty is paid in full (i.e., if the penalty owed is larger than your next performance payout, the remainder of the penalty will be taken from subsequent performance payouts until 100% of the penalty is paid in full).

Failure to meet these expectations and to sustain acceptable performance improvement as noted may lead to further disciplinary action, but I am confident in your ability to improve. I am here to provide coaching on improving your performance, but success is ultimately your responsibility. Please feel free to contact Amy Waltman at 317-276-6095, or me for assistance.

_____  DAVID SUN          March 13, 2020.
David Sun, District Sales Manager              Date

I have read and understand this warning.
Refused to Sign          3/17/2020
Brandon Fell                Date

the employee does not sign.
_____ DAVID SUN.     March 13, 2020.

JA194

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

TANJANEKA JONES,                              *
                                              *
              Plaintiff,                      *
                                              *
v.                                            *        Case No.: 20-cv-03564(GJH)
                                              *
ELI LILLY AND COMPANY,                        *
                                              *
              Defendant.                      *
                                              *
*      *      *      *      *      *      *      *      *      *      *      *      *

I, Tanjaneka Jones, depose and states as follows:

1.      I am over eighteen years old and competent to give testimony in this case.

2.      I have firsthand knowledge of the statements in my affidavit and would testify to
it if called as a witness at trial.

3.      I am writing this affidavit to provide additional testimony under oath in my
lawsuit.

4.      I am a Black female.

5.      Before joining Lilly in 2014, I had worked in different sales roles and spent the
previous two years in sales for Aramark, Inc., selling refreshments. When I joined Lilly, I had
no prior experience working in the pharmaceutical industry or knowledge of that industry's sales
procedures.

6.      In my first year, I had some difficulty grasping Lilly's procedure.

7.      However, in 2016, 2017, and through February 2018, I received satisfactory
performance ratings and no disciplinary actions, and my overall sales were in the top ten percent
for the mid-Atlantic region.

1



8.      In or around February 2018, Lilly transferred me to a new territory under Jacqueline Porter ("Ms. Porter") when I was eight months pregnant. It was challenging to adjust to my new supervisor,  territory, and customers, because I was heavily pregnant, and the job was physically demanding. However, I did my best to manage my territory, get to know my customers, and continue generating sales for Lilly.

9.      After working for Ms. Porter for only one month, I took three months of maternity leave, from March 21, 2018, until June 3, 2018. I  then took three more months of medical leave for an emergency neck surgery beginning on July 10, 2018 and ending on October 3, 2018. Therefore, I was absent seven of the eleven months I worked under Ms. Porter.

10.     During my maternity leave, Lilly conducted a regional training with its Sales Representatives in March 2018, the main focus of which was pre-call planning strategies. The training took place in Chicago, but I could not attend because I was a few weeks from giving birth.

11.     Two months after I returned from my second medical leave, Ms. Porter gave me a performance evaluation. Although I was in the office for four months that year, my performance evaluation did not reflect my medical absences or my transfer to a new territory with new customers. Instead, Ms. Porter rated me "below satisfactory," allegedly for insufficient customer engagement, as if I had been in the office the entire year.

12.     Before rating me, Ms. Porter accompanied me on one field visit, and she ignored that I had limited opportunities to establish relationships with customers due to my absences.

13.     In my performance evaluation, Ms. Porter did not mention my inability to attend Lilly's important regional meeting and training on pre-call planning procedures due to my pregnancy.

14.    After receiving the unfair performance rating, I went to Lilly's Human Resources Department to discuss my options. Although I told HR that my rating was too low given my long medical absences that year, HR said I could do nothing to change it.

15.    In February 2019, Ms. Porter left, and Mark Hudson became my acting supervisor until June 2019. Mr. Hudson went on two ride-along with me in March and April 2019 and complained about my pre-call planning.

16.    However, in discovery, I learned that Mr. Hudson tried to discipline me and find policy violations or performance problems with me in February 2019 before he ever accompanied me on a ride-along.

17.    In June 2019, Mr. Hudson left, and David Sun became my permanent supervisor. Initially, I welcomed his feedback because I thought he would let me start with a clean slate. I was also optimistic about how Mr. Sun would perceive me because my territory had the top sales results in the Mid-Atlantic region, and my sales were the second highest in the Washington, DC, team District.

18.    In 2019, my sales numbers were much higher than Brandon Fell's, a Caucasian Sales Representative under Mr. Sun.

19.    Therefore, when Mr. Sun placed me on a performance improvement plan ("PIP"), I accepted it without objection because I planned to do whatever was necessary to complete the PIP satisfactorily. Due to the PIP, I was not eligible for promotions.

20.    However, Mr. Sun would not allow me to complete the PIP or explain what he wanted from me. Instead, he was dismissive and hostile toward me, overly critical during sales calls, and minimized my successes.

JA197

21.    He also discredited my accomplishments, including my strong sales record and client relationships. For example, he dismissed the compliment Dr. Donna Eversley, a Black female doctor, gave me during a sales call as not "genuine." He claimed that Dr. Eversley "was just saying what we wanted to hear."

22.    Mr. Sun also manufactured or made up issues about my performance during ride-alongs and falsely documented them in his written summaries. Consequently, even when we verbally agreed that my pre-call planning was excellent in several offices, the notes for his summaries focused more on the made-up problems with my performance. He then placed these summaries in Lilly's records and wanted me to sign them, but I refused.

23.    I frequently complained to Grace Faulkner ("Ms. Faulkner") about Mr. Sun's conduct during weekly meetings with her to discuss my PIP in August, September, and October 2019. I told her he was abusive and dismissive during ride-alongs and lied about my performance, and I initially believed it was due to discrimination because I was a woman.

24.    I also told her that Mr. Sun did not communicate his expectations, wrote me up for turning in an administrative task one day late, and did everything he could to prevent me from completing the PIP.

25.    I also told her that Krystle Allen, a Black female, said Mr. Sun made her cry because he was so negative and unfair during a ride-along. And that William White also said Mr. Sun was hostile toward him, which was shocking since he had worked for Lilly for less than four months.

26.    Ms. Faulkner said she discussed my complaints with Mr. Sun, and I believed her because his demeanor toward me worsened.

4

JA198

27.    While on the PIP, Mr. Sun continued to micromanage me and write false notes about my performance. He was also demeaning toward me during meetings.

28.    During one meeting, I asked a question, and he refused to answer. However, when a White male Sales Representative asked the same questions, Mr. Sun answered him.

29.    Eventually, I reported my concerns to Stephanie Long ("Ms. Long"), another HR Representative, because I did not believe Ms. Faulkner listened to my concerns and tried to help me.

30.    As before, I told Ms. Long that Mr. Sun wrote false information about my performance to prevent me from getting off the PIP and placed me on probation. I also told her he treated other Black and minority female Sales Representatives similarly.

31.    Despite Mr. Sun's abusive and discriminatory behavior toward me, my sales remained higher than most of my Caucasian colleagues on his team.

32.    After I complained to Ms. Long, Richard Ruth (Caucasian male), Lilly's Executive Director of HR, investigated my case.

33.    Ultimately, I realized that Mr. Sun wanted to discharge me. Therefore, I filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on November 13, 2019. My Charge accused Mr. Sun of sex discrimination and retaliation and stated that he placed me on probation and restricted my bonus in retaliation for my complaints to HR.

34.    I involuntarily resigned from Lilly in December 2019 because I believed that Mr. Sun wanted to fire me no matter how well I performed.

35.    During discovery, I learned that Mr. Sun did not discipline Brandon Fell ("Mr. Fell"), a Caucasian male Rep. under his supervision who violated five Lilly policies in 2019.

JA199

36.     Later on, I learned that Jazmine Perry, another Black female Sales Representative, also believed Mr. Sun discriminated against her because of her race. Ms. Perry only worked with me for one month while at Lilly, and I did not know how, but I learned she experienced the same discrimination from Mr. Sun.

37.     I also learned more about Mr. Sun's discrimination against Williams White due to my lawsuit because he was more open about discussing the discrimination after he separated from Lilly.

38.     Based on conversations with Ms. Perry and Mr. White, I firmly believe that Mr. Sun discriminated against me because of my race and sex.

On this 21st, day of November 2022, I declare under penalty of perjury that the preceding statements in my affidavit are true and correct to the best of my knowledge, information, and belief.

Tanjaneka Jones

6

JA200

Schott, Timothy                                    June 10, 2022

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

TANJANEKA JONES,                    )

            Plaintiff,      ) Case No.

v.                                  ) 20-cv-03564(GJH)

ELI LILLY AND COMPANY,              )

           Defendant.      )

REMOTE DEPOSITION OF TIMOTHY SCHOTT

Friday, June 10, 2022

10:00 A.M. EASTERN STANDARD TIME

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

JA201

Schott, Timothy                                    June 10, 2022

6

1   understood it.  Okay?

2       A.   Okay.

3       Q.   Mr. Schott, would you please state your

4   full name for the record, please.

5       A.   Timothy Joseph Schott.

6       Q.   What is your current job title?

7       A.   I am an executive sales representative in

8   the diabetes business unit at Eli Lilly.

9       Q.   And how long have you been an executive

10  sales rep?

11      A.   I was promoted about ten years ago, 2011,

12  2012.

13      Q.   How long have you been with Eli Lilly?

14      A.   21 years, working on 22.

15      Q.   Now, did you start as a regular sales rep

16  that was promoted to senior sales rep?  Is that what

17  happened?

18      A.   I was actually first employed by Lilly at

19  the headquarters in Indianapolis.  I worked for the

20  research and development group as a quality engineer.

21      Q.   And how long were you in that position?

22      A.   For about a year and a half -- about two

Schott, Timothy　　　　　　　　　　　　　　　　June 10, 2022

7

1　years there and about 20 years where I am at now.

2　　　Q.　When you first started in sales, what was

3　your position?

4　　　A.　I was a senior sales representative.

5　　　Q.　Have you ever supervised any employees?

6　　　A.　Not while at Lilly.

7　　　Q.　At Lilly, have you ever acted in the role

8　of supervisor?

9　　　A.　No, I have not.

10　　　Q.　Do you know what I mean by if a supervisor

11　was out, you would step in and be the supervisor?

12　　　A.　So there are times where our managers, the

13　district managers are out and they have, you know,

14　one or more of the more experienced representatives

15　as a first line for the other sales representatives

16　on our team to call if there is a question.  So --

17　and if it is something we can answer, we do so.  If

18　it is not, there is always another manager that we

19　contact, if needed.

20　　　Q.　Are you aware of the difference in duties

21　between an executive sales rep and a senior sales

22　rep?

Schott, Timothy                                    June 10, 2022

8

1      A.   So -- yes.  Yes.

2      Q.   Okay.  So between 2019 and the present, can

3  you explain to me what the difference in duties is

4  between an executive sales rep and a senior sales

5  rep?

6      A.   So a lot of it you can look at as far as

7  what it takes to, you know, as far as promotion and

8  then if you, within your team, if you -- so we all

9  have our core sales results and how we perform our

10  job, and then if you look at like a senior sales

11  representative, you have influence, positive

12  influence on the others to get that promotion within

13  your sales group.

14          To become an executive sales

15  representative, you have so go beyond that where

16  you're making a positive contribution as well,

17  typically, on the aerial level.  If you are going to

18  a senior executive sales representative, you would

19  also need all those core -- do all those core sales

20  responsibilities at a high level, plus have national

21  influence, if you will, positive influence.

22      Q.   Okay.  Let me see if I understand it

Schott, Timothy                                        June 10, 2022

9

1    correctly.  If I'm a sales rep, I need to have

2    positive influence in the area to become a senior

3    sales rep.  Is that right?

4         **A.    Well, within your team, you do.**

5         Q.    Within your team.

6         **A.    That is called the district.**

7         Q.    The district?

8         **A.    Uh-huh.**

9         Q.    But I still have the same core values as a

10   sales rep -- strike that.  You still have the same

11   core competencies as a sales rep and as a senior

12   sales rep.  Is that right?

13        **A.    So the competencies are, as you move up in**

14   **level, the expectation is that you are performing at**

15   **a higher level within those competencies.**

16        Q.    When you say performing at a high level,

17   you mean you are meeting -- like the chat tool.  You

18   are meeting the requirements of the, that kind of

19   thing.  Is that what you mean?

20        **A.    That's part of it.**

21        Q.    Okay.  To go from senior sales rep to

22   executive sales rep, you need to have positive

JA205

Schott, Timothy                                    June 10, 2022

10

1    influence nationally.  Is that right?

2        A.   So that would be a senior executive sales

3    rep.  So typically, going to sales representative,

4    certainly, you would need to have a project or

5    something, you know, that's affecting the area and,

6    hopefully, it will go beyond that as well.

7        Q.   But the sales rep all the way to the senior

8    executive sales rep, they all have to still meet the

9    same core competencies.  Am I right?

10       A.   Yes.  So you will have a combination of

11   sales results and behaviors that are to be expected

12   within those core competencies.

13       Q.   What is the primary responsibility of a

14   sales rep at any level, from the bottom to the top?

15       A.   So the primary responsibility is right from

16   our business card, we are sales representatives.  So

17   that is to engage with our customers to generate

18   sales.

19       Q.   And we talked about the chat metrics.  Can

20   you explain what those metrics are?

21       A.   So within sales, you have the what we do,

22   which is we are sales representatives to help

JA206

Schott, Timothy                                    June 10, 2022

11

1   generate sales for the company.  Then there is the

2   how we do it.  Within the how, there's a host of

3   expectations, everything from your sample

4   accountability to expense reports, to -- like you're

5   talking the chat tool, part of pre-call planning and

6   making sure we're calling on the right customers at

7   the right frequency, and then there's also things

8   like what is referred to as pie.

9       Q.   What is referred to as pie?  What do you

10  mean?  I have never heard that.

11      A.   So within Lilly and in our Red Book, the

12  how we operate, respect for people, integrity,

13  maintain excellence in how we perform our jobs.

14      Q.   So this third category of performing your

15  job, one is called execution excellence.  Do you know

16  what that is?

17      A.   Yes.  So execution will include things such

18  as your call plan.  You have calls per day as a

19  metric for meeting calls per day.  Then there is a

20  metric as well that is looking at what is termed

21  frequency, so making sure that you're calling on the

22  appropriate customers the appropriate number of

JA207

Schott, Timothy                                                    June 10, 2022

12

1   times.

2        Q.   Do you have something called --

3        A.   Pardon me?

4        Q.   Excuse me.  I'm sorry.  I thought you were

5   finished.  You finish.

6        A.   I was just thinking, you mentioned the word

7   "chat," the chat tools.  So within the chat tools,

8   you have your calls per day and then you have your

9   reach or your frequency.

10       Q.   Do you also have HCP meal requirements?

11       A.   Absolutely.  So healthcare provider, HCP,

12  and then there is certainly where we get quality

13  time, if you will, more time with customers is at a

14  breakfast or a lunch and an evening program dinner.

15  So those would be examples of where we have

16  additional time to talk to the physician, because

17  typically during the day, they are seeing patients

18  and we come in the office while they are seeing

19  patients.  Obviously, we always respect their time.

20       Q.   Let me see if I'm right.  You are supposed

21  to have ten calls a day.  Is that right?

22       A.   Well, the calls per day change over time.

JA208

Schott, Timothy                                   June 10, 2022

13

1   It has been as low as eight, as high as ten, so it
2   depends on the order.  It depends on -- there's a
3   number of factors that I guess management uses to --
4   for the calls per day.  But it has been different
5   over time.
6        Q.   Now, do you recall how many calls per day
7   you had to have in 2019 and 2020?
8             MS. WAKE:  Objection to the relevance of
9   this since Mr. Schott was not in Ms. Jones' territory
10  at that time.
11            MS. WILLIAMS-JONES:  Well, he testified
12  that all sales reps had the same core competencies.
13  He didn't say it depends on the territory.
14  BY MS. WILLIAMS-JONES:
15       Q.   Can you answer the question, please?
16            MS. WAKE:  Just to clarify, it is not
17  Ms. Jones territory we are talking about.  Same
18  objection.  Vague.
19  BY MS. WILLIAMS-JONES:
20       Q.   You can answer.
21       A.   I believe, at the time, it was nine calls
22  per day but it might be different from -- for

JA209

Schott, Timothy                                    June 10, 2022

14

1   different districts.  I'm not certain what -- I

2   believe at that time, Tanjaneka was in the

3   Washington, D.C. district so that might be different

4   than what was within the Baltimore district.

5        Q.   Well, what was it in the Baltimore district

6   in 2019 and 2020, the calls per day requirement?

7        A.   I believe it was nine calls per day.

8        Q.   What is it now?

9        A.   8.5 calls per day.

10       Q.   What about meals?  What were the meals?

11  Per month or per day?

12            MS. WAKE:  Objection.  Vague as to the time

13  frame.

14  BY MS. WILLIAMS-JONES:

15       Q.   The meals requirement in 2019 and 2020.

16            MS. WAKE:  Objection.  Vague as to the

17  territory.

18  BY MS. WILLIAMS-JONES:

19       Q.   You can answer.

20       A.   So to clarify, you're asking is there a

21  metric that we need to meet on number of meals that

22  we're bringing in per week or per month?

JA210

Schott, Timothy                                      June 10, 2022

15

1       Q.   Yes.

2       **A.   Is that what you're asking?**

3       Q.   Yes.

4            MS. WAKE:  Same objection.

5            THE WITNESS:  I'm not aware of any hard and

6  fast number within the Baltimore district.  We are

7  expected to have quality interactions with our

8  customers and certainly by bringing in healthcare

9  provider meals, that's the number one way we did

10 quality, extended quality time in general.

11 BY MS. WILLIAMS-JONES:

12      Q.   So you are not aware of a requirement to

13 have 12 HCP meals a month?  You aren't aware of a

14 requirement like that in 2019 and 2020; is that your

15 testimony?

16           MS. WAKE:  Objection.  Vague as to the

17 territory.

18 BY MS. WILLIAMS-JONES:

19      Q.   You can answer.

20      **A.   Okay.  Within the Baltimore district, I**

21 **always do that many or more, but I'm not aware of any**

22 **hard and fast scale.**

JA211

Schott, Timothy                                           June 10, 2022

16

1     Q.   So you aren't aware that that's a

2   requirement of every district in sales?  Is that what

3   you're saying?

4     **A.   So every district is a little different.**

5   **Each territory is a little different.  We are**

6   **expected to, you know, have as many quality**

7   **interactions as possible, and one of the leading ways**

8   **to do that is through healthcare provider meals.**

9     Q.   Just so I'm clear before I leave this area,

10  in your annual wrap-up in 2019, did your supervisor

11  include anything about the number of calls per days

12  you were doing and the number of HCP meals you were

13  having in your wrap-up?

14          MS. WAKE:  Objection.  Calls for

15  speculation.  He doesn't have the document.

16          MS. WILLIAMS-JONES:  It doesn't call for

17  speculation.  He saw it.  He had firsthand knowledge,

18  no speculation.

19          MS. WAKE:  You can ask him if he remembers

20  what it includes but to ask him affirmatively calls

21  for speculation.

22          MS. WILLIAMS-JONES:  Listen.  Don't coach

Schott, Timothy                                                    June 10, 2022

17

```
1   the witness.  I don't want to do that.  Okay?  It's

2   his document.

3   BY MS. WILLIAMS-JONES:

4       Q.   Please answer the question, Mr. Schott.

5            MS. WAKE:  Same objection.  You can answer.

6            THE WITNESS:  So calls per day are

7   something that is included in our end-of-the-year

8   performance as a hard item.  Number of healthcare

9   provider meals would be something that is going to

10  vary, depending upon the district, depending upon the

11  territory.  And if we are meeting or exceeding what

12  the managers -- the district manager determines is

13  appropriate, then there's nothing that I see that

14  would be held against you for that.  But there are

15  certainly expectations that we are doing healthcare

16  provider meals.  That's how we get our quality time.

17  BY MS. WILLIAMS-JONES:

18      Q.   In your wrap-up, there is a discussion

19  about whether or not you are meeting the HCP meals in

20  2019 and 2020.  Isn't that right?

21      A.   I can speak for my territory.  I do a

22  considerable number of HCP meals, and that's not
```

JA213

Schott, Timothy                                          June 10, 2022

38

1    customer's positions -- we are very fortunate at

2    Lilly to have multiple medications to help their

3    patients and making sure they choose -- they are able

4    to do what is the best choice for their patients,

5    regardless of if it is our lead product or not.

6         Q.   Just so I'm clear, for example, if a PC I

7    rep is responsible for Trulicity and a PC II rep is

8    responsible for Jardiance, then the reps given

9    incentives for their primary product at Lilly.  Is

10   that right?

11        MS. WAKE:  Objection as to the time and the

12   territory.

13   BY MS. WILLIAMS-JONES:

14        Q.   You can answer.

15        A.   So within -- for like the time when

16   Tanjaneka was my sales partner, it would be a blend,

17   if you will.  It is weighted so we would actually be

18   incentivized on both but we might have different

19   weightings.

20        Q.   So if it is your primary product, you would

21   have higher weightings.  Right?

22        A.   Yes.  My primary product has the highest

JA214

Schott, Timothy                                    June 10, 2022

39

1    **weighting.  That's correct.**

2        Q.   And that was the same procedure in 2019

3    when you were at Lilly.  Right?

4            MS. WAKE:  Objection again as to the

5    territory.

6    BY MS. WILLIAMS-JONES:

7        Q.   You can answer.

8        **A.   Within my district, then certainly, that's**

9    **the way that it is done.**

10       Q.   Do you have any evidence, sitting here

11   today, that it is any different than any other

12   district in Lilly?

13       **A.   I have no evidence as far as it being**

14   **different, as far as, you know, the weighting of**

15   **products.  I believe that would be -- well, I don't**

16   **believe.  That's something that would be across the**

17   **diabetes business unit.**

18       Q.   Okay.  If a sales rep is not achieving a

19   sales goal on their primary product, would that be

20   seen as not meeting sales expectation?

21           MS. WAKE:  Same objection as to time.

22           THE WITNESS:  So it depends.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA215

Schott, Timothy                                    June 10, 2022

40

1   BY MS. WILLIAMS-JONES:

2       Q.   Okay.  Could you explain?

3       A.   **So sales goals are set by corporate office.**

4   **There's different things that can occur whether a**

5   **sales rep exceeds, meets or is below those**

6   **expectations.  So there may be reasons where -- there**

7   **are different reasons other than just the sales**

8   **representative and what they may be doing, you know,**

9   **exactly where that performance falls.  So . . .**

10      Q.   So it is your testimony, Mr. Schott, just

11  so I'm clear, that a sales rep cannot be meeting the

12  sales goal at Lilly for their primary product but

13  still be meeting sales expectations.  Is that your

14  testimony?

15          MS. WAKE:  Objection.  Vague as to time and

16  calls for speculation.

17  BY MS. WILLIAMS-JONES:

18      Q.   You can answer.

19      A.   **I can speak for what I've seen within the**

20  **Baltimore district and the managers that we have and**

21  **what occurs within the state, if you will, the State**

22  **of Maryland, so, for instance, that can make or break**

JA216

Schott, Timothy                                June 10, 2022

41

1    **you as well.**

2        Q.   So that's true then.  You can still be

3    meeting sales metrics but not meeting the sales

4    goals, depending on other issues.  Right?

5            MS. WAKE:  Same objections.

6    BY MS. WILLIAMS-JONES:

7        Q.   Is that what you're saying?

8            MS. WAKE:  Same objections.  Asked and

9    answered.

10   BY MS. WILLIAMS-JONES:

11       Q.   You can answer.

12       **A.   So the same answer as before, where that is**

13   **possible, yes.**

14       Q.   Are you aware that from time to time, a

15   sales rep might have to work in a territory alone?

16       **A.   Yes.**

17       Q.   Have you ever worked in a territory alone?

18       **A.   Yes.**

19       Q.   While you were working the territory alone,

20   were you required to comply with the cat metric?

21       **A.   The calls per day metrics?**

22       Q.   Yes.

JA217

Schott, Timothy                                    June 10, 2022

42

1       **A.    Yes.**

2       Q.    Were you still required to have a

3    sufficient number of HCP meals per month?

4       **A.    So once again, that is something that is --**

5    **a number of HCP meals, healthcare provider meals, is**

6    **not something that, through the years, that has**

7    **typically been a hard number within our requirements.**

8       Q.    Okay.  Well, how would working alone impact

9    a sales rep metric?

10          MS. WAKE:  Objection.  Calls for

11   speculation.

12   BY MS. WILLIAMS-JONES:

13      Q.    You can answer.  Since you worked alone,

14   you are not speculating but you can answer the

15   question.  How would it affect metrics?

16          MS. WAKE:  Ms. Jones, he can answer for

17   himself.  He can't answer for all sales reps.  You

18   know that.  You are trying to get him to make

19   sweeping statements about all sales reps.

20          MS. WILLIAMS-JONES:  Stop coaching the

21   witness.  You've made your objection, counsel.  I

22   don't need an explanation.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA218

Schott, Timothy                                         June 10, 2022

43

1          MS. WAKE:  You do because you were

2     combative with me about it.  Again, he can't speak

3     for everybody at the whole company, the company

4     across the entire country.

5     BY MS. WILLIAMS-JONES:

6          Q.    You can answer.

7          A.    **When I've been in that situation,**

8     **typically, my calls per day and other -- you have to**

9     **hustle.  I mean, there's a lot more to do.  I'm not**

10    **sure what you are looking for there, but typically,**

11    **your calls and all would, if anything, increase**

12    **because you would cover more ground.**

13         Q.    That makes sense.  Okay.  Are sales

14    incentives -- strike that.  When you're working

15    together in a group of sales reps in a territory, are

16    the sales incentives tied to individual performance?

17         A.    **Sales incentives tied to -- so in my**

18    **territory right now, I have a sales partner and it is**

19    **70 percent Trulicity, 30 percent Jardiance.  Hers is**

20    **70 percent Jardiance, 30 percent Trulicity.  So there**

21    **is overlap but it is not exactly the same.**

22         Q.    So your sales incentive, is it tied to your

Schott, Timothy                                    June 10, 2022

44

1    individual performance or as a group?

2       A.   So sales performance for my territory, I

3    talk about my product, my new products, and then I

4    also talk about my secondary product, and my sales

5    partner talks about her primary product which is

6    different from my primary and her secondary which is

7    my primary.  Then they are both weighted and they are

8    both tied to our incentives.

9       Q.   And you receive sales incentives based on

10   how you perform individually with both products.

11   Right?  You don't get incentivized financially

12   because of what your partner did.  Is that right?

13      A.   So right now, once again, it is weighted.

14   So a portion of what my partner led with and her

15   secondary message definitely -- it is going to be a

16   little different because we each have primary

17   products and our primary product is weighted

18   differently.  But it is important that we both

19   contribute.

20      Q.   Well, let me ask the question this way.

21   How much money you get as a bonus is based on your

22   individual performance in sales.  Am I right about

Schott, Timothy                                June 10, 2022

45

1    that?

2        A.   So at present, I have a sales partner and

3    my meat product is 70 percent of my weighting for my

4    bonus.  The second product I have is 30 percent of my

5    bonus.  So that 30 percent is her primary.  So it is

6    not exactly -- you don't have the same bonus but it

7    can either hurt or help.  It's tied together.

8        Q.   Okay.

9        A.   Does that make sense?

10       Q.   No, not really.  Has what you're describing

11   been the same procedure since you've been at Lilly?

12       A.   So when I first moved to the sales --

13       Q.   Excuse me.  Strike the question.  That's a

14   bad question.  In the last five years, what you're

15   describing as the incentive, has it been that way at

16   Lilly?

17       A.   I would have to go back and look to see,

18   because -- the reason I say that, I'm not trying to

19   be evasive.  The reason I say that is there's times

20   where I have not had a partner, but yet I'm

21   responsible for the territory.  So I'm responsible

22   for all products that occur in there.  Then there are

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

JA221

Schott, Timothy                                      June 10, 2022

70

```
 1           MS. WAKE:  Objection.  Vague and calls for
 2   speculation.
 3   BY MS. WILLIAMS-JONES:
 4       Q.   You can answer.
 5       A.   If is it a product the physician doesn't
 6   use, I don't think it would hurt or help just
 7   to . . .
 8       Q.   Do you know Tanjaneka Jones?
 9       A.   Yes, I do.
10       Q.   How do you know her?
11       A.   She was my sales partner at Lilly.
12       Q.   Do you remember what year you worked
13   together?
14       A.   So I believe that was like around two,
15   three years I think that was 2017 when we had a
16   reorganization and then two, three years prior to
17   that, she was my sales partner, so 2014, roughly.
18   I've had a lot of sales partners, I will be honest.
19   I know Tanjaneka, yes.
20       Q.   When Ms. Jones was your sales partner, did
21   you have an opportunity to observe her performance on
22   sales calls?
```

Schott, Timothy                                    June 10, 2022

71

1      A.    Sure.  At times, we would have a lunch

2  where we would do a lunch together or at times,

3  different representatives have ridden with me.  I'm

4  sure she did, yes.

5      Q.   And what was your opinion of her

6  performance during sales calls?

7      A.    Tanjaneka was a good sales representative.

8  I enjoyed having her as a sales partner.  She was

9  very sharp, good on her feet.

10     Q.   Did the customers ever express any opinions

11  to you about Ms. Jones' sales performance?

12     A.    I don't remember anything specific during

13  the time that she was with me.

14     Q.   Did Ms. Jones regularly communicate with

15  you about sales practices?

16     A.    As sales partners in the same territory, we

17  would communicate on a regular basis.

18     Q.   In 2017, did Mr. Mendoza mention Ms. Jones

19  was in the top 10 percent of the Mid-Atlantic region?

20     A.    I don't recall.  I am not trying to be

21  vague.  I'm sure there were times where -- I don't

22  know.

JA223

Schott, Timothy                                      June 10, 2022

72

1      Q.   Were you ever aware that Ms. Jones was

2  placed on a PIP when she was under Mr. Mendoza?

3      A.   On a performance improvement plan under

4  Harold?  I do not remember specifics about a

5  performance improvement plan.

6      Q.   Okay.  Do you know why Ms. Jones was

7  transferred out of your district?

8      A.   I believe that was at the time we had a

9  reorganization.  It was part of what goes on in

10  pharma sales.  Every two, three weeks years, you have

11  some products that are growing, some that are

12  shrinking, different doctors coming in and out of

13  territory, so they rebalance the territories.  And I

14  believe at the time, I think Tanj was living in

15  Laurel and she went to the Annapolis territory, which

16  I believe was closer to her home.

17      Q.   After you stopped working with Ms. Jones,

18  did you continue to speak to her about her job?

19      A.   I'm sure we talked some about job.  We also

20  talked about children.  About that time as well, she

21  gave birth to Chiron.

22      Q.   Do you ever remember speaking to Ms. Jones

JA224

Schott, Timothy                                    June 10, 2022

73

1    about the challenges she was having with her new

2    supervisor, Mr. Sun?

3        A.    I don't remember any specifics related to

4    what was going on.  Sales is -- you know, there's a

5    lot of ups and downs, but I do not recall any

6    specifics other than, you know, he had very high

7    standards.

8        Q.    Do you remember Mr. -- strike that.  Do you

9    remember Ms. Jones telling you that Mr. Sun was

10   abusive?

11       A.    No.

12       Q.    Do you remember Ms. Jones telling you that

13   Mr. Sun was unrealistic about what was required with

14   detailing products?

15       A.    No, not specifically.

16       Q.    Do you remember Ms. Jones asking you for

17   advice about what she should do in trying to work

18   with Mr. Sun?

19       A.    I don't remember any specific

20   conversations.  I know there were -- any time you

21   have a new manager, a new representative, it always

22   takes time to, if you will, figure out your new

JA225

# 2019-11-00050167

**Closed**

**Grace Faulkner**
Owner

**UNITED STATES**
Country Name

**CHING WEI SUN**
Affected Person

**Employee Relations**
Case Type

**Level 1 - Low**
Priority

**2 days and 21 hours**
Duration of Case

**Performance**
Category

## Overview

| | |
|---|---|
| Case Type: | Employee Relations |
| Channel: | Telephone |
| Case Title: | Employee complaining about Leader fairness/style- no finding |
| Description: | During discipline discussions with Tanjaneka Jones (Sr. Sales Rep), she advised that her supervisor (David Sun, DSM) was a liar and was not fair or effective as a leader. I collected information from several other direct reports of SV Sun, his supervisor, and considered information that Tanjaneka provided. The outcome of my inquiry was that there is no evidence that SV Sun is unfair, or a liar, or is ineffective in his leadership. His review of TJ's performance has been based on interactions that he has observed himself as well as feedback coming from customers and peers. |
| Category: | Performance |
| Sub Category: | Performance |
| Sub Category 2: | |
| Status Description: | |
| Priority: | Level 1 - Low |
| Attorney Privilege: | No |

## Resolution

| | |
|---|---|
| Resolution: | Advise |

**EXHIBIT**
7

CONFIDENTIAL

11/23/2020
LILY-JONES001632

**JA226**

Details:

HR Faulkner spoke with Catherine Jones (Sr. Sales Rep) B/F on 10/15/19- I advised I was calling to check in on the territory, and check in on how her new supervisor (David Sun) was doing. Catherine advised that David is the best supervisor she's had so far at Lilly. She said he's very good at managing you where you are and where you need to be. He helps you in areas where you need help. She said that he does a truly awesome job asking what you're struggling with and helping you. He came to her with a full plan which is exactly what she wanted. He really cares. Lets you be yourself. He's great with data and lets you do the talking and the leading but he also gives good advice and guidance. He doesn't try to boss her just because he's the boss. He doesn't make you feel lesser. She thinks he's awesome and gives him 5 stars.

HR Faulkner spoke with Sharon Boggs (Sr. Sales Rep) W/F on 10/15/19- I advised I was calling to check in on the territory, and check in on how her new supervisor (David Sun) was doing. Sharon advised that David has been great. She stated that he's been very engaged with trying to help their team be more cohesive (she is a pod mate of TJ's). He helps them with basic things like routing and basic knowledge of a sales rep, etc. He also helps them see the bigger picture. He knows how to coach, how to make sure they're planning effectively which is something they've struggled with in the past with too much overlap. He knows what he's doing. He checks for clarity and to be sure that what he's communicating is sending the right message. I asked her if she thinks he is sending the right message (English is not his first language). She said he was, that he's never dismissive, is very supportive and keeps things confidential which she appreciates. I asked her to elaborate on her confidential statement. She said that she has recently had to go to him about one of her peers (TJ) because an office complained to her about TJ not giving notice about cancelling a lunch until they called her to ask if it was still on. This is the 2nd time that Sharon has discovered a missed lunch due to the offices complaining. David was very respectful of her reporting this to him without her feeling like she was thrown under the bus. I asked Sharon about the 3rd pod mate (Krystle Allen). Sharon advised that Krystle is great, very communicative and a fantastic performer, while frankly TJ isn't. Sharon advised that when she calls TJ, she can feel that her call is unwelcome, it's not anything TJ says, but the feeling is unmistakable and she thinks it's because TJ must know that the lunch thing must have come from her, though TJ hasn't said anything at all to Sharon about it directly. Sharon has concerns about TJ following policy. On 10/9/19, TJ had a dinner program at a casino which gives Sharon great concern. She told them all she was going to have it during a pod meeting and she was cautioned that a Casino is a real no-no and that she needs to have that checked to be sure it's ok. David specifically told TJ to have it ok'd and TJ said that she cleared it with someone but she didn't say with whom. Sharon brought it up to Mark Hudson who is their compliance person and he said it didn't sound like it would be compliant. (Global Investigations is already aware, has a case and is and working on it.)

HR Faulkner spoke with Krystle Allen (Sales Rep) B/F on 10/15/19- I advised I was calling to check in on the territory, and check in on how her new supervisor (David Sun) was doing. She shared that she has been on the team a little over a year and she has no issues. I asked her how David is as a leader and she said he's a work in progress. I asked her to describe what she meant. She shared that he's a little different from past leaders she's had. His approach is to give more negative feedback than positive, she's used to a more balanced approach. She said that one of the field rides she went on was unpleasant, they did a lunch and made a few calls, he had lots of things to say about her performance and it seemed a little bit attacking vs.

JA227

motivating. I asked her to describe attacking, did he use harsh language or raise his voice, etc? She said no, he didn't raise his voice or use harsh words, he has a monotone voice, it's just that he was criticizing what she'd done and she's very sensitive which she knows but she ended up crying. It was just more negative than positive though he did tell her how he might have done it vs. how she did it. She talked to him about her perception and he apologized to her and expressed he was sorry she was upset, not his intention to upset her. She said that was the only field ride that was upsetting to her and the others (3-4) have been much more pleasant. Other than that, things are great.

HR Faulkner spoke with Sonya Raikar (Sr. Sales Rep) A/F on 10/15/19- I advised I was calling to check in on the territory, and check in on how her new supervisor (David Sun) was doing. Sonya seemed very suspicious of my call (she thought it might be about her personal performance), I re-explained my purpose of my call and she eventually began to share. Sonya advised that David is different then other leaders she's had, more by the book. I asked how often they meet, she said once per month in person, but weekly on calls. She shared that she manages the budget for programs which is not something she's had to do in the past. Her previous supervisor did this and she would help him with it. She advised that she has more admin work to do now over all. She stated that David comes from a different country and he is by the book. He's very different than other supervisors she's had. I asked her if his expectations are clear and reasonable. She stated that they weren't always clear in the beginning but they are clear now. She stated that his expectations are reasonable, just different, and that she knows he's trying to help them all become great. She feels that she can be very open with him. She's currently trying for a promotion and has done a 3 page write up, she offered to go over it with David but he told her he understood all of it and didn't need to go over it with her. She feels like she wants to go over it with him, it's so important to her. I asked her if she'd shared her feelings with him. She said that she hadn't and I encouraged her to do so. I asked her if he's a good coach. She stated that he's very different than other coaches she's had and he's new so he doesn't have the understanding of what the "norms" are for their team, territory, etc. She said that he tends to focus more on the things that she needs to do better than the things she's doing very well and that can be demotivating, at least it has been for her. She stated that he talked to her about not having cell control installed and having a sample discrepancy - other supervisors might not have emphasized it so much with her. I asked if she finds him to be respectful. She stated that he is and she knows he has great intentions. I asked if there was anything she would find beneficial for the team. She stated that she would like more big team interactions to keep everyone on the same page. I asked if she had suggested that. She said that she had not. I encouraged her to do so.

HR Faulkner spoke with Catherine Stilwell (Exec Sales Rep) W/F on 10/15/19- I advised I was calling to check in on the territory, and check in on how her new supervisor (David Sun) was doing. She shared that she has been very pleased with him. She is impressed with his communication style. He's been very supportive for her personally, helping her work on areas that she has identified. He's a different kind of leader, one she considers to be a breath of fresh air. There's a pervasive culture of "this is how Diabetes does things" which hasn't been good. There will be some growing pains as he makes changes but the changes are good. She shared that he frequently consults with her on communications he's preparing for the team, she is the most senior person on the team, which she thinks is a great sign of his understanding and desire to make sure that he is addressing matters in a

CONFIDENTIAL                                                                    LLY-JONES001635

JA228

clear and consistent way.  He does have different expectations than other leaders and he's more analytical, more into the details and he uses data to give them a different perspective.  He helps them understand why they need to do things vs. just trying to coax them into it.  She said that he's very interested in "new starts" which she believes is coming from the top leaders.  I asked her about his coaching style.  She expressed that he is not a cheerleader and doesn't praise as freely as other leaders she's had.  He takes a more balanced approach.  He's pointed out things to her that others might not have noticed which she finds valuable.  He's very astute, respectful, but will dig into any issue if he's concerned.  I asked if it seems that he's more critical of women.  She stated that she knows he's addressed performance issues with the males, one of them has mentioned it to her.  He's a good listener, really retains what is said from one conversation to the next.  Even if he doesn't agree with her, he'll listen and discuss with her.  He's trying to make the team better, lots of people were babied for a long time and now they're not being babied.  I asked if he seems consistent, she stated that she believes so.  His expectations are higher for the team than previous leaders and if someone is sensitive or not doing well, they may not prefer his style, but he's trying to help them improve and the things he's asking them to do are things they should have been doing all along.  I asked her if she knows who may be struggling from a performance perspective.  She said that William has told her that he's on a plan with David.  Brian also struggles, not meeting metrics.  Brian struggles with business ownership.  Tanjaneka is another person who struggles and has struggled with several leaders.  Jax and Mark (previous supervisors) tended to be more the cheerleader type.  David is buttoned up and serious.

HR Faulkner spoke with Christina Lugo Vega (Director) on 10/18/19 - I advised of the comments that Tanjaneka had made and that I had contacted several of David's team to get their perspective.  I shared that I do no find any inappropriate behaviors on his part.  Christina advised that David is doing exactly what she's been asking him to do which is to add more structure to the team and hold people accountable (where they may not have been held accountable before).  I advised that one thing she might consider coaching on is that if people are easily demotivated, his style of being in the details and providing more corrective feedback than they're used to may be a big change for them and could possibly affect the team if they are used to having a "cheerleader" type of supervisor.

Files

| Files | Created By | Created Date ▼ | Content Searchable |
|-------|-----------|----------------|--------------------|

No records to display.

JA229

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TANJANEKA JONES,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | Case No.: **20-cv-03564(GJH)** |
| | * | |
| **ELI LILLY AND COMPANY,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### AFFIDAVIT OF WILLIAM WHITE

I, William White, depose and states as follows:

1.    I am over eighteen years old and competent to give testimony in this case.

2.    I have firsthand knowledge of the statements in my affidavit and would testify to it if called as a witness at trial.

3.    I am a Black male.

4.    I began working as a Sales Representative for Eli Lilly (Lilly) in or around April 2019 under the supervision of David Sun (Mr. Sun), the District Sales Manager.

5.    In December 2019, I was discharged from Lilly due to Mr. Sun's performance evaluations.

6.    When I started at Lilly, I had never worked as a sales representative in the pharmaceutical industry. As a result, I realized there would be a learning curve, and I worked hard to get up to speed. Therefore, I tried to perform my duties competently and to the best of my ability as a new sales representative with no prior experience.

7.    Despite my efforts, Mr. Sun treated me extremely harshly due to my race.

1

EXHIBIT
9

JA230

8.    At all times, Mr. Sun had a hostile, aggressive attitude toward me that I did not observe when interacting with my Caucasian counterparts.

9.    In addition, Mr. Sun talked "at me" rather than "to me" and created a toxic and hostile workplace for me at Lilly.

10.    For example, on our "ride-along," when Mr. Sun accompanied me on the sales calls, he magnified everything I did incorrectly and minimized the things I did well. He also overly scrutinized my work performance and disregarded my sales accomplishments.

11.    When my sales call went well, Mr. Sun did not encourage me and had little to say. And if he did not like anything I did on the call, he made it appear that everything one wrong.

12.    Mr. Sun also made inappropriate comments to me while we worked together in the field. For instance, he told me he "did not like my style" without explaining his meaning and falsely accused me of lying about obtaining the signatures I needed.

13.    Several times, Mr. Sun falsely accused me of lying and behaved like he was my parent rather than my supervisor.

14.    In my opinion, Mr. Sun was a racist and disingenuous supervisor. However, since I was a new sales representative and did not want to lose my job, I did not feel comfortable complaining about Mr. Sun to HR. Instead,  I thought my complaint would be perceived as troublemaking, reflecting poorly on me.

15.    As a result, I tried to bear the situation as best I could despite Mr. Sun's false claims about me and his discrimination and hostility toward me.

16.    For example, I had difficulty completing the expense report exactly the way Mr. Sun wanted it because I had not done it many times before. In one instance, I finished it on time without a receipt, or it was missing a provider's name. Rather than accept what I submitted, Mr.

2

Sun returned the entire expense report and wrote me up for submitting the information untimely when I returned it to him again because it was after the deadline.

17.     At that time, I had been a sales representative in the district for less than four months, but Mr. Sun offered me no assistance or tips on how to improve. Instead, he repeatedly wrote me up for minor infractions and called me a liar whenever I made a mistake.

18.     Moreover, Mr. Sun's tone, demeanor, and attitude toward me were, for the most part, more aggressive and demanding during our ride-along, and I observed him treat other Black sales representatives this way.

19.     By comparison, I observed that he was friendly and spoke nicely to the Caucasian sales representatives. And when I talked to my Caucasian colleague, Vitoria Ajaoudi, a new sales representative, about her experiences with Mr. Sun, she stated he was nice to her.

20.     During my time with Lilly, Mr. Sun documented my performance as if everything I did was wrong, even when I had higher sales numbers than some of my Caucasian colleagues.

21.     Despite how much product I sold, Mr. Sun always gave the false impression that my performance was completely negative and failed to accurately reflect what happened during the call.

22.     At one point, I was interviewed by HR regarding an investigation of Tanjaneka Jones's complaint against Mr. Sun. I told HR that Mr. Sun was hostile to me.

23.     When asked if Mr. Sun discriminated against me, I replied that I did not know but thought it was a 50/50 chance that discrimination played a role.

24.     However, after speaking to Tanjaneka Jones and Jazmine Perry and learning that Mr. Sun treated them the same as me, I am convinced that race played a role in his actions because he never gave me a chance to succeed.

3

JA232

25.    Like Ms. Jones and Ms. Perry, Mr. Sun overly scrutinized my work and wrote only negative things about my performance.

26.    He sabotaged my career with Lilly and did not support or encourage me to succeed. He repeatedly threatened my job and made me feel insecure in Lilly's workplace.

27.    When I discussed what was happening to me with my Caucasian colleague Ms. Ajaoudi, she had the opposite experience with Mr. Sun, finding him supportive and a good supervisor. My race was the only reason for the difference in treatment.

28.    As a result of Mr. Sun's misconduct toward me, Lilly discharged me in December 2019.

29.    I believe Mr. Sun's racial discrimination was the reason for my discharge.

On this _19____, day of October 2022, I declare under penalty of perjury that the preceding statements in my affidavit are true and correct to the best of my knowledge, information, and belief.

_____
William White

4

JA233



| EXHIBIT |
|---|
| C |

# 2019 Wrap-up for Brandon Fell

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Brandon | Last Name | Fell |
| Supervisor | CHING WEI David SUN | Department | WASHINGTON DC DIAB PC DISTRICT |
| Position | Sales Rep-WASHINGTON DC DIAB PC2 | Global ID | 2192680 |

## Goals

Goals

1.1 1. Meet or exceed 2019 Area VOB Goals through Focus and Execution Excellence

### Goal Details

| Organizational Goal | 1. Meet or exceed 2019 Area VOB Goals through Focus and Execution Excellence |
|---|---|

Individual Goal

## Individual Goal

| Individual Goal | · Achieve or exceed Area-level monthly lead indicators<br><br>o 100% to goal on all promoted products<br><br>o 85% minimum reach (monthly) and attainment (quarterly)<br><br>o Average 9 calls per day Nationally—stretch 10 calls per day Mid-Atlantic<br><br>o Enter calls in Veeva daily<br><br>o Review Veeva field note within 48 hours and prior to each field visit<br><br>o Meet and do not exceed monthly Operating Expense (quarterly)<br><br>o Optimized P2P implementation to meet VOB goals and Brand objectives | Due Date | 12/31/2019 |
|---|---|---|---|

Goals

2019 Wrap-up for Brandon Fell



| EXHIBIT |
|---|
| 12 |

Page 1 of 5

CONFIDENTIAL

LLY-JONES001767

JA234

## 1.2 Meet or exceed 2019 Area VOB Goals by Advancing Team Lilly

### Goal Details

| | |
|---|---|
| Organizational Goal | Meet or exceed 2019 Area VOB Goals by Advancing Team Lilly |

Individual Goal

### Individual Goal

| | | | |
|---|---|---|---|
| Individual Goal | · Consistently apply insights from all Employee Journeys in appropriate District and Area forums | | |
| | · Utilize the Inspire recognition Program to drive team culture and inclusivity | | |
| | · Create an individualized development and Territory Action Plan that focuses on the TEAM to drive district results | Due Date | 12/31/2019 |
| | · Demonstration of B.E.C.O.T. (Boldness, Excellence, Collaboration, Ownership, and Trust) Area Leadership Principles | | |

Goals

## 1.3 Meet or exceed 2019 Area VOB Goals by Growing Customer Value and Enhancing HCP Experiences

### Goal Details

| | |
|---|---|
| Organizational Goal | Meet or exceed 2019 Area VOB Goals by Growing Customer Value and Enhancing HCP Experiences |

Individual Goal

### Individual Goal

| | | | |
|---|---|---|---|
| Individual Goal | · Maintain or grow Patient Outcome Measure (2nd fill rate measure) from baseline through consistent application of both the "Start and Stay and "Why, How, Now" approaches | | |
| | · Balance disciplined implementation with commitment to and innovation in multi-channel-engagement | | |
| | · Use tailored VBS as the sole framework for field implementation and sales meeting practice dialogues | Due Date | 12/31/2019 |
| | · Keep patient alive and actively pre-call | | |

*2019 Wrap-up for Brandon Fell*

**CONFIDENTIAL**

LLY-JONES001768

JA235

plan and post call analyze using
PERQS to progress the call

· Appropriately leverage medical
professionalism knowledge to enhance
quality of customer dialogues

· Collaborate actively with district payer
champ to drive local pull through
opportunities for each brand

Goals
## 1.4 Build a culture of #Excellence through personal development

### Goal Details

| Organizational Goal | Build a culture of #Excellence through personal development |

Individual Goal

### Individual Goal

| Individual Goal | - Improve business planning, become a pro at Tableau<br>-Lead team in Jardiance sales results<br>-District Impact through champ role<br><br>Career Goal: S3 promotion | Due Date | 12/31/2019 |

### Employee Highlights

Employees:  Enter performance highlights and key learnings below.

#### Comments by Brandon Fell

Achieved goal as being a leader in Jardiance. Helped teammates throughout the year both in my champ role and discussing pre-call plans with teammates. Provided insight on AAF/OLA meeting with team, organized JDRF event, team party, etc. Helped keep team meetings organized and fun. This year I became a better pre-call planner with tableau and became better at recognizing opportunities. I want to continue to use my strengths of building rapport and relationships inside the office. I would like to get better at challenging providers with more authority.

### Supervisor Documentation

Supervisors should provide concise yet meaningful documentation in the myPM wrap-up form to summarize their assessment of performance for the year.

### Results and Behaviors

Briefly summarize performance considering both business results and behaviors reflective of the Lilly Values. Include next steps to address any performance gaps.

#### Comments by CHING WEI David SUN
Business Results
Territory VOB performance as of September dashboard
Territory YTD attainment: portfolio 103%, Jardiance Family 108%, Trulicity 101%, Basaglar 95%
District YTD attainment: portfolio 104%, Jardiance Family 107%, Trulicity 103%, Basaglar 103%
Area YTD attainment: portfolio 103%, Jardiance Family 104%, Trulicity 102%, Basaglar 106%

*2019 Wrap-up for Brandon Fell*

**CONFIDENTIAL**

LLY-JONES001769

JA236

Nation YTD attainment: portfolio 102%, Jardiance Family 102%, Trulicity 103%, Basaglar 102%
The territory performance has been trending above the nation, on par with the area, and below the district on portfolio basis with bucket 21–40%. You managed to deliver the business results without PC 1 partner in the majority of the time in 2019.

Execution Excellence
The room for improvement is the largest in terms of your execution excellence this year. Your average business meals was 6.5 per month, which does not meet the expectation of our district SOP. You committed to 10 per month in Q4 but did not achieve the goal by missing nearly 2 per month on average. Your average 9.4 calls per day in the second half of the year met the expectation but the reach was not consistently above 85% as required by the district SOP. Your P2P execution was in the bottom 1/3 of the district with 1 P2P this year. The fact that you missed many fundamental metrics is causing performance concerns with negative impact on your entire body of work and an immediate improvement to meet the basic requirement for 2020 is necessary.

Growing Customer Values
You demonstrated good customer facing skills with unique strengths in building rapport and relationships in the office. I also recognized your systematic approach for pre-call planning which enabled your understanding of customer needs and you met the minimum expectation of 10 Veeva Approve Email this year. On the other hand, you could enlarge your impact in front of the customers by enhancing clarify and focus of target patient during your detailing conversation.

Summary
Brandon, you expressed your interests in advancing your career in other division or geography this year. You were given the feedback after the interview to demonstrate 1) top tier sales results year after year, 2) master of your craft in the competency model and VBS and 3) how you make impact on others to become better. More importantly, making sure the administrative part of the job is done properly is the foundation of success.
Reviewing your entire body of work, I see an improvement needed in your fundamental execution. Although you will receive meeting the job expectations for 2019 considering that you ran the territory solo, rapid course of correction is required since limited progress has been made in your behavior changes. The trend is unhealthy for both your business and career and needs your highest sense of urgency for 2020.

## Team Lilly Expectations

Briefly summarize how this employee has exhibited the Team Lilly Expectations (INCLUDE, INNOVATE, ACCELERATE, DELIVER).

Supervisor:  *Identify 1 or more Team Lilly Expectations for continued growth to incorporate into employee's development plan.*

### Comments by CHING WEI David SUN
Culture & Leadership
As the Culture and D&I Champ in the district, you led several initiatives to enhance the culture cohesiveness such as JRDR walk and the culture session in our district meetings. In addition, you participated in the AAF / OLA forum in Indianapolis this year on behalf of the district and shared your insights and experiences on raising awareness of diversity and inclusion in the organization. You met the expectation of leadership behaviors on your level.

## Adherence to Red Book

Document any violation of company expectations outlined in the Red Book (including but not limited to Safety, Quality, Ethics and Compliance, and Company Confidential Information) resulting in discipline during the performance period.

### Comments by CHING WEI David SUN
All Red Book and E&C policies have been upheld.

### Performance Assessment

Answer the following question considering results, behaviors, and adherence to the Red Book.

Has employee sufficiently met job expectations for the performance period?   Yes

### Signature

Employee signature does not imply agreement, only acknowledgement that the Wrap-up discussion occurred.

Employee:  Brandon Fell                                    12/12/2019

Supervisor:  CHING WEI David SUN                 12/12/2019

*2019 Wrap-up for Brandon Fell*

CONFIDENTIAL

LLY-JONES001770

JA237

**CONFIDENTIAL**

LLY-JONES001771

JA238

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

TANJANEKA JONES,                           *
                                           *
                Plaintiff,                 *
                                           *
v.                                         *         Case No.: 20-cv-03564(GJH)
                                           *
ELI LILLY AND COMPANY,                     *
                                           *
                Defendant.                 *
                                           *
*      *      *      *      *      *      *      *      *      *      *      *      *

<u>**AFFIDAVIT OF JAZMINE PERRY**</u>

I, Jazmine Perry, depose and states as follows:

1.      I am over eighteen years old and competent to give testimony in this case.

2.      I have firsthand knowledge of the statements in my affidavit and would testify to it if called as a witness at trial.

3.      I am a Black female.

4.      I began working as a Sales Representative for Eli Lilly (Lilly) in Lynchburg, Virginia, in or around September 2019.

5.      In or around December 2019, I transferred to Lilly's Washington, DC office, working as a new sales representative under David Sun, the District Sales Manager.

6.      At all times, I performed my duties competently and was an excellent Sales Representative for Lilly.

7.      Despite my hard work, Mr. Sun discriminated against me because of my race and treated me more harshly than my Caucasian counterparts.

8.      I noticed this behavior during our "ride-along" when he accompanied me on the sales calls. Even when the call went well or resulted in new business for Lilly, Mr. Sun was

1



hypercritical of my performance. In many cases, he made false claims about how I performed or whether I discussed a particular topic or not. I would describe his performance assessment as dishonest, deceitful, and angry.

9.      Moreover, his tone, demeanor, and attitude were more aggressive and demanding during our ride-along, and I also observed him treat other Black sales representatives this way. When he spoke to the Caucasian sales representatives, his demeanor and attitude changed from angry and aggressive to friendly and engaging.

10.     In addition to dishonestly evaluating my performance verbally, Mr. Sun wrote false information about my overall performance. For instance, after our sales calls, we would verbally discuss what went well or not as well and if there was room for opportunities. However, Mr. Sun documented my performance as if everything went wrong in the written record and did not mention anything positive about my performance during the call. In other words, he gave the false impression that my performance was completely negative and failed to reflect what happened during the call accurately.

11.     After falsely documenting my performance, Mr. Sun used his false and misleading written descriptions to justify his negative comments in my annual performance review. His poor performance review adversely affected my job, prevented me from applying for other jobs at Lilly, and caused me to get lower bonuses.

12.     Aside from the false and misleading performance evaluation, Mr. Sun also over-scrutinized my performance and magnified the slightest mistakes I made compared to my Caucasian counterpart. He repeatedly threatened and used hostile language toward me, such as "it better get done."

2

JA240

13.     When I discussed what was happening to me with my Caucasian colleague Shayna Walko (Ms. Walko), she told me that Mr. Sun supported her and encouraged her success in the district. Although Ms. Walko and I were both new to the district, Mr. Sun did not support my success or encourage me to work there as he did Ms. Walko.

14.     I also found an aspect of Mr. Sun's behavior very disturbing. He would be hostile and aggressive toward me out in the field but act friendly and nice towards me in staff meetings in front of the team. It was almost like a Dr. Jekyll Mr. Hyde experience, but I understood that he was being deceitful.

15.     While employed at Lilly, I spoke to other Black sales representatives who all described the same or remarkably similar experiences with Mr. Sun, including William White, Catherine Jones, and Krystle Allen.

16.     Like me, the Black sales representatives described him as aggressive and hostile toward them, and Mr. White told me he made verbally threatening remarks about his job. The Black sales representatives consistently said that Mr. Sun over-scrutinized their performance or mischaracterized their overall performance in his comments to make it appear that they had not done anything right.

17.     While  Mr. Sun threatened Black employees for minor infractions, i.e., you better do that right, or I'll write you up,  based on my observation, he warned Caucasian employees when they did something wrong, i.e., make sure you get that right next time.

18.     My discussions with other Black sales representatives supported my belief that Mr. Sun treated Black representatives poorly. Like me, they all believed that Mr. Sun was harsher to Black sales representatives and treated them less favorably than Caucasian representatives.

3

19.    Finally, I once discussed my difficulties with Mr. Sun with Indria Gibson, the Regional Director and my mentor at Lilly. During the discussion, I told Ms. Gibson that Mr. Sun was demanding and did not like Black sales representatives.

20.    As a result of Mr. Sun's misconduct toward me, I did not feel that I had job security or could ever advance in my career at Lilly.

On this _____, day of October 2022, I declare under penalty of perjury that the preceding statements in my affidavit are true and correct to the best of my knowledge, information, and belief.

*Jazmine M. Perry*
Jazmine Perry

4

JA242

Schott, Timothy                                June 10, 2022

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

TANJANEKA JONES,              )

          Plaintiff,          ) Case No.

v.                            ) 20-cv-03564(GJH)

ELI LILLY AND COMPANY,        )

          Defendant.          )

REMOTE DEPOSITION OF TIMOTHY SCHOTT

Friday, June 10, 2022

10:00 A.M. EASTERN STANDARD TIME

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA243

Schott, Timothy                                    June 10, 2022

86

1       A.    No, she did not.

2       Q.    Now, you spoke to Ms. Jones after she

3  resigned.   Right?

4       A.    She sent me a text message.  I don't recall

5  whether we had a specific -- the only specific

6  incident I remember is one of the offices wanted to

7  see a picture of Chiron and she sent that to me.   I

8  gave her feedback.

9       Q.    How did you become aware Ms. Jones resigned

10  from Lilly?

11       A.    As I recall, she contacted me and said

12  that, you know, she's had enough and that's it.   I

13  don't even know whether she -- I thought she left on

14  her own.  I didn't realize or I don't know whether

15  she was actually fired or left on her own.   My

16  understanding is she left on her own.

17       Q.    Were you surprised when she left?

18       A.    I was disappointed because I considered her

19  a good sales partner and I consider Tanj a friend.

20  From a surprise standpoint, it is a tough industry

21  and there's lots of really talented people coming and

22  going.  So, no.  The reason I guess I wasn't

Schott, Timothy                                    June 10, 2022

87

1  surprised as well with Tanj is as talented as she

2  was, it didn't seem to matter what manager she was

3  under.  She always -- it was difficult for her to

4  take constructive criticism.  You have to have a

5  thick skin because managers are going to constantly

6  push us to be our very best, and she struggled with

7  constructive criticism, regardless of the manager.

8      Q.   Do you have a specific recollection of

9  speaking to Ms. Jones after she resigned?

10     A.   I don't recall whether it was right before

11 or right after, but I do remember there was no

12 communication with her.  She did reach out and let me

13 know.

14     Q.   Do you recall during that conversation

15 anything that Ms. Jones told you about why she

16 resigned?

17     A.   Just that she had had enough and -- I don't

18 recall specifics from -- it is a hard -- it is a

19 tough industry.  There's a lot of sales

20 representatives that come in and a lot of very good

21 sales representatives that leave, but I don't

22 remember a specific conversation other than she had

Schott, Timothy                                      June 10, 2022

88

1   had enough and she was leaving.

2        Q.   Do you remember that Ms. Jones told you she

3   was tired of Mr. Sun overly scrutinizing her?

4        A.   I don't remember specifics.  That would be

5   -- we worked very closely with our managers, so that

6   would make sense.

7        Q.   Do you remember Ms. Jones telling you that

8   Mr. Sun was racist?

9        A.   No, I do not.

10       Q.   Did anyone ever tell you that Mr. Sun was

11  unfair to black people?

12       A.   No.

13       Q.   Did anyone ever tell you that three

14  African-Americans were either fired or quit from

15  Mr. Sun's team?

16       A.   I know that there were others that left.  I

17  don't have any -- with that not being in our

18  district, I don't have any -- we don't get any

19  announcements from other districts when people come

20  and go.  It would just be through sales

21  representatives contacting each other.  Lilly

22  management holds that confidential between the sales

JA246

Schott, Timothy                                    June 10, 2022

89

1  **representative that's leaving.**

2       Q.   Okay, but did anyone ever say to you,

3  listen, three African-Americans on his team,

4  Mr. Sun's team, either quit or were fired at the same

5  time or near the same time, did anyone ever tell you

6  that?

7       **A.   No.  I'm not aware of -- I know in general**

8  **that there's turnover within districts, and I know**

9  **I've been here awhile, but I'm the only one that's**

10 **still with our district.  There's been dozens and**

11 **dozens of sales reps that have come and gone.  I just**

12 **have to say, though, as a point in general, Lilly is**

13 **not racist.  Lilly is -- that is not tolerated.  That**

14 **is --**

15      Q.   Excuse me, sir.  Do you know Mr. Sun?

16      **A.   No.  I'm speaking for Lilly.**

17      Q.   I know, but I'm asking another question.

18 Do you know Mr. Sun?

19      **A.   No, I do not.**

20      Q.   Do you know anything about him or what he

21 believes or anything like that?

22      **A.    I don't even ever recall having a**

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA247

Schott, Timothy                                    June 10, 2022

98

1   our routing in Viva.  You talked about a routing

2   plan, so it holds our routing plan.  We also enter

3   calls into Viva.

4           Viva also handles signatures from the

5   physicians for samples that we have left.  So then

6   that's what is used in your calls per day and stuff

7   like that.

8       Q.   If a sales rep is going to be out of the

9   field for being sick, what are they supposed to enter

10  in Viva during that period?

11      A.   Viva is not very good as far as the number

12  of choices as far as pull-downs.  If I'm sick, what I

13  just put in there is out of territory and then you

14  basically have three choices.  As I recall, you have

15  vacation, you have Lilly meeting, and then you have

16  Lilly training.  So obviously, it is not training.

17  Obviously, it is not an Lilly meeting.  So like

18  today, I put in Lilly meeting into my Viva.  But if

19  you're sick, it is like this big bucket for vacation.

20  But once again, Viva is not the official keeper of

21  vacation.  That's just showing out of field.  The

22  official keeper of vacation is Workday.

JA248

Schott, Timothy                                  June 10, 2022

99

1          **MS. WILLIAMS-JONES:  I don't have anything**

2     **else.**

3               MS. WAKE:  Just a few questions,

4     Mr. Schott.

5                         EXAMINATION

6     BY MS. WAKE:

7          Q.   As you know, Ms. Jones is done asking her

8     questions.  I'll ask just a few and Ms. Jones may

9     have a couple more and then we should be done soon.

10    In 2019, you were not Ms. Jones' supervisor.

11    Correct?

12         **A.   That's correct.  In 2019, yes.  I have**

13    **never been her supervisor.  Yes.  That's right.**

14         Q.   In 2019, you were not in her district.

15    Correct?

16         **A.   That's correct.  I was part of the**

17    **Baltimore district.  She was a part of the**

18    **Washington, D.C. district.**

19         Q.   And those districts have different district

20    sales managers.  Right?

21         **A.   Yes, they do.**

22         Q.   You never prepared a performance review for

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA249

Schott, Timothy                                    June 10, 2022

100

1   Ms. Jones.  Correct?

2       **A.   No.  I never prepared a performance review**

3   **for Ms. Jones.**

4       Q.   Did you ever review a performance review

5   for Ms. Jones that was prepared by someone else?

6       **A.   No.  I've never reviewed a performance**

7   **review for Tanjaneka.**

8       Q.   Did any manager ever consult with you on

9   the contents of Ms. Jones' performance reviews?

10      **A.   No.  No.**

11      Q.   So you don't have any firsthand knowledge

12  of her performance issues while she was at Lilly.

13  Correct?

14      **A.   No.  I don't have any other than just, as I**

15  **explained before, she had some difficulty with some**

16  **of the constructive criticism.  Unfortunately, that's**

17  **part of our job.  We are never good enough.  We are**

18  **always driving.**

19          MS. WAKE:  Nothing further from me.  Thank

20  you, Mr. Schott.

21          MS. WILLIAMS-JONES:  I don't have anything

22  else.

JA250

Schott, Timothy                                June 10, 2022

101

1        MS. WAKE:  Carol, I would like to reserve

2    signature and request a copy of the transcript when

3    it is ready, please.

4            (Whereupon, at 1:30 p.m., the deposition of

5    Timothy Schott concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

JA251

Faulkner, Grace                                    June 29, 2022

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

TANJANEKA JONES              :

       Plaintiff          :

v.                           :   20-CV-03564 (GJH)

ELI LILLY AND COMPANY        :

       Defendant          :

--------------------------X


Deposition of GRACE FAULKNER, held on

Wednesday, June 29, 2022, commencing at 10:00 a.m EST

via Zoom before Linda M. Bahur, Notary Public.


Reported by:  Linda M. Bahur, RPR

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

JA252

Faulkner, Grace                                      June 29, 2022

18

1          MS. JONES:  And I would ask you to please

2      have the witness answer the questions.

3          Q    You can answer.

4          **A    I can't answer that question because every**

5      **case is going to be investigated.  Saying something**

6      **like "ethics policy" is too broad.  I cannot say that**

7      **a person is a discharged every time they violate an**

8      **ethics policy because it just depends on what the**

9      **situation is.**

10         Q    Of course not.  That makes sense to me.  So

11     that's why I'm asking you whether the same

12     disciplinary policy applies even if the person

13     violates some ethics issues where they won't be

14     discharged or if they're tardy or some other

15     performance issue.  That's why I'm asking you that

16     question.

17          It's the same discipline policy; right?

18          MS. WAKE:  Objection.  Very vague.

19     Confusing.

20         Q    You can answer.

21         **A    We have one disciplinary process for**

22     **performance issues.  We have a different policy and a**

JA253

Faulkner, Grace                                    June 29, 2022

19

1  **different process for those who have been determined**

2  **to have committed misconduct.**

3     Q   Okay.  There you go.  All right.  So for

4  first violation of misconduct, you investigate it.

5  That's what you're saying; correct?

6       MS. WAKE:  Objection.  Misstates her

7     testimony.

8     Q   You can answer.

9     **A   We investigate every case that comes to us.**

10    Q   Okay.  And you find the employer -- strike

11  that.

12       If you find that the employee did engage in

13  some ethics violation, do you -- strike that.

14       If you find that the employee engaged in an

15  ethical violation and it's not dischargeable, what is

16  the penalty for that under Lilly's disciplinary policy

17  in 2019?

18       MS. WAKE:  Objection.  Vague.

19    Q   You can answer.

20    **A   It depends on the details of the case.**

21    Q   Okay.  What are the possible disciplinary

22  scenarios?

JA254

Faulkner, Grace                                    June 29, 2022

20

1      **A     If a person is determined to have violated**
2  **a policy or procedure about how sales reps are**
3  **expected to interact with doctors, for example, it**
4  **could result in, I think it's a one-time violation.  I**
5  **mean, you're asking me to speculate about the**
6  **possibilities of a case where there are so many**
7  **details that would determine the outcome of this.  But**
8  **it could range from corrective feedback to separation**
9  **depending on whether it rose with the level of**
10 **misconduct or not.**
11     Q    Okay.  What's in between corrected feedback
12 and discharge?
13         MS. WAKE:  Objection as to the time.  I
14     assume you mean 2019-2020?
15         MS. JONES:  Yes.
16     Q    You can answer.
17     **A    So corrective feedback, written warning or**
18 **a performance improvement plan at the time, it would**
19 **have been probation.  We call it final written warning**
20 **now, but at that time it was called probation.  And**
21 **then termination.**
22     Q    So if you were engaged in a violation of

JA255

Faulkner, Grace                                    June 29, 2022

21

1    some ethical rule, the discipline would be corrective

2    feedback, written warning or probation or discharge.

3    Those were the possible options after an

4    investigation; right?

5         **A    If it rises to the level of misconduct, it**

6    **would be termination.**

7         Q    Automatic termination?

8         **A    Yes.  If it resulted in something that was**

9    **considered performance, it would follow the**

10   **disciplinary path of written warning or probation at**

11   **the time.  Currently called final written warning.  If**

12   **it was something that didn't rise to the level of**

13   **discipline, it would be corrective feedback.**

14        Q    So if I engage in some kind of performance

15   issues, for instance, I'm not meeting my sales goal,

16   what would the possible range of discipline be for a

17   sales rep in 2019 and 2020?

18        **A    It could range from corrective feedback to**

19   **written warning to probation at that time.**

20        Q    So it's the same as if you violate ethics

21   except for the discharge parts; right?

22             MS. WAKE:  Objection.  Misstates her

Henderson Legal Services, Inc.

JA256

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TANJANEKA JONES,                    *
                                    *
            Plaintiff,              *
                                    *
    vs.                             *       Civil Action No. ADC-20-3564
                                    *
ELI LILLY AND COMPANY,              *
                                    *
            Defendant.              *
                                    *
*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION

Defendant Eli Lilly and Company ("Defendant" or "Eli Lilly") moves this Court for summary judgment on Plaintiff Tanjaneka Jones's Third Amended Complaint. ECF Nos. 26, 48. After considering Defendant's Motion and the responses thereto (ECF Nos. 48, 51, 52, 55), the Court finds that no hearing is necessary.[1] Loc.R. 105.6 (D.Md. 2021). For the reasons stated herein, Defendant's motion for summary judgment is GRANTED.

## Factual Background

Plaintiff is a Black woman who was hired as a senior sales representative at Eli Lilly in 2014. ECF No. 48-2 at 29.[2] She was originally assigned to the Baltimore District of Eli Lily's Diabetes Business Unit where she was responsible for selling diabetes related products to physicians. *Id.* at 31-32, 51-52. Plaintiff received a base salary for her role and was also eligible for additional incentive compensation through Eli Lilly's Premier Regards Program. *Id.* at 191-93;

---

[1] On March 2, 2023, this case was referred to United States Magistrate Judge A. David Copperthite for all proceedings in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 (D.Md. 2021). ECF No. 59.
[2] ECF No. 48-2 is a condensed copy of Plaintiff's deposition with four pages of deposition testimony printed to one page. Citations in this Opinion correspond to the deposition page number.

1

ECF No. 51-4.

Plaintiff was originally supervised by Harald Mendoza, a White or Hispanic male. ECF No. 48-2 at 52, 55. In December of 2015, during Plaintiff's first full year at Eli Lilly, Mr. Mendoza issued Plaintiff a written warning for deficient performance. *Id.* at 56-57. Plaintiff was, in Mr. Mendoza's opinion, failing to "consistently engage customers in a meaningful selling dialogue including using active listening skills, asking effective questions and demonstrating agile communications skills." *Id.* at 57. Given these issues, and others, he concluded that Plaintiff did not sufficiently meet her job expectations in 2015. *Id.* at 64-65. This was, however, the only disciplinary warning that Plaintiff received under Mr. Mendoza's supervision, and she subsequently received a satisfactory performance rating in 2016. *Id.* at 66. In July 2017, Andrea Gibson—a Black female—replaced Mr. Mendoza. *Id.* Under Ms. Gibson's supervision, Plaintiff received a satisfactory performance rating in 2017. ECF No. 51-2 at 1.

As part of a company realignment, Plaintiff was transferred to the Washington D.C. District of the Diabetes Business Unit in February 2018 where she was supervised by Jacquelyne Porter—a Black female. ECF No. 52 at 68-69.[3] Shortly after her transfer, Plaintiff went out on maternity leave for three months. ECF No. 51-2 at 2. Although she briefly returned to work in June 2018, Plaintiff had to take medical leave in July 2018 for emergency neck surgery. *Id.* After nearly seven months of leave, Plaintiff returned to Eli Lilly on October 3, 2018. ECF No. 51-2 at 2. Once Plaintiff was back in the sales force, Ms. Porter noticed several performance deficiencies related to Plaintiff's value-based selling and pre-call planning. ECF No. 48-2 at 70. Based on these performance inadequacies, Ms. Porter rated Plaintiff's 2018 performance as "not sufficiently

---

[3] ECF No. 52 is a condensed copy of Plaintiff's deposition with four pages of deposition testimony printed to one page. Citations in this Opinion correspond to the deposition page number.

meeting job expectations." *Id.* at 71. To spark improvement, Ms. Porter set up weekly check-in meetings with Plaintiff and advised her to "invest more time and practice in reviewing studies and data." *Id.* at 70-71.

In February 2019, Mark Hudson became the interim supervisor of Plaintiff's team. ECF No. 52 at 74. Prior to assuming this position, Mr. Hudson was the Mid-Atlantic sales trainer for Eli Lilly's Diabetes Business Unit. *Id.* at 75. In his training roll, Mr. Hudson accompanied Plaintiff on a field ride and trained her in value-based selling. *Id.* at 76, 126. In the months after assuming his new supervisory responsibilities, Mr. Hudson completed two additional field rides/visits with Plaintiff during which he—like Ms. Porter—noticed that Plaintiff's pre-call planning and value-based selling were inadequate. ECF No. 48-2 at 127-32. To correct these deficiencies, Mr. Hudson sent Plaintiff Eli Lilly training literature reenforcing the processes and procedures that sales representatives were expected to adhere to. *Id.* Despite these efforts, Plaintiff's performance in these areas did not improve. Consequently, in May 2019, Mr. Hudson informed Plaintiff that she would be receiving a Performance Improvement Plan ("PIP"). *Id.* at 140. Mr. Hudson was, however, ultimately replaced before the PIP was issued. *Id.*

On June 1, 2019, David Sun took over as the supervisor of Plaintiff's team. *Id.* at 77. During his first month on the job, Mr. Sun accompanied Plaintiff on a field ride and, like Ms. Porter and Mr. Hudson, observed gaps in Plaintiff's pre-call planning and customer facing abilities. ECF No. 48-3 at 1. Due to her "trend of unacceptable performance," Plaintiff was issued a PIP by Mr. Hudson and Mr. Sun on June 28, 2019. *Id.* This disciplinary action was taken despite Plaintiff exceeding her sales goals. ECF No. 26 at ¶ 8. The PIP specifically identified the following performance inadequacies: "[i]nadequate pre-call planning which has led to ineffective discussions with customers, lack of impact and influence during customer interactions"; "[l]ack of technical

3

JA259

knowledge of disease state"; "[i]nability to achieve consistently effective call progression and consistent sales results"; and "[l]ack of demonstrated team leadership at an S3 level." *Id.* Plaintiff was required to meet the following performance management goals to complete the PIP: adhere to value-based selling based on a structured pre-call plan; show sufficient technical knowledge on disease state with customers; conduct efficient dialogue with customers; and conduct monthly communications with her district. *Id.* at 3. Failure to meet these goals could "lead to further disciplinary action." *Id.*

After receiving the PIP, Plaintiff met regularly with Grace Faulkner, a member of the human resources office at Eli Lilly. ECF No. 48-2 at 89. In August 2019, Plaintiff reported to Ms. Faulkner that Mr. Sun was not accurately documenting her performance as he only documented interactions where she "had a slight error, or [] didn't show something properly." ECF No. 52 at 110. She also expressed that Mr. Sun was discrediting her accomplishments, such as her "strong sales record and client relationships." ECF No, 51-2 at 4. Two months later, Plaintiff reported that Mr. Sun was discriminating against her on the basis of her sex and race. ECF No. 52 at 96. She alleged that Mr. Sun's management style was abusive, demeaning, and upsetting. *Id.* at 97. She specifically recalled that Mr. Sun accused her of being "overemotional" and that he dismissed her questions but answered identical questions posed by her white colleagues. *Id.* at 96-98.

Based on Plaintiff's allegations of discrimination, Ms. Faulkner immediately opened an investigation into Mr. Sun's conduct. ECF No. 48-2 at 106. As part of this investigation, Ms. Faulkner interviewed five female members of Plaintiff's team as well as Mr. Sun's supervisor. ECF No. 48-5 at 58.[4] While Plaintiff's teammates described Mr. Sun's management style as

---

[4] ECF No. 48-5 is a condensed copy of Ms. Faulkner's deposition with four pages of deposition testimony printed to one page. Citations in this Opinion correspond to the deposition page number.

4

JA260

"different," none of them accused him of race or sex discrimination. ECF No. 51-7 at 2-4. Additionally, Mr. Sun's supervisor explained that he was "doing exactly what she's been asking him to do which is to add more structure to the team and hold people accountable (where they may not have been held accountable before)." *Id.* at 4. Based on these interviews, Ms. Falkner deemed Plaintiff's complaints unfounded. *Id.* at 1.

The day after Plaintiff reported this discriminatory conduct, Mr. Sun placed her on a three-month probationary period for her "unacceptable performance since being put on a [PIP]." ECF No. 48-4 at 1. Mr. Sun explained that Plaintiff had failed to: "provide positive customer experiences"; "pre-call plan efficiently within the VSB model"; "achieve adequate call progression'"; and "complete administrative deliverables in a timely manner." *Id.* at 1-5. As a consequence of this disciplinary action, Plaintiff would be "deemed as not sufficiently meeting expectations for performance for 2019" and was "ineligible for a base pay increase, promotional consideration, and Total Equity Program grant" as well as "any Incentive Pay under the Premier Rewards Plan." *Id.* at 4-5.

On November 1, 2019, Plaintiff contacted Stephanie Long—another member of the human resources office at Eli Lilly—to report that Mr. Sun was discriminating against her based on her race and sex and was retaliating against her for reporting his behavior. ECF No. 52 at 212. Plaintiff's allegations were ultimately brought to a human resources supervisor, Richard Ruth. *Id.* at 212-13. In her interview with Mr. Ruth, Plaintiff reported that Mr. Sun was not fair and balanced in his feedback, was abusive and dismissive towards women, and was racially discriminatory toward Black employees. ECF No. 51-11 at 3-5. To investigate these claims, Mr. Ruth interviewed William White and Krystal Allen, two Black members of Mr. Sun's team whom Plaintiff alleged were similarly discriminated against. *Id.* at 6; ECF No. 48-2 at 214. Mr. White expressed that there

5

was "a cultural clash between management and the team" and that Mr. Sun did not respect the sales representatives. ECF No. 51-11 at 6. He went on to say that, in his view, it was "50/50" whether Mr. Sun was targeting Black employees. *Id.* However, he later clarified that Mr. Sun's behavior was "not about race" but more about Mr. Sun's "leadership and how he runs the team like a dictatorship." *Id.* Ms. Allen similarly explained that, while Mr. Sun was a micromanager, she did not believe that he was targeting Black members of the team. *Id.* at 7.

While Mr. Ruth's investigation was ongoing, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that she had been discriminated against based on her sex and retaliated against for engaging in protected activity. ECF No. 12-2. After filing this charge, Plaintiff alleged that the frequency and intensity of Mr. Sun's discrimination and retaliation escalated, making the workplace feel "more and more hostile because she was being disciplined for false reasons." ECF No. 18-1 at ¶ 15. Plaintiff ultimately resigned her employment at Eli Lilly on December 5, 2019, after learning that the company was investigating her for compliance related violations. ECF No. 52 at 193-94.

### Procedural Background

Plaintiff filed a Complaint in the Circuit Court for Prince George's County on or around February 28, 2020. ECF No. 23 at 5. She subsequently filed an Amended Complaint on October 21, 2020. ECF No. 3. Defendant removed the action to this Court on December 9, 2020. ECF Nos. 1-6. On January 29, 2021, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 12. Plaintiff filed a Response in Opposition, Motion for Leave to Amend, and proposed Second Amended Complaint on March 11, 2021. ECF No. 18. Plaintiff's proposed Second Amended Complaint alleged Sex Discrimination in violation of Title VII and Maryland Code, State Government Article, § 120-606 (Count I); Sex Based Retaliation in violation of Title VII and

Maryland Code, State Government Article, § 120-606 (Count II); Hostile Work Environment/Harassment in violation of 42 U.S.C. § 1981 (Count III); Race Discrimination in violation of 42 U.S.C. § 1981 (Count VI); Retaliation in violation of 42 U.S.C. § 1981 (Count V); and Constructive Discharge based on race and/or sex in violation of Title VII and 42 U.S.C. § 1981 (Count VI). ECF No. 18-1. Defendant filed its Reply and Opposition to Plaintiff's Motion for Leave to Amend on March 25, 2021. ECF Nos. 19, 20.

On September 30, 2021, this Court granted in part and denied in part Defendant's Motion to Dismiss and granted in part and denied in part Plaintiff's Motion for Leave to Amend. ECF Nos. 23, 24. The Court dismissed Count III, finding that Plaintiff had not sufficiently alleged that Defendant's conduct was "severe or pervasive." *Id.* at 16. The Court also dismissed Count VI, finding that Plaintiff failed to allege a viable constructive discharge claim. *Id.* at 18. Plaintiff was, however, granted leave to amend Counts I, II, IV, and V. *Id.* at 11-14, 19-23.

Plaintiff filed a Third Amended Complaint on October 13, 2021. ECF No. 26. This Complaint alleged the following counts: Sex Discrimination in violation of Title VII and the Maryland Fair Employment Practices Act ("MFEPA"), Maryland Code, State Government Article, § 20-606 (Count I); Sex Retaliation in violation of Title VII and the MFEPA (Count II); Race Discrimination in violation of 42 U.S.C. § 1981 (Count III); and Retaliation in violation of 42 U.S.C. § 1981 (Count VI). *Id.*

Defendant filed the instant Motion for Summary Judgment on October 12, 2022. ECF No. 48. Plaintiff Responded in Opposition on November 23, 2022. ECF No. 51. Defendant Replied on December 21, 2022. ECF No. 55.

JA263

<u>DISCUSSION</u>

**A.    Standard of Review**

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the Court has drawn all reasonable inferences in favor of the nonmoving party, and "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The party seeking summary judgment bears the initial burden of establishing either that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322-24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

8

JA264

**B.      The Race and Sex Discrimination Claims (Counts I & III)**

Defendant first argues that it is entitled to summary judgment on Plaintiff's sex and race discrimination claims brought under Title VII, the MFEPA and 42 U.S.C. § 1981. ECF No. 48-1 at 12-16. Discrimination claims brought under Title VII, § 1983, and the MFEPA are analyzed under the same standards. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004); *Hawkins v. Leggett*, 955 F.Supp.2d 474, 496-97 (D.Md. 2013). To survive summary judgment on these claims, "a plaintiff must either proceed under the mixed-motive framework or the *McDonnell Douglas* burden-shifting framework." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649 (4th Cir. 2021) (citing *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206 n.4 (4th Cir. 2014)). Here, Plaintiff has chosen to proceed under the *McDonnell Douglas* burden-shifting framework. ECF No. 51 at 13.

Under the burden-shifting framework, a plaintiff must first offer a prima facie case of discrimination. *Sempowich*, 19 F.4th at 649. A plaintiff may do so by showing: (1) membership in a protected class; (2) satisfactory job performance; (3) that her employer took an adverse action against her; and (4) that she was treated differently from similarly situated employees outside the protected class. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 626 n.8 (4th Cir. 2020); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Once the plaintiff makes this initial showing, "the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions." *Sempowich*, 19 F.4th at 650 (citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007)). If the defendant does so, "the burden then shifts back to the plaintiff to show that the employer's explanation was 'actually a pretext for discrimination.'" *Id.* (quoting *Lettieri*, 478 F.3d at 646).

Here, Defendant does not contest that, as a Black female, Plaintiff is a member of a protected class. ECF No, 48-1. Defendant does, however, argue that Plaintiff cannot make the

requisite showing on the second, third, and fourth prong of the prima facie case. ECF No. 48-1 at 12-15. For the reasons explained below, the Court finds that Plaintiff has not successfully alleged that she was satisfactorily performing her job or that she was disciplined more severely than other similarly situated employees outside of the protected class. Accordingly, Plaintiff cannot make out a prima facie case of discrimination.

    i.   <u>Satisfactory Job Performance</u>

        Defendant first argues that Plaintiff cannot establish that she was satisfactorily performing her job as she "received coaching and criticism for the same performance deficiencies by four different supervisors . . . over a five-year period." ECF No. 48-1 at 12-13. To establish the satisfactory job performance element of a prima facie case, a plaintiff must show that she was "performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). "Generally, in evaluating whether a plaintiff has met the legitimate expectations of her employer, '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *Rodgers v. Eagle Alliance*, 586 F.Supp.3d 398, 438 (D.Md. 2022) (quoting *King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir. 2003)). A plaintiff need not "show that [s]he was a perfect or model employee." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Moreover, a plaintiff may introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006).

        Plaintiff here argues that she was meeting Eli Lilly's performance expectations as she was reaching and exceeding her sales quota. ECF No. 51 at 17. The Court initially notes that Plaintiff

submits scant evidence demonstrating that she was achieving her sales quota. [5] However, even if this assertion was properly supported, Defendant has introduced evidence that meeting the requisite sales quota was but one of many duties Plaintiff was expected to perform as a Senior Sales Representative. Indeed, Plaintiff agreed during her deposition that she was expected to perform all of the following functions:

- Understand—"Understands the healthcare marketplace; the payer environment; customer (account and stakeholder) priorities; patient, product and money flows; patient disease states and therapeutic options; and Lilly resources, processes, policies and procedures."
- Plan—"Analyzes patient, product and monetary flows; prioritizes opportunities; builds territory and account plans; and secures needed resources."
- Execute—"Executes territory and account plans; achieves territory and account plan goals and completes actions on a timely basis; and regularly assesses and adjusts territory and account plans as needed."

ECF No. 48-2 at 39-40. In light of this array of expectations, the Court finds that achievement of Plaintiff's sales quota was necessary but not sufficient to meet Defendant's legitimate job expectations. More importantly, Plaintiff has not offered evidence showing that she was satisfactorily performing these other job functions. This omission is especially problematic given that *all* of Plaintiff's disciplinary violations relate to her deficient planning and communications skills—not the failure to achieve the requisite sales quota.

Plaintiff also argues that Mr. Sun used subjective criteria to falsely evaluate her performance. ECF No. 51 at 17-19. I disagree. To the contrary, Mr. Sun included in Plaintiff's PIP and Notice of Probation concrete and specific performance deficiencies that he heard about or personally observed. ECF No. 48-4. For example, he notes that the staff at the Maryland Primary

---

[5] In support of this assertion, Plaintiff offers only her own affidavit in which she alleges that "her sales were the second highest in the Washington, DC, team district." ECF No. 51-2 at 3. This is, however, unhelpful as a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [a plaintiff] was meeting [their employer's] expectations." *See King*, 328 F.3d at 149.

11

JA267

Care/Arnold office "brought up to [him] a lunch that was cancelled" by Plaintiff and that he witnessed Plaintiff neglect several provisions of the "Global SR Competency Model" during their field rides. *Id.* at 3-4. Mr. Sun also developed five specific performance management goals to ensure that Plaintiff's performance improved. *Id.* Among other things, he explained that Plaintiff was "expected to develop [a] pre-call plan that is customer centric, sequential and anticipates customer needs, concerns and outcomes of the call." *Id.* at 3. Considering the detailed nature of Plaintiff's disciplinary reprimands, the Court finds that Mr. Sun's criticisms are not too subjective to be considered at the prima facie stage. *See Warch*, 435 F.3d at 517-18 (reasoning that an employer's criticisms were not too subjective when they were based on "concrete, specific observations and accompanied . . . with explicit instructions on how to improve").

In sum, Plaintiff has not offered facts to show that she was satisfactorily performing *all* or even *most* of her legitimate job expectations. Moreover, Defendant has introduced *undisputed facts* that, over her five-year tenure with the company, multiple supervisors—of different genders and races—found that she was not satisfactorily meeting performance expectations. This is evidenced by her written warning, PIP, Notice of Probation, and three unsatisfactory performance ratings. ECF Nos. 48-2 at 56-57; 48-3; 48-4; 52 at 127-32. When evidence of a plaintiff's deficient performance is presented, it is not this Court's role "to sit 'as a kind of super-personnel department weighing the prudence of employment decisions.'" *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Accordingly, the Court finds that there is no genuine dispute of material fact as to this element of Plaintiff's discrimination claim.

ii.    Adverse Employment Action

Defendant next argues that Plaintiff did not suffer an adverse employment action because

she resigned prior to experiencing the "tangible consequences" of her probationary term. ECF No. 48-1 at 14. I disagree. The United States Court of Appeals for the Fourth Circuit has explained that "[a]n adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).  Adverse actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, *or reduced opportunities for promotion.*" *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) (emphasis added). Here, Plaintiff's Notice of Probation made her ineligible for, among other things, "promotional consideration." ECF No. 48-4 at 4-5. Plaintiff therefore worked without the possibility of promotion from the date she received the Notice of Probation through the date that she resigned. Accordingly, the Court finds that she has sufficiently alleged an adverse employment action.

iii.   Disparate Treatment

Finally, Defendant argues that "Plaintiff was treated the same as employees outside her protected classes." ECF No. 48-1 at 14, "Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination . . . '[t]he similarities between comparators . . . must be clearly established to be meaningful.'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 Fed.App'x 745, 748 (4th Cir. 2017) (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)). "In the employee discipline context, a prima facia case of discrimination is established if the plaintiff shows that [she] 'engaged in prohibited conduct similar to that of a person of another race [or sex] . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.'" *Kelley v. U.S. Parcel Serv., Inc.*, 528 Fed.App'x 285, 286 (4th Cir. 2013) (quoting *Moore v. City*

13

*of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).

Plaintiff provides specific evidence of only one comparator, a white male sales representative named Brandon Fell. ECF No. 51 at 18-20. She argues that Mr. Fell received preferential treatment as Mr. Sun gave him a satisfactory performance rating in 2019 despite serious performance deficiencies. ECF No. 51-12. The Court is, however, dubious of this comparison as Plaintiff has not introduced evidence suggesting that she and Mr. Fell were reprimanded for the same or similar conduct. For example, while Plaintiff was consistently disciplined for her deficient pre-call planning skills, Mr. Fell was noted as having "good customer facing skills" and a "systematic approach for pre-call planning which enabled [his] understanding of customer needs." *Id.* at 4. Mr. Fell was, instead, disciplined for, among other things, using unapproved electronic resources and failing to utilize all promotional materials. ECF No. 48-6. These differentiating circumstances leave the Court unable to determine whether any disciplinary disparity is attributable to Plaintiff's sex/race or simply the differences in Mr. Fell's actionable conduct.

Even if Mr. Fell was deemed a proper comparator, Plaintiff has failed to show she was disciplined more severely. Just three months after Mr. Fell was given a satisfactory rating, Mr. Sun issued him a "Written Warning for Violation" of various Eli Lilly policies and procedures. ECF No. 48-6 at 1. In her deposition, Ms. Faulkner explained that at some point after Plaintiff resigned, the Company eliminated "probation" from its disciplinary structure and replaced it with "final written warning." ECF No. 51-8 at 20. Accordingly, despite the difference in title, there is no material difference between Plaintiff's "Notice of Probation" and Mr. Fell's "Written Warning for Violation." Indeed, much of the language explaining the consequences of the disciplinary actions is repeated verbatim in both documents. Like Plaintiff's "Notice of Probation," Mr. Fell's "Written

14

Warning for Violation" required that he be deemed "as not sufficiently meeting expectations for performance" and assigned him specific performance management goals. ECF No. 48-6 at 2-3. Accordingly, while there are differences in the specific terms of the disciplinary documents, the Court finds that Mr. Fell and Plaintiff were both disciplined and that there is no evidence that Mr. Fell was treated more favorably. Therefore, Plaintiff has failed to generate a genuine dispute of material fact on this element of her discrimination claim.

Because Plaintiff has failed to show that she was satisfactorily performing her job and that other employees outside of the protected class were treated more favorably, she has failed to make out a prima facie case of discrimination.

iv.   Legitimate Nondiscriminatory Reason & Pretext

Even if Plaintiff could establish a prima facie case, she has failed to rebut Defendant's legitimate, non-discriminatory reason for placing her on probation: namely, her unsatisfactory performance. As explained above, Plaintiff's performance deficiencies were documented by four different supervisors of various genders and races (including a Black female) over a five-year span. Plaintiff has failed to rebut this evidence by showing that she *was in fact* satisfactorily performing the functions of her job or that other similarly situated employees were more leniently disciplined for similar violations. Accordingly, Plaintiff has failed to show that Defendants proffered non-discriminatory reason is "false" or "unworthy of credence" and therefore, pretextual. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (Pretext can be proven "by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of" race/sex discrimination (citation omitted)); *see also King*, 328 F.3d at 152 (explaining that the plaintiff's comparator pretext argument fails because he did not "present

15

JA271

the first form or proof . . . testimony that the administrators believed the two teachers were similarly situated in the relevant respect").

For all these reasons, the Court finds that summary judgment in favor of Defendant is appropriate as to Counts I & III.

## C.    The Retaliation Claims (Counts II & IV)

Defendant further argues that it is entitled to summary judgment on Plaintiff's retaliation claims brought under Title VII, the MFEPA, and 42 U.S.C. § 1981. ECF No. 48-1 at 16-18. Plaintiff's retaliation claims are all analyzed under the same standard. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *Lowman v. Md. Aviation Admin.*, No. JKB-18-1146, 2019 WL 133267, at *4 (D.Md. Jan. 8, 2019) ("[C]ourts judge discrimination and retaliation claims brought under MFEPA by the same standards as those same claims brought under Title VII."). As with discrimination claims, "[t]he series of proofs and burdens outlined in *McDonnell Douglas* apply to retaliation claims." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). To make out a prima facie case of retaliation, a plaintiff must prove three elements: (1) "that she engaged in a protected activity"; (2) "that her employer took an adverse employment action against her"; and (3) "that there was a causal link between two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

i.    The Prima Facia Case

In the instant case, Defendant does not dispute that Plaintiff engaged in protected activity when she reported Mr. Sun's behavior to Ms. Faulkner. *See Roberts v. Glen Indus Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) ("Complaints raised through internal company procedures are recognized as protected activity."). And, as explained above, restricting Plaintiff's promotional opportunities constitutes an adverse employment action. *See Burlington Northern & Santa Fe Ry.*

16

*Co. v. White*, 548 U.S. 53, 67-68 (2006) (In the context of retaliation, any action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" constitutes an adverse employment action (cleaned up)). Accordingly, to make out a prima facie case of retaliation Plaintiff need only show that her placement on probation was causally connected to her engaging in protected activity.

The United States Court of Appeals for the Fourth Circuit has held that "establishing a 'causal relationship' at the prima facia stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). "An employee may establish prima facia causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* at 335-36; *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) ("[T]emporal proximity suffices to show a causal relationship."). When a plaintiff relies on the temporal proximity between an employer's knowledge of protected activity and an adverse employment action, "the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting that a gap of two months and two weeks between protected activity and an adverse action did "not undercut the inference of causation enough to render [the plaintiff's] prima facie claim unsuccessful.").

Here, Defendant argues that Plaintiff did not complain about Mr. Sun's behavior until after she was informed that she would be placed on probation. ECF No. 48-1 at 17. Not so. Plaintiff has submitted evidence that she first accused Mr. Sun of fabricating false performance reviews in August 2019, two months before she was ultimately placed on probation. ECF No. 52 at 110-11. She also alleges that Ms. Faulkner kept Mr. Sun apprised of her complaints and that the two were

17

"conspiring . . . to get her discharged." *Id.* at 113, 186. While there is no evidence of "conspiracy," there are facts to support Ms. Faulkner's integral involvement in drafting, presenting, and executing Plaintiff's PIP and Notice of Probation. ECF Nos. 52 at 82-83, 171-72; 51-14. Based primarily on the timing of the events, the Court finds that Plaintiff has established prima facia causation, although causation is dubious at best.

    ii.   <u>Non-Retaliatory Reason & Pretext</u>

       Assuming, based upon the timing of these events, that Plaintiff has established a prima facie case of retaliation, the burden shifts back to Defendant to "articulate a lawful, non-retaliatory reason for the adverse employment decision." *Shaffer v. ACS Gov. Servs., Inc.*, 454 F.Supp.2d 330, 335-36 (D.Md. 2006). Here, as explained above, Defendant has done so by detailing Plaintiff's extensive history of unsatisfactory performance. ECF No. 48-1 at 18. Accordingly, "the burden shifts back on the plaintiff to establish that the proffered explanation is pretextual." *Shaffer*, 454 F.Supp.2d at 336. At this stage, Plaintiff "faces a heavier burden than [she] did at the prima facie stage." *Marley v. Kaiser Permanente Found. Health Plan*, No. PWG-17-1902, 2021 WL 927459, at 8 (D.Md. March 11, 2021). To meet her burden, Plaintiff "must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

       In support of her pretext claim, Plaintiff argues that Mr. Sun fabricated false and misleading performance evaluations.[6] ECF No. 51 at 23. This argument is, however, undermined by the great

---

[6] The Court notes that Plaintiff does not clearly argue that Defendant's stated *non-retaliatory* reason for placing her on probation was pretextual. Indeed, the majority of her pretext arguments address Defendant's "*nondiscriminatory reason*" for placing her on probation. ECF No. 51 at 22 (emphasis added).

18

deal of evidence showing that Plaintiff's performance deficiencies began well before Mr. Sun took over as her supervisor. Indeed, Mr. Mendoza, Ms. Porter, and Mr. Hudson all found Plaintiff's performance to be deficient in the same critical areas that Mr. Sun did. Moreover, as explained above, Plaintiff has not rebutted Defendant's evidence with competing evidence that she was satisfactorily performing the functions of her job on a consistent basis. Without such evidence, Plaintiff cannot show that Defendants non-retaliatory reason—her poor performance—is false and therefore pretextual.

Plaintiff has further failed to demonstrate that her participation in protected activity—as opposed to her deficient job performance—led to Mr. Sun placing her on probation. Here, Defendant has introduced undisputed facts that Plaintiff's supervisors took actions to correct her deficient performance well before she engaged in protected activity. *Francis v. Booze Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d. Cir. 2001))). In particular, Ms. Porter rated Plaintiff's performance as insufficient *more than six months* before she engaged in protected activity, Mr. Hudson informed Plaintiff that she would be placed on a PIP *approximately three months* before she engaged in protected activity, and Mr. Sun noted Plaintiff's performance deficiencies *approximately two months* before she engaged in protected activity. *See* ECF Nos. 48-2 at 71, 140; ECF No. 48-3 at 1. This pattern of gradual adverse job actions suggests that placing Plaintiff on probation was simply the rational consequence of Plaintiff failing to complete the PIP. Accordingly, the Court finds that Plaintiff has not proven that her engaging in protected activity was the but-for cause of her placement on probation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar,*

19

JA275

570 U.S. 338, 351 (2013) ("Title VII retaliation claims must be proved according to the traditional principles of but for causation.").

For these reasons, the Court finds that there are no genuine disputes of material fact that have been raised. On this record, a reasonable juror could not conclude that Defendant's stated reason for terminating Plaintiff, namely her poor performance, was pretextual. As the Fourth Circuit has explained: "Workers are shielded from retaliation on account of their assertion of rights protected under Title VII. But a complaining worker is not thereby insulated from the consequences of . . . poor performance." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Accordingly, the Court finds that summary judgment in favor of Defendant is proper on Counts II and IV.

**CONCLUSION**

For the reasons set forth in this Memorandum Opinion, Defendant's Motion (ECF No. 48) is GRANTED. A separate Order will follow.

Date: 7 April 2023

A. David Copperthite
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TANJANEKA JONES, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Civil Action No. ADC-20-3564 |
| | * | |
| ELI LILLY AND COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

In accordance with the accompanying Memorandum Opinion, it is this 7ᵗʰ day of April, 2023, by the United States District Court for the District of Maryland, **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (ECF No. 48) is hereby **GRANTED**; and

2. The Clerk shall transmit copies of the foregoing Memorandum Opinion and Order to counsel of record and **CLOSE** this case.

A. David Copperthite
United States Magistrate Judge

JA277

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Tanjaneka Jones,

     \*

     \*

     v.                         Case No. __ADC-20-3564__

Eli Lilly and Company     \*

     \*

## NOTICE OF APPEAL

Notice is hereby given that __Tanjaneka Jones_____,
(fill in names of all parties who are appealing)

__Plaintiff_____ in the above captioned case, hereby appeals to the
(indicate plaintiff/s or defendant/s)

United States Court of Appeals for the Fourth Circuit the __Memorandum Opinion and Order__
(indicate order or judgment)

entered in this case on __April 7, 2023_____

__May 2, 2023_____
Date

Signature

__Janice Williams-Jones (25701)__
Printed Name and Bar Number

3201 Rogers Ave., Ste 301, Ellicott City, MD 21043
Address

__lawofficeofjwjones@gmail.com__
Email Address

__(410)203-1246__
Telephone Number

__(410)203-1246__
Fax Number

NoticeofAppeal (06/2016)

JA278